**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

ACUTE CARE AMBULANCE §
SERVICE, L.L.C., §
§
     Plaintiff, §
§
vs. §
§     CIVIL ACTION NO. 7:20-cv-217
ALEX M. AZAR II, Secretary, §
UNITED STATES §
DEPARTMENT OF HEALTH §
AND HUMAN SERVICES, §
     Defendant. §

## DECLARATION UNDER PENALTY OF PERJURY OF JUAN CARLOS ROJAS

I, Juan Carlos Rojas, hereby declare:

1.     "My name is Juan Carlos Rojas. I am competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am the President and owner of Acute Care Ambulance Services, L.L.C. ("Acute Care"), which is an ambulance company located in Mercedes, Texas, and have acted in that capacity at all times relevant to the issues underlying the lawsuit.

3.     Acute Care is an ambulance supplier that is certified to participate in the Medicare program.  It has been in operation in the Rio Grande Valley for over 9 years.  It employs some 43 medics, drivers, and administrative staff.  The supplier derives approximately 90% of its revenue from Medicare payments, and it has an estimated value of approximately $2.1 million.

4.     Many of the ambulance transports are due to COVID-19.  The ambulance supplier also has a diverse census of approximately 50 regular patients it transports on a scheduled and/or nonrepetitive basis.   Although it provides emergency transportation when a patient experiences a sudden medical emergency and it endangers his or her health, many patients rely on Acute Care



for nonemergency, scheduled repetitive ambulance services. Medicare covers nonemergency transportation when medically necessary, and patients have a written order from their physicians that ambulance transportation is medically necessary. Ambulance services are necessary for medical transport for these patients to and from life-saving medical treatments. For example, patients that must rely on ambulance transport for dialysis will die if they do not receive this life-saving treatment. These transports are covered when the ambulance supplier furnishing the service obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements have been met. The physician's order must be dated no earlier than 60 days before the date the service is furnished.

5.      On July 24, 2020, Qlarant issued to Plaintiff a notice of suspension of Medicare payments that informed the hospice that CMS had suspended its Medicare payments effective that day. (A true and correct copy is attached hereto as **Ex. A**). The suspension took effect on July 22, 2020. The suspension was brought under 42 C.F.R. §405.371(a)(2) and based upon a "credible allegation of fraud."

6.      CMS based its decision to suspend upon its belief the ambulance supplier had failed to describe beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated. The list of sample claims indicates a *single incident* where a patient's transportation claim was denied due to deficient documentation. As a result, *all* Medicare payments owed to the ambulance company are being withheld pending resolution of the ongoing investigation.

7.      Unfortunately, the suspension action could not come at a worse time. President Donald Trump declared a national emergency over the COVID-19 outbreak on March 13, 2020. Dr. Deborah Birx, White House Coronavirus Response Coordinator, has reported that U.S.

deaths cause by COVID-19 may be catastrophic. She stated that Dr. Anthony Fauci, National Institute of Allergies and Infectious Diseases, has predicted U.S. deaths could range from 1.6 to 2.2 million in a worst-case scenario and projects 100,000 to 200,000 in a best-case scenario. To date, there are now in excess of 200,000 COVID-19 related deaths. The surge in confirmed coronavirus cases is having an overwhelming effect on our nation's hospitals. And it is having a cascading effect on ancillary providers, suppliers and practitioners as well, like our home health agency.

8. Governor Gregg Abbott also declared a state of disaster in Texas due to COVID-19 on March 13, 2020.

9. The surge in confirmed coronavirus cases is overwhelming south-Texas. The Rio Grande Valley is particularly vulnerable to COVID-19 with more than 90% of its residents being Latinx and having one of the highest poverty rates in the State. Chronic health conditions abound. For example, the rate of diabetes is triple that of the national average. Also, it is chronically underfunded and underserved. Recently, Governor Abbott sent Navy teams to assist the area's hard-hit hospitals deal with the COVID-19 outbreak. The valley health community is so overrun by coronavirus that a field hospital or some other type of repurposed facility is now being built because current resources are failing in the fight to curb the COVID-19 outbreak.

10. And the problem is exacerbated by Hurricane Hanna striking the south-Texas coast on July 25, 2020.

11. Dr. Ivan Melendez, Hidalgo County Health Authority, was quoted as saying that "The Rio Grande Valley has become the hotspot of a hotspot of a hotspot."

12. Ambulance companies in the Rio Grande Valley are in crisis due to the pandemic. Hospitals are in "divert" status – unable to accept new patients through ER. Ambulances are

being forced to wait in hospital parking sometimes for as long as 12 hours for bed to become available for their patients.  In early-July 2020, the Texas Emergency Medical Task Force deployed "ambulance strike teams" to the Rio Grande Valley to help the local ambulance companies deal with such problems associated with the COVID-19 emergency.

13.     On August 3, 2020, a Rebuttal Statement was presented by Acute Care to Qlarant informing the UPIC that the Medicare suspension during the COVID-19 epidemic and national emergency that informed the contractor that the Medicare suspension during the COVID-19 national emergency was improper. (A true and correct copy is attached hereto as **Ex. B**).  It explained that the suspension would force the supplier to close and file bankruptcy, and doing so in the midst of the COVID-19 epidemic jeopardized the supplier's patients and was a danger to their life and health.

14.     Shortly thereafter, on September 9, 2020, CMS issued a reply stating that the payment suspension "will not jeopardize the ability of Acute Care's patients to obtain ambulance services" essentially because there are other Medicare ambulance suppliers.  (A true and correct copy is attached hereto as **Ex. C**).  Defendant continued the suspension action and Plaintiff had no right to an administrative appeal or right to a hear to contest this determination.

15.     In early-August, 2020, Acute Care filed suit against HHS alleging procedural Due Process and *ultra vires* claims.  (A true and correct copy of the Verified Complaint is attached hereto as **Ex. D**).  The Verified Complaint alleged that its Due Process and *ultra vires* claims are collateral to the Applicant's administrative process, invoking *Mathews v. Eldridge*, 424 U.S. 319, 326-32 (1976).  Additionally, the asserted claims rely on *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000), and jurisdiction lies because §405 "would not simply channel

review through the agency, but would mean no review at all." In such situation jurisdiction is available under 28 U.S.C. §1331.

16.    On or about **October 1, 2020,** we filed a Motion for Preliminary Injunction with this Court.

17.    Acute Care is struggling to survive financially as it continues to provide ambulance services to our very sick patients during the COVID-19 emergency, and with the unique challenges faced in transporting patients in a coronavirus "hot spot."  The impact of the Medicare payment suspension threatens to force Acute Care's closure and filing of bankruptcy. The provider derives approximately 90% of its revenue from Medicare, and revenues from the federal program are critical to the survival of the ambulance supplier.  Because the supplier is not being paid for medical transports it provides to Medicare beneficiaries, it will soon be compelled to terminate its employees as well as cease operations.

18.    If Acute Care is forced to close, our patients will have to obtain their medical transports elsewhere.  This will cause our patients to obtain ambulance services from other suppliers in the midst of the pandemic when the availability of arranging for such transports is severely limited by COVID-19, and many of our patients may be unable to access essential healthcare under the federal Medicare program.

19.    CMS has imposed the suspension even though its impact will force Acute Care's closure and despite the fact it jeopardizes the health and safety of the provider's patients as well as their access to essential healthcare services under the Medicare program.  During the current healthcare crisis, these patients may only be able to access essential healthcare through our ambulance supplier.  I fear that the ambulance company will not be able to continue servicing are patients without payment for Medicare services much longer, perhaps less than a month, unless

Acute Care obtains the emergency relief it seeks and obtains an injunction against the Medicare payment suspension.

> I declare under penalty of perjury that the foregoing is true and correct."

> EXECUTED on <u>Sept 30</u>, 2020.


_____
JUAN CARLOS ROJAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

ACUTE CARE AMBULANCE            §
SERVICE L.L.C.                  §
                                §
         Plaintiff,             §
                                §
vs.                             §
                                §   CIVIL ACTION NO. 7:20-cv-217
ALEX M. AZAR II, Secretary,     §
UNITED STATES                   §
DEPARTMENT OF HEALTH            §
AND HUMAN SERVICES,             §
                                §
         Defendant.             §

<u>**DECLARATION UNDER PENALTY OF PERJURY OF JAN SPEARS**</u>

I, Jan Spears, hereby declare:

1.      "My name is Jan Spears. I am competent to make this declaration. The facts stated

in this declaration are within my personal knowledge and are true and correct.

2.      I am a healthcare consultant and have more than 35 years of experience in home

health, hospice, ambulance, durable medical supplies and physician billing, collections, medical

compliance, appeals, provider education, and legal defense.  I was the founder of MJS &

Associates, L.L.C., a Texas healthcare consulting firm, with knowledgeable staff certified in

many different healthcare areas, such as CPT and ICD-10 coding, Medicare Reimbursement

rules, Medicaid regulations, and other critical healthcare areas.  MJS & Associates assists

providers and practitioners in nearly every aspect of billing and account recovery, with specific

expertise in the healthcare delivery system, specializing in medical billing, coding, education,

and infusion services for physicians, home health, hospice, and other providers.

3.      In addition, I have acted as an expert witness and testified in various criminal,

civil and administrative cases on Medicare, Medicaid, home health and hospice operations, and



other reimbursement and payment issues. (a true and accurate copy of my Curriculum Vitae (CV) is attached as Exhibit A)

4.     I am familiar with the operations of Acute Care Ambulance Services, L.L.C. (ACUTE CARE), a non-emergency ambulance transport provider that services patients in the greater Rio Grande Valley in Texas including Hidalgo County, which is the most populous county in the Rio Grande Valley. I am aware that the ambulance provider has the appropriate licensure and certification to transport Medicare beneficiaries from their place of residence to dialysis centers for life-saving treatment when medically appropriate and when ordered by the beneficiary's physician. In general, over the past three years, Acute Care has transported approximately 40 patients annually for an average of 3,500 transports during the year. The latest statistics published in the Medicare Payment Utilization and Payment Data: Physician and Other Supplier reports for 2017 substantiates the averages provided above.

5.     The beneficiary's eligibility for non-emergency transport via ambulance is determined by the beneficiary's attending physician in a written order stating that transportation by ambulance is medically necessary for the health and safety of the beneficiary and that no other means of transportation can meet this requirement. The transport must be for the purpose of receiving a Medicare approved service, such as dialysis treatment for the beneficiary suffering from End State Renal Disease, for which dialysis is a life-sustaining treatment. The beneficiary must be "*essentially confined to bed, unable to get up from bed without assistance, unable to walk, and unable to sit in a chair or wheelchair, or need vital medical services during the transport that are only available in an ambulance, such as administration of medications or monitoring of vital functions.*"

6.        Acute Care provides non-emergency ambulance services in Hidalgo County Texas as its primary site of service. Hidalgo County and three other adjourning counties, (Starr, Cameron, and Willacy) comprise the region in South Texas referred to as the "lower Rio Grande Valley." Because of their close geographical connections in miles, non-emergent ambulance providers can serve beneficiaries in any of the counties, not just the county within which the provider is located. Within the region, much of population is Hispanic with a high prevalence of Diabetes in the population. Because many of the resident are immigrants from other countries, health care limitations in the other countries have also increase the occurrences of Chronic Kidney Disease secondary to uncontrolled Diabetes. This leads to higher need for dialysis services as well. The acute need for dialysis is supported by the number of freestanding dialysis providers in Hidalgo, Cameron, Willacy, and Starr counties. According to the Medicare Dialysis Center Compare 2020, there are thirty-seven (37) active Medicare certified dialysis centers active in the four-county region with eight hundred sixty-four (864) stations available for treatment during each day and evening. Of this total, Hidalgo County, the county where Acute Care is geographically located, has twenty-five (25) centers with five hundred fifty-two stations available for treatment.[1] While the number of non-emergency ambulance transports is available by state in the 2017 Medicare Provider Utilization and Payment Report, these numbers cannot be broken into statistics by county. The state of Texas does provide an online listing of ambulance providers by county. While there is no clear distinction between those providers who principally provide emergency transport versus non-emergency transport, the entity names do help delineate between the providers. As such, there are approximately thirty (30) ambulance providers in the region that are available to provide

---

[1] https://data.medicare.gov/Dialysis-Facility-Compare/Dialysis-Facility-Compare-Listing-by-Facility/23ew-n7w9,

transportation for non-emergent, life-sustaining treatment.[2]   Since dialysis treatments are scheduled events, the need for ambulance availability for transport for qualified beneficiaries at appointment times requires access to providers who have the flexibility to work with the center's schedules. To reduce the access for such transportation services is not easily picked up by other providers who are trying to meet scheduling obligations as well.

7.     In my role as a healthcare consultant, I became aware in January 2020 of the novel Coronavirus outbreak and the ensuing COVID-19 epidemic that began to impact the United States, as well as the State of Texas, and the greater-Houston area.

8.     A national emergency because of the COVID-19 pandemic was declared by President Donald Trump on March 13, 2020.

9.     Governor Gregg Abbott also declared a state of disaster in Texas due to COVID-19 on March 13, 2020.

10.     I am familiar with the U.S. Government COVID-19 Response Plan that was issued when the national emergency was declared outlining the coordinated federal response activities for COVID-19.  The Government's response plan makes two things clear: (1) the pandemic "will last 18 months or longer" and (2) the COVID-19 outbreak will result in the implementation of drastic measures to contain its spread throughout the nation.  In fact, society as a whole is now faced with strict containment and social distancing measures for an extended period of time.

11.     Recently, Dr. Deborah Birx, White House Coronavirus Response Coordinator, has reported that U.S. deaths cause by COVID-19 may be catastrophic. She said that Dr. Anthony Fauci, National Institute of Allergies and Infectious Diseases, has predicted U.S. deaths could range from 1.6 to 2.2 million in a worst case scenario and projects 100,000 to 200,000 in a best

---

[2] https://dshs.texas.gov/emstraumasystems/emsdirectory.shtm:EMS Directory, 2020

case scenario. To date, there have been more than 2 million confirmed cases of COVID-19 in the United States with nearing 200,000 deaths recorded. The Rio Grande Valley in Texas has been hit especially hard with the outbreak. Between July 1, 2020 and August 1, 2020, the number of cases in the four-county region doubled (from slightly more than 15,000 to approximately 30,000 reported cases. By September 1, 2020, the number of positive cases exceeded 55,000.  Judge Richard Cortez, County Judge for Hidalgo County issues a "shelter at home" order on August 6, 2020. The initial order has been continued through September 13, 2020. With the surge of confirmed coronavirus cases, America's hospitals are being overwhelmed, and hospitalization for non-COVID-19 patients is greatly limited. This is particularly hard on the Rio Grande Valley. In early August, Texas Governor Gregg Abbott announced the opening of a temporary hospital in the McAllen Convention Center to provide hospital care due to the overwhelmed hospital systems due to the increasing numbers of Covid-19 cases.  According to the John Hopkins data tracking report, the following table represents the status of COVID-19 infections in the four-county region:[3]

| COUNTY | Confirmed Cases | New Cases past two days | Number of Deaths |
|---|---|---|---|
| Cameron County | 21,943 | 141 | 833 |
| Hidalgo County | 29,209 | 127 | 1,355 |
| Starr County | 3,223 | 51 | 145 |
| Willacy County | 1,176 | 2 | 45 |

The pandemic is having a cascading effect on ancillary providers and practitioners, including ambulance providers. There are news reports in the Rio Grande Valley tolling long waits in the ambulance for patients who were in emergency transport because of the hospital's emergency department overload with COVID-19 cases. This places even more difficulty for patients receiving

---

[3] https://dshs.texas.gov/news/updates.shtm. COVID-19 Case Dashboard; 09/10/2020

dialysis services to have the life-saving dialysis treatment when ambulance transports are interrupted during a widespread pandemic. Suspending Medicare payments to any ambulance provider limits the industry in totality from meeting the needs of the most vulnerable at an extreme period of health crisis.

12.     I was informed by Acute Care Medical Services, L.L.C. that by letter from Qlarant dated July 24, 2020, the ambulance provider was notified of a determination to suspend Medicare payment pursuant to 42 C.F.R. § 405.371(a0(2). (A true and correct copy is attached hereto as Exhibit B).  The suspension action alleged a "credible allegation of fraud" based specifically upon a misrepresentation of services billed to the Medicare program.  As a result of the suspension action, all Medicare payments owed to the provider are being withheld pending resolution of the ongoing investigation. This notice of suspension, which is in effect for 180 days or until January 22, 2021, was issued during the highest growth period related to COVID-19 cases in the Rio Grande Valley.

13.     In my experience, the underlying reason for Medicare payment suspension of ambulance services is typically deficient documentation.  The CMS notice letter indicated that the decision to suspend was based upon its belief that "a review of a sample of claims showed the claims failed to meet requirements for Medicare coverage in that *"the documentation submitted to substantiate the claims failed to describe the beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated."* There was only one claim listed as a sample of the findings. There were no beneficiary interview samples cited.  We believe the decision is likely related to deficient documentation. However, the determination to suspend payments based upon the sample was issued before the provider was afforded the opportunity to

appeal the decisions with clarifications to documentation and/or supporting information from other health care providers during the claim period.

14.     Having been advised that more than 90% of Plaintiff's revenues are from Medicare, it is clear to me that the provider cannot sustain operations, and the impact of the Medicare payment suspension threatens to force Plaintiff's closure.

15.     CMS should have found good cause exists not to continue the suspension of Plaintiff's Medicare payments because beneficiary access to items or services would be so jeopardized by a payment suspension as to cause a danger to life or health.  The federal regulation at 42 C.F.R. §405.371(b)(1)(ii) provide that CMS may find that good cause exists not to suspend payments or not to continue to suspend payments to an entity against which there is a credible allegation of fraud if it is *"determined that beneficiary access to items or services would be so jeopardized because such a payment suspension in whole or part as to cause danger to life or health."*  I believe that the arguments presented herein clearly indicate that the situation in the Rio Grande Valley is so dire that to force the closure of medical providers would most definitely (A true and correct copy is attached hereto as Exhibit C).

16.     I strongly believe that good cause exists to not impose the suspension against Acute Medical Services, L.L.C. because the COVID-19 pandemic and the surge of confirmed coronavirus cases is having an overwhelming impact on America's healthcare system, including Texas ambulance providers, especially those servicing the Rio Grande Valley.

17.     While Acute Medical Services, L.L.C. has informed me that that the government's Medicare payment suspension will force the provider to shut down very soon, I believe such action places an even greater burden on the Rio Grande Valley health care community at a time when ambulance services are in greater demand.

18.     It is my opinion that CMS has imposed the suspension even though its impact will force Acute Medical Services, L.L.C. closure and despite the fact it jeopardizes the health and safety of patients of the provider and their choice of this provider and election of hospice to provide them with essential end of life care.

19.     I am especially concerned that during the current COVID-19 outbreak, Acute Medical Services, L.L.C.  patients may be unable to receive dialysis services from an over-burdened health care system in the region they serve. There are not sufficient providers to pick up the slack in medical transportation. Consequently, I believe that the government's Medicare payment suspension will force the provider's closure and jeopardizes the health and safety of Plaintiff's current patients and their access to life-sustaining dialysis care.

I declare under penalty of perjury that the foregoing is true and correct."


EXECUTED on September 10, 2020.


_____

JAN SPEARS

Page **8** of **8**

# VITAE
# FOR
# M. JAN SPEARS

P.O. BOX 630600 • NACOGDOCHES, TX 75964-0600
PHONE 936-559-7234 • FAX 936-560-4652 • E-MAIL JANSPEARS@MJANSPEARS.COM
WWW.MJSASSOCIATES.ORG

## SUMMARY OF EXPERIENCE AND CREDENTIALS

With more than thirty-five years of experience in the health care industry, most of which has been in home health care in various administrative positions, Ms. Spears has gained a wealth of on-the-job experience in process development and system analysis. She has worked for other companies, set-up new home care agencies as a consultant, owned and operated a multi-location home health agency for more than ten years with more than 350 employees and, most recently owned and operated a full-service health care consulting company providing services annually to more than three hundred and fifty health care providers in twenty-three states.

During the past twenty years, Ms. Spears has owned and operated a broad based medical consulting company providing medical billing, collections, clinical record compliance reviews, financial due diligence for acquisition and medical consultation to more than seventy-five clients under investigation by federal and state fraud control units. Ms. Spears' firm consults with more than ten law firms providing services ranging from audit work to process analysis and review for the development of corporate compliance programs consistent with the Office of Inspector General (OIG) guidelines. MJS has billed more than $1,000,000,000 to Medicare, Medicaid and private insurance payers for health care providers across the spectrum of provider types. Ms. Spears employs a team of more than twenty professional staff including registered nurses, accountants, business managers, clinical auditors, certified ICD10 and CPT coders, and information technology network managers and software development staff. The team works in a coordinated fashion to develop business solutions from a multi-faceted approach.

In the past ten years, Spears has testified in more than thirty-five administrative law judge hearings where she served as a qualified expert in Medicare and Medicaid reimbursement issues. In addition, Spears served as a summary witness for the defense in the largest Medicare fraud case involving a physician in U.S. history (United States of America vs Jacques Roy, Case Number: 3:12-cr-00054-L). She also has testified as an expert witness in United States of America vs Mariamma Viju and Viju Matthews (Dallas Home Health). Spears has provided consultation in several other civil and criminal matters settled prior to trial.

Spears is a certified educator in the state of Texas and is the author of several publications on business process and medical policies.

Page 1 of 4



## EDUCATION

| 1971 - 1976 | University of Texas | Austin, TX |
| | SFASU | Nacogdoches, TX |

*Bachelors of Arts Degree: Major: English   Post Graduate work in Business Administration*

## SUMMARY OF EXPERIENCE

**1998 – Present     MJS and Associates,LLC            Nacogdoches, TX**
**Owner and CEO**

- Supervision of staff for medical billing to private insurance, private pay, state Medicaid and federal Medicare programs in home health services, hospice, CORFs/ORFs, pharmacy, DME and health care practitioners

- Coordinated with staff of Associates for training covering medical practices, scopes of operation and maximizing reimbursement

- Certified educator in state of Texas – authored and presented numerous training sessions covering all administrative aspects of home care industry

- Conducts due diligence of home care agencies for prospective buyers, including analysis of findings with recommendations of viability of Seller to Buyer (more than 500 acquisitions to date)

- Works with Buyers and Sellers to complete change of ownership (CHOW) documents for expeditious transfer of ownership interests

- Serves as expert witness for health care litigation cases, including both civil and criminal areas of representation

- Provides billing and medical record audits under attorney client privilege for multiple provider types under investigation of OIG at both federal and state levels; represents client interests in hearings with investigative groups including ALJ hearings

- Authored customized home care policies and procedures for new agencies

- Prepares budgets and financial requirements for new home care agencies

- Conducts mock surveys of home health agencies in preparation for their state/federal audits

- Facilitates the transfer of ownerships for facilities with Medicare participation agreements

- Supervised creation of *The Auditor* software system for home care agencies

- Supervised design and implementation of software billing package for home care industry

- Member and featured presenter/speaker for Texas Association of Home Care (TAHC)

- Featured presenter/speaker for Home Care Association of Louisiana and Southwest Regional Home Care Association – TX, NM, OK, LA, MS

**1987 - 1998    Qualicare of East Texas, Inc.        Nacogdoches, TX**
**Administrator and CEO**

- 11 years as Administrator – C corporation; board member, CEO
- Supervises 10 department chiefs and six locations, with total employees of more than 350
- Superior rating with Texas Department of Health Licensure Division
- Authored policy and procedure manuals for multi-faceted home care programs
- Designed and implemented all data collection tools for clinical applications
- Participated as a site demonstration location for HCFA Prospective Pay Demonstration Project – selected as one of 90 agencies in the nation to study home care optional reimbursement methods under Medicare as a pre-cursor to a prospective pay program.
- Certified as a TQM trainer; implemented model Performance Improvement program using data analysis tools for statistical measurement and process analysis; improved voluntary team participation by 200%
- Thoroughly knowledgeable of current JCAHO standards applicable for home health care
- Developed and implemented clinical paths for home care integrating RN management of care into a comprehensive teaching model
- Integrated fully networked MIS program with remote site data transfers; experienced with HAMS, DocPlus, Lewis Prompt software programs integrated into multi-office applications
- Competent in Medicare/Medicaid cost reporting development, record keeping and appropriate general ledger set-up and management
- Developed comprehensive employee training programs using interactive computer training; scripted and supervised the development of video training for all employees

**1983 - 1987    Americare Professionals, Inc.        Houston, TX**
**Medicare Administrator**

- Provided administrative supervision to Medicare certified home care departments operational in several cities in Texas
- Authored all policy manuals; three specific policies were used as examples by the Texas Department of Health for regulatory compliance
- Opened four site locations offices; performed feasibility studies, prepared budgets, hired supervisory level staff ad implemented processes to meet federal and state licensure requirements;
- Maintained a "zero deficiency" status with TDH for all licensure surveys for five consecutive years

- Represented home care interests in lobbying efforts at state and federal levels; served as liaison for state home care organization
- Developed and supervised a comprehensive consulting division – Americare Professional Consultants – providing feasibility studies for hospitals considering home care departments; consulted directly with several hospital in the development of home care department; provided consultation services for home care departments in trouble with licensure and certification agencies.

**1982 - 1983      Home Health – Home Care.**                    **Orange, TX**
**Administrative Coordinator**

- Provided direct administrative supervision to a region (7 offices) for a multi-state home care company
- Marketed services to physicians, hospitals, and the community through personal presentations to individuals and small groups



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

July 24, 2020

Acute Care Ambulance Service, LLC
1802 Joleigh St.
Mercedes, TX 78570

Re:   **Notice of Suspension of Medicare Payments**
**Supplier Medicare ID Number(s): AMB1342**
**Supplier NPI: 1932471075**
**Record Identifier: PSP-200617-00004**

Dear Acute Care Ambulance Service, LLC:

The purpose of this letter is to notify you of our determination to suspend your Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). The suspension of your Medicare payments took effect on July 22, 2020  Prior notice of this suspension was not provided, because giving prior notice would place additional Medicare funds at risk and hinder our ability to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3).

The decision to suspend your Medicare payments was made by the Centers for Medicare & Medicaid Services (CMS) through its Central Office. *See* 42 C.F.R. § 405.372(a)(4)(iii). This suspension is based on credible allegations of fraud. CMS regulations define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. This suspension may last until resolution of the investigation as defined under 42 C.F.R. § 405.370 and may be extended under certain circumstances. *See* 42 C.F.R. § 405.372(d)(3)(i)-(ii). Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, a medical review of claims submitted by Acute Care Ambulance Service, LLC determined that Medicare coverage guidelines were not met since the documentation submitted to substantiate the claims failed to describe the beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated. Additionally, beneficiary interviews conducted supported that the ambulance services were not warranted.

The following list of sample claims provide evidence of our findings and serve as a basis for the determination to suspend your Medicare payments:

| Claim Control Number (CCN) | Date(s) of Service | Amount Paid | Basis for Selected Claim |
|---|---|---|---|
| 452919176129030 | 06/24/2019-06/24/2019 | 135.42 | Beneficiary interview indicated this |



14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254-1613  •  www.qlc



EXHIBIT
B



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

| | | | this beneficiary had their claim denied as part of a postpayment medical review because the run sheets that failed to document a detailed objective description of the patient's symptoms and physical findings to support meeting the Medicare requirements for an ambulance service. |
|---|---|---|---|

This list is not exhaustive or complete in any sense, as the investigation into this matter is continuing. The information is provided by way of example in order to furnish you with adequate notice of the basis for the payment suspension noticed herein.

Pursuant to 42 C.F.R. § 405.372(b)(2), you have the right to submit a rebuttal statement in writing to us indicating why you believe the suspension should be removed. We request that you submit this rebuttal statement to us within 15 days. You should include with this statement any evidence you believe is pertinent to your reasons why the suspension should be removed. Your rebuttal statement and any pertinent evidence should be sent to:

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

If you submit a rebuttal statement, we will review that statement (and any supporting documentation) along with other materials associated with the case. Based on a careful review of the information you submit and all other relevant information known to us, we will determine whether the suspension should be removed, modified, or should remain in effect within 15 days of receipt of the complete rebuttal package. However, the suspension of your Medicare funds will continue while your rebuttal package is being reviewed. Thereafter, we will notify you in writing of our determination to continue or remove the suspension and provide specific findings on the conditions upon which the suspension may be continued or removed, as well as an explanatory statement of the determination. *See* 42 C.F.R. § 405.375(b)(2). This determination is not administratively appealable. *See* 42 C.F.R. § 405.375(c).

If the suspension is continued, we will review additional evidence during the suspension period to determine whether claims are payable and/or whether an overpayment exists and, if so, the amount of the overpayment. *See* 42 C.F.R. § 405.372(c). We may need to contact you with specific requests for further information. You will be informed of developments and will be promptly notified of any overpayment determination. Claims will continue to be processed during the suspension period, and you will be notified about bill/claim determinations, including appeal rights regarding any bills/claims that are denied. The payment suspension applies to both current and future payments.



14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254-1613  •  www.qlarant.com



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

In the event that an overpayment is determined and it is determined that a recoupment of payments under 42 C.F.R. § 405.371(a)(3) should be put into effect, you will receive a separate written notice of the intention to recoup and the reasons.   You will be given an opportunity for rebuttal in accordance with 42 C.F.R. § 405.374 from Novitas Solutions, Inc.  When the payment suspension has been removed, any money withheld as a result of this action shall be first be applied to reduce or eliminate the determined overpayment and then to reduce any other obligation to CMS or to the U.S. Department of Health and Human Services in accordance with 42 C.F.R. § 405.372(e).  In the absence of a legal requirement that the excess be paid to another entity, the excess will be released to you.

Should you have any questions, please contact Christina Cardenas in writing or via telephone at 972-383-000, Ext. 13160.

Sincerely,

S. Scott Ward, CFE, AHFI
Program Director
Qlarant Integrity Solutions, LLC

cc: Centers for Medicare & Medicaid Services

Qlarant:·· 14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254-1613  •  www.qlarant.com

# EXHIBIT E

## § 405.371 Suspension, offset, and recoupment of Medicare payments to providers and suppliers of services.

**(a) *General rules*** - Medicare payments to providers and suppliers, as authorized under this subchapter (excluding payments to beneficiaries), may be one of the following:

**(1)** Suspended, in whole or in part, by CMS or a Medicare contractor if CMS or the Medicare contractor possesses reliable information that an overpayment exists or that the payments to be made may not be correct, although additional information may be needed for a determination.

**(2)** In cases of suspected fraud, suspended, in whole or in part, by CMS or a Medicare contractor if CMS or the Medicare contractor has consulted with the OIG, and, as appropriate, the Department of Justice, and determined that a credible allegation of fraud exists against a provider or supplier, unless there is good cause not to suspend payments.

**(3)** Offset or recouped, in whole or in part, by a Medicare contractor if the Medicare contractor or CMS has determined that the provider or supplier to whom payments are to be made has been overpaid.

**(4)** Suspended, in whole or in part, by CMS or a Medicare contractor if the provider or supplier has been subject to a Medicaid payment suspension under § 455.23(a)(1) of this chapter.

**(b) *Good cause exceptions applicable to payment suspensions.***



**(1)** CMS may find that good cause exists not to suspend payments or not to continue to suspend payments to an individual or entity against which there are credible allegations of fraud if -

**(i)** OIG or other law enforcement agency has specifically requested that a payment suspension not be imposed because such a payment suspension may compromise or jeopardize an investigation;

**(ii)** It is determined that beneficiary access to items or services would be so jeopardized by a payment suspension in whole or part as to cause a danger to life or health;

**(iii)** It is determined that other available remedies implemented by CMS or a Medicare contractor more effectively or quickly protect Medicare funds than would implementing a payment suspension; or

**(iv)** CMS determines that a payment suspension or a continuation of a payment suspension is not in the best interests of the Medicare program.

**(2)** Every 180 days after the initiation of a suspension of payments based on credible allegations of fraud, CMS will -

**(i)** Evaluate whether there is good cause to not continue such suspension under this section; and

**(ii)** Request a certification from the OIG or other law enforcement agency that the matter continues to be under investigation warranting continuation of the suspension.

**(3)** Good cause not to continue to suspend payments to an individual or entity against which there are credible allegations of fraud must be deemed to exist if a payment suspension has been in effect for 18 months

and there has not been a resolution of the investigation, except CMS may extend a payment suspension beyond that point if -

(i) The case has been referred to, and is being considered by, the OIG for administrative action (for example, civil money penalties); or such administrative action is pending or

(ii) The Department of Justice submits a written request to CMS that the suspension of payments be continued based on the ongoing investigation and anticipated filing of criminal or civil action or both or based on a pending criminal or civil action or both. At a minimum, the request must include the following:

(A) Identification of the entity under suspension.

(B) The amount of time needed for continued suspension in order to conclude the criminal or civil proceeding or both.

(C) A statement of why or how criminal or civil action or both may be affected if the requested extension is not granted.

(c) *Steps necessary for suspension of payment, offset, and recoupment.*

(1) Except as provided in paragraphs (d) and (e) of this section, CMS or the Medicare contractor suspends payments only after it has complied with the procedural requirements set forth at § 405.372.

(2) The Medicare contractor offsets or recoups payments only after it has complied with the procedural requirements set forth at § 405.373.

(d) *Suspension of payment in the case of unfiled cost reports.*

(1) If a provider has failed to timely file an acceptable cost report, payment to the provider is immediately suspended in whole or in

part until a cost report is filed and determined by the Medicare contractor to be acceptable.

**(2)** In the case of an unfiled cost report, the provisions of § 405.372 do not apply. (See § 405.372(a)(2) concerning failure to furnish other information.)

**(e)** *Suspension of payment in the case of unfiled hospice cap determination reports.*

**(1)** If a provider has failed to timely file an acceptable hospice cap determination report, payment to the provider is immediately suspended in whole or in part until a cap determination report is filed and determined by the Medicare contractor to be acceptable.

**(2)** In the case of an unfiled hospice cap determination report, the provisions of § 405.372 do not apply. (See § 405.372(a)(2) concerning failure to furnish other information.)

[76 FR 5961, Feb. 2, 2011, as amended at 79 FR 50509, Aug. 22, 2014; 84 FR 47852, Sept. 10, 2019] id



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

July 24, 2020

Acute Care Ambulance Service, LLC
1802 Joleigh St.
Mercedes, TX 78570

Re:  **Notice of Suspension of Medicare Payments**
     **Supplier Medicare ID Number(s): AMB1342**
     **Supplier NPI: 1932471075**
     **Record Identifier: PSP-200617-00004**

Dear Acute Care Ambulance Service, LLC:

The purpose of this letter is to notify you of our determination to suspend your Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). The suspension of your Medicare payments took effect on July 22, 2020  Prior notice of this suspension was not provided, because giving prior notice would place additional Medicare funds at risk and hinder our ability to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3).

The decision to suspend your Medicare payments was made by the Centers for Medicare & Medicaid Services (CMS) through its Central Office. *See* 42 C.F.R. § 405.372(a)(4)(iii). This suspension is based on credible allegations of fraud. CMS regulations define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. This suspension may last until resolution of the investigation as defined under 42 C.F.R. § 405.370 and may be extended under certain circumstances. *See* 42 C.F.R. § 405.372(d)(3)(i)-(ii). Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, a medical review of claims submitted by Acute Care Ambulance Service, LLC determined that Medicare coverage guidelines were not met since the documentation submitted to substantiate the claims failed to describe the beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated. Additionally, beneficiary interviews conducted supported that the ambulance services were not warranted.

The following list of sample claims provide evidence of our findings and serve as a basis for the determination to suspend your Medicare payments:

| Claim Control Number (CCN) | Date(s) of Service | Amount Paid | Basis for Selected Claim |
|---|---|---|---|
| 452919176129030 | 06/24/2019-06/24/2019 | 135.42 | Beneficiary interview indicated this |



14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254 1613  •  www.qlara



EXHIBIT
A



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

| | | | this beneficiary had their claim denied as part of a postpayment medical review because the run sheets that failed to document a detailed objective description of the patient's symptoms and physical findings to support meeting the Medicare requirements for an ambulance service. |
|---|---|---|---|

This list is not exhaustive or complete in any sense, as the investigation into this matter is continuing. The information is provided by way of example in order to furnish you with adequate notice of the basis for the payment suspension noticed herein.

Pursuant to 42 C.F.R. § 405.372(b)(2), you have the right to submit a rebuttal statement in writing to us indicating why you believe the suspension should be removed. We request that you submit this rebuttal statement to us within 15 days. You should include with this statement any evidence you believe is pertinent to your reasons why the suspension should be removed. Your rebuttal statement and any pertinent evidence should be sent to:

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

If you submit a rebuttal statement, we will review that statement (and any supporting documentation) along with other materials associated with the case. Based on a careful review of the information you submit and all other relevant information known to us, we will determine whether the suspension should be removed, modified, or should remain in effect within 15 days of receipt of the complete rebuttal package. However, the suspension of your Medicare funds will continue while your rebuttal package is being reviewed. Thereafter, we will notify you in writing of our determination to continue or remove the suspension and provide specific findings on the conditions upon which the suspension may be continued or removed, as well as an explanatory statement of the determination. *See* 42 C.F.R. § 405.375(b)(2). This determination is not administratively appealable. *See* 42 C.F.R. § 405.375(c).

If the suspension is continued, we will review additional evidence during the suspension period to determine whether claims are payable and/or whether an overpayment exists and, if so, the amount of the overpayment. *See* 42 C.F.R. § 405.372(c). We may need to contact you with specific requests for further information. You will be informed of developments and will be promptly notified of any overpayment determination. Claims will continue to be processed during the suspension period, and you will be notified about bill/claim determinations, including appeal rights regarding any bills/claims that are denied. The payment suspension applies to both current and future payments.





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

In the event that an overpayment is determined and it is determined that a recoupment of payments under 42 C.F.R. § 405.371(a)(3) should be put into effect, you will receive a separate written notice of the intention to recoup and the reasons.   You will be given an opportunity for rebuttal in accordance with 42 C.F.R. § 405.374 from Novitas Solutions, Inc.  When the payment suspension has been removed, any money withheld as a result of this action shall be first be applied to reduce or eliminate the determined overpayment and then to reduce any other obligation to CMS or to the U.S. Department of Health and Human Services in accordance with 42 C.F.R. § 405.372(e).  In the absence of a legal requirement that the excess be paid to another entity, the excess will be released to you.

Should you have any questions, please contact Christina Cardenas in writing or via telephone at 972-383-000, Ext. 13160.

Sincerely,

S. Scott Ward, CFE, AHFI
Program Director
Qlarant Integrity Solutions, LLC

cc: Centers for Medicare & Medicaid Services



14643 Dallas Parkway, Suite 400   •   Dallas, Texas 75254-1613   •   www.qlarant.com



# Kennedy
Attorneys & Counselors at Law

**Via FedEx Delivery**

August 3, 2020

Qlarant Integrity Solutions, LLC
ATTN:  Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX  75254

> RE:   Suspension of Medicare Payments
>          Provider Medicare ID Number:  AMB1342
>          Provider NPI:  1932471075
>          Record Identifier:  PSP-200617-00004

Dear Sir or Madam:

Our firm represents Acute Care Ambulance Services, LLC (hereinafter "Acute Care"), a Medicare ambulance supplier located in Mercedes, Texas.  The city is known as the Queen of the Rio Grande Valley in south-Texas.  We have been retained to respond to the July 24, 2020 Notice of Suspension of Medicare Payments.  A copy is enclosed.  We also enclose an Appointment of Representative.  This is to present a rebuttal pursuant to 42 C.F.R. §405.374 to the suspension of Medicare payments.  As explained below, we request that HHS temporarily rescind the payment suspension during the COVID-19 national emergency (or until a hearing is provided to challenge the suspension).  Due to the exigent circumstances caused by the COVID-19 pandemic, we will be forced to file a lawsuit in federal district court asserting a collateral constitutional claim and seeking injunctive and declaratory relief on Friday, August 7, 2020.  However, we are presenting our rebuttal in hope of obtaining an amicable resolution and your agreement to temporarily rescind the suspension during the COVID-19 national emergency (or until a hearing is provided to challenge the suspension).

### Background Information

On July 24, 2020, CMS issued its Notice of Suspension of Medicare Payments.  The suspension took effect on July 22, 2020.  The action was brought under 42 C.F.R. §405.371(a)(2) and alleges a "credible allegation of fraud."  CMS based its decision to suspend upon its belief the ambulance supplier had failed to describe beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated.  The list of sample claims offered as evidence indicates a single incident where a patient's transportation claim was denied due to deficient documentation.  As a result, *all* Medicare payments owed to the supplier are being withheld pending resolution of the ongoing investigation.

The impact of the Medicare payment suspension threatens the very viability of Acute Care. The ambulance supplier derives in excess of 90% of its revenues from transporting sick and elderly Medicare patients.  Obviously, if the ambulance company is not paid for these

**1 |** P a g e



EXHIBIT
B

services, it cannot pay its employees, the medics and drivers for these very needy patients. Consequently, Acute Care will soon be forced to shut down and file bankruptcy.

Indeed, the suspension action could not come at a worse time. President Donald Trump declared a national emergency over the COVID-19 outbreak on March 13, 2020. The surge in confirmed coronavirus cases is overwhelming south-Texas. The Rio Grande Valley's residents are particularly vulnerable to COVID-19 with more than 90% being Latinx and having one of the highest poverty rates in the State. Chronic health conditions abound. For example, the rate of diabetes is triple that of the national average. Also, it is chronically underfunded and underserved. Recently, Texas Governor Abbott sent Navy teams to assist the area's hard-hit hospitals in dealing with the COVID-19 outbreak. And the pandemic is having a cascading effect on ancillary suppliers and practitioners as well. The problem is exacerbated by Hurricane Hanna striking the south-Texas coast on July 25, 2020.

If Acute Care is forced to close, the ambulance company's patients will have to obtain their emergency and scheduled medical transportation services elsewhere. Doing so during the COVID-19 outbreak is an uncertainty. In fact, ambulance companies in Rio Grande Valley are now in crisis due to the pandemic. Hospitals are in "divert" status. Ambulances are being forced to wait in hospital parking lots for as long as 12 hours for beds to become available for their patients. Ambulance strike teams are being deployed by the State to the Rio Grande Valley to help the local ambulance companies deal with the coronavirus pandemic.

### Issues & Contentions

At issue is HHS's improper use of suspension under 42 C.F.R. §405.371(a)(2). Aside from the suspension being essentially a documentation issue, we contend that HHS's use of suspension in the midst of the national COVID-19 emergency is improper for the following reasons:

1. Payment suspension is improper in the midst of the COVID-19 outbreak because it threatens the viability of Acute Care and jeopardizes the health and safety of its patients. At this time, ambulance companies are critical during the ongoing COVID-19 outbreak because an ambulance may be the only mode of transportation that patients have to access hospitals as well as other healthcare providers and practitioners.

2. Importantly, Federal regulations provide that CMS may find good cause exists not to suspend a provider or supplier's Medicare payments over credible allegations of fraud where it is determined that beneficiary access to items or services would be so jeopardized by a payment suspension, in whole or in part, as to cause a danger to life or health. 42 C.F.R. §405.371(b)(1)(ii). It is a clear abuse of discretion for CMS to not find that good cause exists here when it will force Acute Care out of business during the COVID-19 pandemic and surge of confirmed coronavirus cases that are overwhelming Rio Grande Valley ambulance companies.

3. Acute Care has a constitutional right in payments for services rendered and now indefinitely suspended. HHS violates Due Process of law by imposing the action during the COVID-19 emergency without extending to the ambulance supplier notice

and a right to a hearing to contest the Medicare payment suspension. There is a high risk that Acute Care will be erroneously deprived of its property interest in Medicare payments it has earned for services rendered and indefinitely withheld by suspension, pursuant to 42 C.F.R. §405.371(a)(2), because the supplier is not entitled under the available process to notice and an opportunity for hearing to dispute and contest the suspension, and there is absolutely no established time frame for resolving the investigation of the claims underlying its imposition.

4. Patients at Acute Care have a constitutional right to access safe and reliable services under the federal Medicare program. HHS violates the patients' right to access such healthcare by imposing the suspension during the coronavirus pandemic. Since President Donald Trump declared a national emergency, the COVID-19 outbreak is overwhelming south-Texas hospitals. And it is having a cascading effect on ancillary suppliers and practitioners as well, like Acute Care. The government's ill-advised suspension will essentially deprive the ambulance company's patients of their constitutional right to access healthcare.

## Conclusion

For these reasons, we present this rebuttal to the Medicare payment suspension. Critically, the Due Process violations and *ultra vires* actions of HHS threaten the very viability of the ambulance supplier. It also jeopardizes the health and safety of the supplier's patients as well as deprives them of their constitutional right to access healthcare. Accordingly, we request that HHS immediately temporarily rescind the Medicare payment suspension and place Acute Care in payment status during the COVID-19 national emergency (or until a hearing is made available to challenge the suspension). Indeed, 42 C.F.R. §405.371(b)(ii) contemplates that suspension should not be imposed under these circumstances. Due to the exigent circumstances caused by the COVID-19 pandemic, we will be filing a lawsuit in federal district court asserting our client's collateral constitutional and statutory claims and seeking injunctive and declaratory relief on Friday, August 7, 2020. Again, we are presenting rebuttal to the suspension in hope of obtaining an amicable resolution and your agreement to temporarily rescind the suspension.

Please contact my office immediately so that we can amicably resolve this matter. We look forward to your prompt response.

Sincerely,

Mark S. Kennedy

Enclosures

cc:    Acute Care Ambulance Services, LLC



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

July 24, 2020

Acute Care Ambulance Service, LLC
1802 Joleigh St.
Mercedes, TX 78570

Re:     **Notice of Suspension of Medicare Payments**
        **Supplier Medicare ID Number(s): AMB1342**
        **Supplier NPI: 1932471075**
        **Record Identifier: PSP-200617-00004**

Dear Acute Care Ambulance Service, LLC:

The purpose of this letter is to notify you of our determination to suspend your Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). The suspension of your Medicare payments took effect on July 22, 2020  Prior notice of this suspension was not provided, because giving prior notice would place additional Medicare funds at risk and hinder our ability to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3).

The decision to suspend your Medicare payments was made by the Centers for Medicare & Medicaid Services (CMS) through its Central Office. *See* 42 C.F.R. § 405.372(a)(4)(iii). This suspension is based on credible allegations of fraud. CMS regulations define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. This suspension may last until resolution of the investigation as defined under 42 C.F.R. § 405.370 and may be extended under certain circumstances. *See* 42 C.F.R. § 405.372(d)(3)(i)-(ii). Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, a medical review of claims submitted by Acute Care Ambulance Service, LLC determined that Medicare coverage guidelines were not met since the documentation submitted to substantiate the claims failed to describe the beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated. Additionally, beneficiary interviews conducted supported that the ambulance services were not warranted.

The following list of sample claims provide evidence of our findings and serve as a basis for the determination to suspend your Medicare payments:

| Claim Control Number (CCN) | Date(s) of Service | Amount Paid | Basis for Selected Claim |
|---|---|---|---|
| 452919176129030 | 06/24/2019-06/24/2019 | 135.42 | Beneficiary interview indicated this |





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

| | | | this beneficiary had their claim denied as part of a postpayment medical review because the run sheets that failed to document a detailed objective description of the patient's symptoms and physical findings to support meeting the Medicare requirements for an ambulance service. |
|---|---|---|---|

This list is not exhaustive or complete in any sense, as the investigation into this matter is continuing. The information is provided by way of example in order to furnish you with adequate notice of the basis for the payment suspension noticed herein.

Pursuant to 42 C.F.R. § 405.372(b)(2), you have the right to submit a rebuttal statement in writing to us indicating why you believe the suspension should be removed. We request that you submit this rebuttal statement to us within 15 days. You should include with this statement any evidence you believe is pertinent to your reasons why the suspension should be removed. Your rebuttal statement and any pertinent evidence should be sent to:

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

If you submit a rebuttal statement, we will review that statement (and any supporting documentation) along with other materials associated with the case. Based on a careful review of the information you submit and all other relevant information known to us, we will determine whether the suspension should be removed, modified, or should remain in effect within 15 days of receipt of the complete rebuttal package. However, the suspension of your Medicare funds will continue while your rebuttal package is being reviewed. Thereafter, we will notify you in writing of our determination to continue or remove the suspension and provide specific findings on the conditions upon which the suspension may be continued or removed, as well as an explanatory statement of the determination. *See* 42 C.F.R. § 405.375(b)(2). This determination is not administratively appealable. *See* 42 C.F.R. § 405.375(c).

If the suspension is continued, we will review additional evidence during the suspension period to determine whether claims are payable and/or whether an overpayment exists and, if so, the amount of the overpayment. *See* 42 C.F.R. § 405.372(c). We may need to contact you with specific requests for further information. You will be informed of developments and will be promptly notified of any overpayment determination. Claims will continue to be processed during the suspension period, and you will be notified about bill/claim determinations, including appeal rights regarding any bills/claims that are denied. The payment suspension applies to both current and future payments.





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

In the event that an overpayment is determined and it is determined that a recoupment of payments under 42 C.F.R. § 405.371(a)(3) should be put into effect, you will receive a separate written notice of the intention to recoup and the reasons.    You will be given an opportunity for rebuttal in accordance with 42 C.F.R. § 405.374 from Novitas Solutions, Inc.  When the payment suspension has been removed, any money withheld as a result of this action shall be first be applied to reduce or eliminate the determined overpayment and then to reduce any other obligation to CMS or to the U.S. Department of Health and Human Services in accordance with 42 C.F.R. § 405.372(e).  In the absence of a legal requirement that the excess be paid to another entity, the excess will be released to you.

Should you have any questions, please contact Christina Cardenas in writing or via telephone at 972-383-000, Ext. 13160.

Sincerely,

S. Scott Ward, CFE, AHFI
Program Director
Qlarant Integrity Solutions, LLC

cc: Centers for Medicare & Medicaid Services

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

## Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Acute Care Ambulance Service, LLC | 1932471075 |

### Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual, MARK S. KENNEDY, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 07/31/20 |
|---|---|
| Street Address 1802 JOLEIGH DR | Phone Number (with Area Code) 956-968-7999 |
| City MERCEDES | State TEXAS | Zip Code 78570 |
| Email Address (optional) ACUTECAREAMBULANCE@YAHOO.COM | |

### Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, MARK S. KENNEDY, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an ATTORNEY

(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative | Date 07/31/20 |
|---|---|
| Street Address 12222 MERIT DRIVE, SUITE 1750 | Phone Number (with Area Code) 214-445-0740 |
| City DALLAS | State TX | Zip Code 75251 |
| Email Address (optional) MARKSKENNEDYLAW@MSN.COM | |

### Section 3: Waiver of Fee for Representation

**Instructions:** This section must be completed if the representative is required to, or chooses to, waive their fee for representation. (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

### Section 4: Waiver of Payment for Items or Services at Issue

**Instructions:** Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |



**Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)**

September 9, 2020

Mark S. Kennedy, Esq.
Kennedy & Counselors at Law
12222 Merit Drive, Suite 1750
Dallas, TX 75251

Re:   **Provider Medicare ID Number: AMB 1342
Provider NPI: 1932471075
Record Identifier: PSP-200617-00004
Response to Rebuttal Statement**

Dear Mr. Kennedy:

This letter is in response to the suspension rebuttal statement (rebuttal), dated August 3, 2020, you submitted to Qlarant Integrity Solutions, LLC (Qlarant), the Unified Program Integrity Contractor (UPIC) for Medicare Program Integrity for the South Western jurisdiction, on behalf of Acute Care Ambulance Service, LLC (Acute Care), regarding the suspension of Acute Care's Medicare payments, which took effect on July 22, 2020. Prior notice of the suspension was not provided because giving prior notice would place additional Medicare funds at risk and hinder the ability of the Centers for Medicare & Medicaid Services (CMS) to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3). On August 5, 2020, Qlarant received Acute Care's rebuttal statement and forwarded it to CMS for review. CMS is responsible for determining if a suspension of Medicare payments is warranted under applicable federal regulations and as appropriate, whether and when a suspension may be rescinded. *See* 42 C.F.R. § 405.375.

As stated in the Notice of Suspension (Notice), dated July 24, 2020, the suspension of Acute Care's Medicare payments is based on credible allegations of fraud. *See* 42 C.F.R. § 405.371(a)(2). Specifically, the Medicare payment suspension is based on, but not limited to, information that Acute Care misrepresented services billed to the Medicare program. More particularly, medical review of claims submitted to Medicare determined that Medicare coverage guidelines were not met since the documentation submitted to substantiate the claims failed to describe the beneficiaries' symptoms at the time of transport and that other means of transportation were contraindicated. Additionally, beneficiary interviews conducted supported that the ambulance services were not warranted.

In the rebuttal, you assert, on behalf of Acute Care, the following statements for consideration:

1. *"The impact of the Medicare payment suspension threatens the very viability of Acute Care. The ambulance supplier derives in excess of 90% of its revenues from transporting sick and elderly Medicare patients….if the ambulance company is not paid for these services, it cannot pay its employees, the medics and drivers for these very needy patients. Consequently, Acute Care will soon be forced to shut down and file bankruptcy."*



EXHIBIT
C

RECEIVED
SEP 1 0 2020
BY: .......................



*14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254-1613  •  www.qlarant.com*



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

While we understand the operational difficulties that CMS's decision to suspend Medicare payments may cause to suppliers, once it is determined that credible allegations of fraud exist, and that an investigation is therefore warranted, payment suspension enables CMS to protect program funds while the government completes its investigation. Because of the potential impact of a payment suspension, CMS takes great care when assessing whether to impose or continue a payment suspension. CMS is aware that, on April 17, 2020, Acute Care attested to accepting a Provider Relief Fund payment of $60,363.50 from the recently established CARES Act Provider Relief Fund, which is designed to assist eligible suppliers with operational costs during the COVID-19 national public health emergency. CMS has determined that the continued suspension of Acute Care's Medicare payments is warranted during the ongoing investigation.

*"The Rio Grande Valley's residents are particularly vulnerable to COVID-19 with more than 90% being Latinx and having one of the highest poverty rates in the State. Chronic health conditions abound. For example, the rate of diabetes is triple that of the national average. Also, it is chronically underfunded and underserved. Recently, Texas Governor Abbott sent Navy teams to assist the area's hard-hit hospitals in dealing with the Covid-19 outbreak. …The problem is exacerbated by Hurricane Hanna striking the south-Texas coast on July 25, 2020."*

*"If Acute Care is forced to close, the ambulance company's patients will have to obtain their emergency and scheduled medical transportation services elsewhere. Doing so during the COVID-19 outbreak is an uncertainty. In fact, ambulance companies in Rio Grande Valley are now in crisis due to the pandemic. Hospitals are on "divert" status. Ambulances are being forced to wait in hospital parking lots for as long as 12 hours for beds to become available for their patients. Ambulance strike teams are being deployed by the State to the Rio Grande Valley to help the local ambulance companies deal with the coronavirus pandemic."*

*"At this time, ambulance companies are critical during the ongoing COVID-19 outbreak because an ambulance may be the only mode of transportation that patients have to access hospitals as well as other healthcare providers and practitioners."*

*"…Federal regulations provide that CMS may find good cause exists not to suspend a provider or supplier's Medicare payments over credible allegations of fraud where it is determined that beneficiary access to items or services would be so jeopardized by a payment suspension, in whole or in part, as to cause a danger to life or health. 42 C.F.R. § 405.371(b)(1)(ii). It is a clear abuse of discretion for CMS to not find that good cause exists here when it will force Acute Care out of business during the COVID-19 pandemic and surge of confirmed coronavirus cases that are overwhelming Rio Grande Valley ambulance companies."*

*"Patients at Acute Care have a constitutional right to access safe and reliable services under the federal Medicare program. …The government's ill-advised suspension will essentially deprive the ambulance company's patients of their constitutional right to access healthcare."*

CMS is very sensitive to the needs of Medicare beneficiaries and has reviewed beneficiary access to ambulance services in the areas served by Acute Care. Acute Care is an ambulance supplier located in





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

Mercedes, Texas, in Hidalgo County. There are fifty-four (54) ambulance suppliers in Hidalgo County and the surrounding four counties serving the area served by Acute Care. Based on CMS's assessment of access to care due to the operation of other ambulance suppliers in the areas served by Acute Care, CMS has determined that the payment suspension will not jeopardize the ability of Acute Care's patients to obtain ambulance services from other suppliers in the market area if Acute Care is unable to provide beneficiaries with services. Therefore, CMS declines to find good cause to terminate the suspension under 42 C.F.R. § 405.371(b)(1)(ii).

2.  *"Aside from the suspension being essentially a documentation issue, we contend that HHS's use of suspension in the midst of the national COVID-19 emergency is improper…. Payment suspension is improper in the midst of the COVID-19 outbreak because it threatens the viability of Acute Care and jeopardizes the health and safety of its patients."*

*"…we request that HHS temporarily rescind the Medicare payment suspension and place the supplier in payment status during the COVID-19 national emergency."*

CMS has used its authority granted under section 1812(f) of the Social Security Act to take proactive steps respond to the 2019 Novel Coronavirus Disease (COVID-19) emergency. CMS has issued waivers allowing regulatory flexibilities to help healthcare suppliers contain the spread of COVID-19.[1] CMS has also implemented blanket waivers and flexibilities that relax certain requirements for Medicare providers and suppliers – including ambulance suppliers – from March 1, 2020 through the end of the COVID-19 emergency declaration.[2] While CMS has issued flexibilities regarding ambulance allowable destinations, participation by states in the Non-Emergent Ambulance Transportation Demonstration, accelerated and advance payments, and provider enrollment to respond to COVID-19,[3] CMS has not issued waivers that eliminate the statutory and regulatory requirements for ambulance services or stopped ambulance payment suspensions based on credible allegations of fraud.

CMS can only pay for ambulance services that comply with Medicare statutes and regulations. Those statutes and regulations require that the documentation provided to support claims demonstrate that the services provided were reasonable and necessary and met Medicare criteria for coverage. Beneficiary interviews have revealed that Acute Care provided ambulance transport to beneficiaries who did not qualify for ambulance transport and post-payment review of Acute Care's claims has revealed that run sheets failed to document a detailed objective description of the patient's symptoms and physical findings to support compliance with Medicare requirements. Documentation failed to support that transportation by any other means was contraindicated and that the level of medical care of an ambulance service was required.

---

[1] Information regarding CMS's COVID-19 waivers and flexibilities can be viewed at https://www.cms.gov/about-cms/emergency-preparedness-response-operations/current-emergencies/coronavirus-waivers.
[2] A list of CMS's blanket waivers as of July 28, 2020 can be viewed at https://www.cms.gov/files/document/summary-covid-19-emergency-declaration-waivers.pdf.
[3] See https://www.cms.gov/files/document/covid-ambulances.pdf.





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

In addition, Qlarant's review indicates that there have been ongoing concerns related to Acute Care's documentation of services billed to Medicare. Three prior reviews of claims submitted by Acute Care resulted in error rates of 96.8% to100%. The denials were based on a finding that the documentation was not sufficient to support the beneficiary's condition at the time of transport met Medicare guidelines for ambulance transport. On May 6, 2016 Acute Care was educated on properly documenting the patient's condition at the time of transport.

Accordingly, CMS has determined that the payment suspension is warranted during the ongoing investigation into credible allegations that Acute Care has misrepresented services billed to the Medicare program.

3. *"**Acute Care has a constitutional right in payments for services rendered and now indefinitely suspended.  HHS violates Due Process of law by imposing the action during the COVID-19 pandemic and emergency without extending to the ambulance supplier notice and a right to a hearing to contest the Medicare payment suspension. There is a high risk that Acute Care will be erroneously deprived of its property interest in Medicare payments it has earned for services rendered and indefinitely withheld by suspension, … because the provider is not entitled under the available process to notice and an opportunity for hearing to dispute and contest the suspension, and there is absolutely no established time frame for resolving the investigation of the claims underlying its imposition."***

It is the Medicare Act, and not the U.S. Constitution that authorizes CMS to pay Acute Care for ambulance services rendered to Medicare beneficiaries. The Medicare Act authorizes payment for ambulance services only if such services are medically necessary. *See* 42 U.S.C. § 1395x (s)(7) and 42 C.F.R. § 410.40.  Per CMS guidance, medical necessity for ambulance services is established when "the patient's condition is such that use of any other method of transportation is contraindicated.  In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services." *See* Medicare Benefit Policy Manual (CMS 100-02), Chapter 10, Sections 10.2.1 and 10.2.3. As explained above, we have credible allegations that the ambulance services that Acute Care is currently providing do not meet the statutory requirements.

The Medicare Act also allows CMS to suspend Medicare payments to Acute Care until the government completes its fraud investigation.  Pursuant to 42 U.S.C. § 1395y(o), if CMS receives a credible allegation of fraud, it may suspend payments to a provider pending an investigation of a credible allegation of fraud.  Pursuant to 42 C.F.R. § 405.372(a)(3), a payment suspension may be imposed without prior notice if CMS, the intermediary, or carrier determines that the Medicare Trust Fund would be harmed by giving prior notice. While the payment suspension action is not appealable, if CMS ultimately determines that Acute Care has received an overpayment, Acute Care has the opportunity to appeal the overpayment determination through five levels of administrative adjudication as well as judicial review. Also, payment suspension terms, where there are credible allegations of fraud, are not indefinite, as you have asserted. Payment suspensions are temporary and do not continue after the resolution of an investigation as defined in 42 C.F.R. § 405.370.





Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

**4.** ***"Due to the exigent circumstances caused by the COVID-19 pandemic, we will be filing a lawsuit in federal district court asserting a collateral constitutional claim and seeking injunctive and declaratory relief…."***

Your assertions regarding the potential impact on Acute Care due to the COVID-19 national emergency may be considered within the ongoing investigation into Acute Care's billing. However, the COVID-19 national emergency does not justify terminating the suspension, particularly, when the suspension is based on credible allegations of fraud. CMS has determined that in order to protect the Medicare Trust Fund, suspension of Acute Care's Medicare payments is necessary during the ongoing investigation into credible allegations that Acute Care submitted claims for which documentation failed to describe the beneficiaries' symptoms at the time of transport and that other means of transportation were contraindicated and claims for beneficiaries who have stated that the ambulance services provided by Acute Care were not warranted.

In conclusion, after a careful review of Acute Care's rebuttal statement and Acute Care's billing history and prior education, CMS has decided to continue the suspension of Acute Care's Medicare payments due to credible allegations of fraud.  *See* 42 C.F.R. § 405.375.  While CMS's determination to continue the suspension is not appealable, CMS will consider any additional information and/or evidence Acute Care may submit.

Please contact the undersigned in writing should you have any questions about this matter.

Sincerely,

S. Scott Ward, CFE, AHFI
Program Director
Qlarant Integrity Solutions, LLC



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

ACUTE CARE AMBULANCE          §
SERVICE, L.L.C.,              §
                             §
    **Plaintiff,**       §
                             §
vs.                          §
                             §    **CIVIL ACTION NO. 7:20-cv-217**
ALEX M. AZAR II, Secretary,  §
UNITED STATES                §
DEPARTMENT OF HEALTH         §
AND HUMAN SERVICES,          §
                             §
    **Defendant.**       §

**VERIFIED COMPLAINT FOR INJUNCTIVE**
**AND DECLARATORY RELIEF AND ATTORNEY FEES**

    COMES NOW, Acute Care Ambulance Service, L.L.C. (the "Plaintiff" or "Acute Care"), and files this its Verified Complaint for Injunctive and Declaratory Relief and Attorney's Fees against Alex M. Azar II, Secretary of the United States Department of Health and Human Services (the "Defendant"), and alleges and avers as follows:

**INTRODUCTION**

    1.    Acute Care provides ambulance services to Medicare beneficiaries when the use of other methods of transportation is contraindicated. Essentially, this requires that the ambulance supplier show that patients' health would be jeopardized by use of any other mode of transportation. For Part B to cover ambulance services, the following conditions must be met: the supplier meets the requirements of 42 C.F.R. § 410.41; the services meet the medical necessity and origin and destinations requirements of 42 C.F.R § 410.40; and Medicare Part A payment is not made directly or indirectly for the services. Typically, Medicare covers emergency ambulance transportation when a patient experiences sudden medical emergency and



it endangers his or her health. It also covers nonemergency transportation when medically necessary, and the patient has a written order from his or her physician that ambulance transportation is medically necessary.

2.    Patients rely upon Acute Care for nonemergency, scheduled repetitive ambulance services. Indeed, ambulance transportation is necessary to safely shuttle these patients to and from life-saving medical treatments. For example, patients that *must* rely on ambulance transport for dialysis will die if they do not receive this life saving treatment. These transports are covered when the ambulance supplier furnishing the service obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements have been met. The physician's order must be dated no earlier than 60 days before the date the service is furnished.

3.    On July 24, 2020, Defendant noticed the imposition of a Medicare payment suspension of Plaintiff's Medicare payments. The suspension was brought under 42 C.F.R. § 405.371(a)(2) based upon a "credible allegation of fraud." CMS based its decision to suspend upon its belief the ambulance supplier had failed to describe beneficiaries' symptoms at the time of transport and that any other means of transportation would be contraindicated. The list of sample claims indicates a *single incident* where a patient's transportation claim was denied due to deficient documentation. As a result, *all* Medicare payments owed to the ambulance company are being withheld pending resolution of the ongoing investigation.

4.    The impact of the Medicare payment suspension threatens the very viability of Acute Care. The ambulance supplier derives in excess of 90% of its revenues from transporting sick and elderly Medicare patients. Obviously, if the ambulance company is not paid for these

2

services, it cannot pay its employees, the medics and drivers for these very need patients. Consequently, Acute Care will soon be forced to shut down and file bankruptcy.

5.     Unfortunately, the suspension action could not have come at a worse time. President Donald Trump declared a national emergency over the COVID-19 outbreak on March 13, 2020.[1] Dr. Deborah Birx, White House Coronavirus Response Coordinator, has reported that U.S. deaths cause by COVID-19 may be catastrophic. She reported that Dr. Anthony Fauci, National Institute of Allergies and Infectious Diseases, has predicted U.S. deaths could range from 1.6 to 2.2 million in a worst-case scenario and projects 100,000 to 200,000 in a best-case scenario.

6.     In fact, the surge in confirmed coronavirus cases is overwhelming south-Texas. The Rio Grande Valley is particularly vulnerable to COVID-19 with more than 90% of its residents being Latinx and having one of the highest poverty rates in the State. Chronic health conditions abound. For example, the rate of diabetes is triple that of the national average. Also, it is chronically underfunded and underserved. Recently, Governor Abbott sent Navy teams to assist the area's hard-hit hospitals in dealing with the COVID-19 outbreak. Indeed, the valley health community is so overrun by coronavirus that a field hospital or some other type of repurposed facility is now being built because current resources are failing in the fight to curb the COVID-19 outbreak. The problem is exacerbated by Hurricane Hanna striking the south-Texas coast on July 25, 2020.

7.     The pandemic is having a cascading effect on ancillary suppliers and practitioners as well. If Acute Care is forced to close, it is much more than the loss of a very much needed ambulance company, the supplier's existing patients will have to obtain their medical

---

[1] The Trump Administration has recently announced a wide array of temporary regulatory waivers and new rules to equip the American health care system with maximum flexibility to respond to the COVID-19 pandemic.

3

transportation services elsewhere. Doing so during the COVID-19 outbreak is an uncertainty. Ambulance companies in the Rio Grande Valley are in crisis due to the pandemic. Hospitals are in "divert" status – unable to accept new patients through the Emergency Room. Ambulances are being forced to wait in hospital parking lots sometimes for as long as 12 hours for a bed to become available for their patients. Ambulance strike teams are now being deployed by the State to the Rio Grande Valley to help the local ambulance companies deal with such problems associated with the COVID-19 emergency.

      8.    Had Defendant acted properly, it would not have imposed the suspension. Federal regulations provide that CMS may find good cause exists *not* to suspend a provider's Medicare payments where it is determined that beneficiary access to items or services would be so jeopardized by a payment suspension in whole or in part as to cause a danger to life or health. 42 C.F.R. § 405.371(b)(1)(ii). It is a clear abuse of discretion for CMS to not find that good cause exists here when the COVID-19 pandemic and the surge of confirmed coronavirus cases will soon overwhelm America's healthcare system, including hospices.[2] Not only will Plaintiff be forced to shut down, the government's suspension action places an even greater burden on a healthcare community that is on the brink of collapse.[3]

---

[2] Aside from the jeopardy to patients, the impact of the suspension is at odds with the coronavirus stimulus package. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act was enacted, an economic relief package in response to the COVID-19 pandemic. The CARES Act provides economic support at the federal level to the business sector, employees, individuals and families, and specific industries that have been impacted, including air transportation, healthcare, and education. Key provisions providing for loan forgiveness require that workers need to remain employed.

[3] HHS's Office of Inspector General issued a message on minimizing burdens to provider on March 30, 2020. It stated that the OIG places a high priority on providing the health care community with the flexibility to provide needed care during this emergency. The delivery of patient care during this public health emergency must be the primary focus of the health care industry. For any conduct during this emergency that may be subject to OIG administrative enforcement, OIG will carefully consider the context and intent of the parties when assessing whether to proceed with any enforcement action. In view of the consequences, a review that is primarily focused on documentation that allegedly failed to support the complexity of claimed services does not warrant suspension of Medicare payments during the COVID-19 pandemic and national emergency.

9. Notwithstanding the abuse of discretion, Acute Care has a constitutional property interest in payments for services rendered and now *indefinitely* suspended during the investigation into the adequacy of its documentation. Defendant violates Due Process of law by imposing the adverse action during the COVID-19 pandemic and national emergency and when it fails to give notice and an opportunity for a hearing to contest the Medicare payment suspension. Indeed, the supplier has no administrative appeal rights to contest the suspension. Clearly, there is a high risk that Plaintiff will be erroneously deprived of its property interest in earned Medicare payments withheld by suspension, pursuant to 42 C.F.R. § 405.371(a)(2), because the supplier is not entitled to an administrative appeal to dispute and contest the adverse action, HHS has abused its discretion and not found good cause to not impose the adverse action, and there is absolutely no established time frame for resolving the investigation of its documentation.

10. Moreover, patients at Acute Care have a constitutional Due Process right (consistent with principles of equal protection) to access safe and reliable services under a federal Medicare program. HHS violates the patients' right to access such healthcare by imposing the suspension during the COVID-19 pandemic and national emergency. In fact, during the crisis, these patients only access to ambulance services may be through Plaintiff's ambulance company. Indeed, it may be their only life-line to essential healthcare services. Clearly, good cause exists for Defendant not to suspend the supplier's Medicare payments where, as here, the beneficiary's access to ambulance transport is jeopardized and it poses a danger to their life or health. *See* 42 C.F.R. § 405.371(b)(1)(ii).

11. Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the COVID-19 pandemic and national

5

emergency, and release all suspended payments, until the national emergency is lifted or Defendant otherwise gives notice and an opportunity for a hearing on the adverse action in conformance with Due Process of law. Clearly, the government's ill-advised Medicare payment suspension during the COVID-19 pandemic and national emergency will irreparably harm Plaintiff by destroying its business and forcing its closure, and it jeopardizes the health and safety of the provider's patients and violates their Due Process right (consistent with principles of equal protection) to access essential healthcare services. Moreover, the government's action will place an even greater burden on area providers and practitioners. Defendant's egregious *ultra vires* conduct can only be remedied by an order for injunctive relief otherwise unavailable through the administrative process. Accordingly, Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the COVID-19 pandemic and national emergency, as well as release all suspended payments, until the emergency ends or Defendant can otherwise give notice and a hearing in conformance with Due Process of law.[4]

## PARTIES

12.     Acute Care Ambulance Service, L.L.C. is a Texas limited liability company that has its principle place of business in the city of Mercedes located in Hidalgo County, Texas, and it provides ambulance services in the greater-Mercedes area.

13.     Defendant, Alex M. Azar II, in his official capacity, is the Secretary of the United States Department of Health and Human Services ("HHS"), the governmental department which contains the Centers for Medicare and Medicaid Services ("CMS"), the agency within HHS that

---

[4] Recently, in *Family Rehabilitation, Inc. v. Azar*, 886 F.3d 496 (5th Cir. 2018), the Fifth Circuit held the trial court had jurisdiction under the collateral-claim exception to the administrative exhaustion requirement over a provider's due process and *ultra vires* claims. The provider brought an action to prevent recoupment until a hearing could be provided in accordance with 42 U.S.C. § 1395ff(d) and in conformance with Due Process of law.

is responsible for administration of the Medicare and Medicaid programs. He may be served with process in accordance with Rule 4 of the Federal Rules of Civil Procedure by serving the U.S. Attorney for the district where the action is brought, serving the Attorney General of the United States in Washington, D.C., by certified mail, and by serving the United States Department of Health and Human Services, by certified mail.

## JURISDICTION

14.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 under the entirely collateral Constitutional claim exception to the Medicare exhaustion requirement established by *Mathews v. Eldridge*, 424 U.S. 319 (1976). Defendant's imposition of the Medicare payment suspension during the COVID-19 pandemic and national emergency without giving notice and an opportunity for a hearing to contest the adverse action violates Due Process of law. There is a high risk that Plaintiff will be erroneously deprived of its property interest in Medicare payments it has earned for services rendered and withheld indefinitely by the suspension, pursuant to 42 C.F.R. § 405.371(a)(2), because the supplier is not entitled to notice and opportunity for a hearing to dispute and contest the suspension, and there is absolutely no established time frame for resolving the investigation. Thus, Plaintiff is deprived of an administrative appeal and that effectively prevents the supplier from exhausting administrative remedies to challenge the payment suspension. No administrative or judicial review is otherwise available to contest Defendant's *ultra vires* actions. Such failure violates Plaintiff's constitutional right of Due Process guaranteed by U.S. CONST. amend. V, § 1. Moreover, the Medicare payment suspension and the request to temporarily rescind the action is not a benefits determination, but an otherwise unreviewable procedural issue. Jurisdiction is based upon Plaintiff's constitutional claim that is collateral to a substantive claim for benefits. Likewise,

7

Defendant violates Plaintiff's patients' right to access medically necessary ambulance transportation by imposing the suspension during the COVID-19 pandemic and national emergency.

15.     Additionally, the Court has jurisdiction over the lawsuit pursuant to 42 U.S.C. §§ 405(g), 1395ii and 1395ff(b), and on the authority of *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000). Defendant's failure to extend to Plaintiff an administrative appeal to contest the Medicare payment suspension violates Due Process of law. Thus, Plaintiff is deprived of an administrative appeal and that effectively prevents the provider from exhausting administrative remedies to challenge the payment suspension. No administrative or judicial review is otherwise available to contest Defendant's *ultra vires* actions. Section 405 of the statute "would not simply channel review through the agency, but would mean no review at all." *Illinois Council*, 529 U.S. at 17. Therefore, the exhaustion requirement is excepted under *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986). This exception was explicitly reaffirmed by *Illinois Council*, 529 U.S. at 19-23. The amount in controversy exceeds the $1,000 jurisdictional limit.

## VENUE

16.     Venue is proper in this Court under 42 U.S.C. §§ 505(g), 1395ii and 1395ff(b), and 28 U.S.C. §§ 1391(b) and (e), and 5 U.S.C. § 703.

## APPLICABLE MEDICARE LAWS

### The Medicare Program

17.     As part of the Social Security Amendments of 1965, Congress established the Medicare program: a national health insurance plan to cover the cost of medical care for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq*. Officially known as "Health Insurance Benefits

for the Aged and Disabled," it provides basic protection against the costs of inpatient hospital and other institutional provider care. It also covers the costs of physician and other healthcare practitioner services and items not covered under the basic program. In 1997, beneficiaries were extended the option of choosing a managed care plan. More recently, in 2006, the program was expanded further to include a prescription drug benefit.

### Ambulance Services

18.     Ambulance services are covered by Medicare when the use of other methods of transportation is contraindicated.  Essentially, this requires that the ambulance supplier show that patients' health would be jeopardized by use of any other mode of transportation.  Coverage requires that the following conditions must be met:  the supplier meets the requirements of 42 C.F.R. § 410.41; the services meet the medical necessity and origin and destinations requirements of 42 C.F.R § 410.40; and Medicare Part A payment is not made directly or indirectly for the services.  Typically, Medicare covers emergency ambulance transportation when a patient experiences sudden medical emergency and it endangers his or her health.  It also covers nonemergency transportation when medically necessary, and the patient has a written order by his or her physician that ambulance transportation is medically necessary.[5]

19.     For nonemergency ambulance transportation, medical necessity is satisfied if either: the beneficiary is bed-confined and it is documented that other methods of transportation are contraindicated; or the beneficiary's medical condition, regardless of bed-confinement, is such that ambulance transportation is medically required.  To be bed-confined, the beneficiary must be unable to get up from bed without assistance; ambulate; or sit in a chair or wheelchair. 42 C.F.R. § 410.40(d).

---

[5] To satisfy the medical necessity requirement, the beneficiary's condition must require both the ambulance transportation itself and the level of service provided.  *See* 42 C.F.R. § 410.40(d).

20. Medicare covers the following levels of ambulance services:

- Basic life support;
- Advanced life support;
- Paramedic ALS intercept;
- Specialty care transport;
- Fixed wing transport; and
- Rotary wing transport.

42 C.F.R. § 410.40(b).

21. Medicare covers the following ambulance transportation:

- From any point of origin to the nearest hospital, critical access hospital, or skilled nursing facility that is capable of furnishing the required level and type of care for the beneficiary's illness or injury;

- From a hospital, critical access hospital, or skilled nursing facility to the beneficiary's home;

- From a skilled nursing facility (SNF) to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip; and

- For a beneficiary who is receiving renal dialysis for treatment of end-stage renal disease, from the beneficiary's home to the nearest facility that furnishes renal dialysis, including the return trip.

42 C.F.R. § 410.40(e).

**Ambulance Reimbursement**

22. Ambulance services are reimbursed under a fee schedule payments system. The fee schedule payment equals a base rated for the levels of service plus a separate payment for mileage to the nearest appropriate facility and applicable adjustment factors. 42 U.S.C. § 1395m(l); 42 C.F.R. §§ 414.601 and 414.610(a).

**Payment and Audit Functions**

23. Medicare's payment and audit functions are performed by various federal contractors. For instance, the payment of home health claims at issue in this case was made by

10

Palmetto GBA, LLC. Various other contractors, like Qlarant, a Unified Program Integrity Contractor ("UPIC"), investigate instances of suspected fraud, waste, and abuse as well as identify any improper payments that are to be collected by Administrative Contractors.

### Appeal Process

24.     Ambulance suppliers participating in the Medicare program are entitled to appeal the initial determination. *See* 42 U.S.C. § 1395ff. Federal regulations establish an elaborate administrative appeal process to review the adverse action. *See* 42 C.F.R. Subpart I – Determination, Redeterminations, and Appeals Under Original Medicare. A provider dissatisfied with an initial determination may request a Redetermination by a contractor in accordance with 42 C.F.R. §§ 405.940-405.958. The Redetermination must be issued within sixty (60) calendar days. If a provider is dissatisfied with a Redetermination decision, it may request a Reconsideration by a Qualified Independent Contractor ("QIC") in accordance with 42 C.F.R. §§ 405.960-405.986. The Reconsideration must be issued within sixty (60) calendar days. In the event the provider is dissatisfied with the Reconsideration decision, it may request an ALJ hearing in accordance with 42 C.F.R. §§ 405.1000-405.1054. The ALJ must issue a decision within ninety (90) calendar days. The provider may request review of the ALJ's decision by the Medicare Appeals Council in accordance with 42 C.F.R. §§405.1100-405.1140. The Council must issue a decision within ninety (90) calendar days. The Council's decision is the final agency action, and it is subject to judicial review. *See* 42 U.S.C. § 1395ff; 42 C.F.R. §§ 405.1130, 405.1132, 405.1134; *see also* 42 U.S.C. § 405(g).

### Suspension of Medicare Payments

25.     Medicare payments to providers may be suspended, in whole or in part, by CMS or its contractors, if there is "reliable information that an overpayment exists." 42 C.F.R.

11

§ 405.371(a)(1).

26.    In cases of suspected fraud, CMS or its contractors may suspend Medicare payments where there is a "credible allegation of fraud" against the provider, unless there is good cause not to suspend payments. 42 C.F.R. § 405.371(a)(2).

27.    CMS may find that good cause exists not to suspend a provider's payments where, among other things, it is determined that beneficiary access to services would be so "jeopardized by a payment suspension" as to cause a "danger to life or health." 42 C.F.R. § 405.371(b)(ii).

28.    Every 180 days after the initiation of a suspension of payments based on a credible allegation of fraud, CMS will evaluate whether there is good cause to extend the suspension. 42 C.F.R. § 405.371(b)(2). Good cause to not continue a suspension is deemed to exist if it has been in effect for 18 months and there has not been a resolution of the investigation. 42 C.F.R. § 405.371(b)(3). However, the suspension can be continued indefinitely if the case has been referred to OIG for enforcement action or DOJ requests that it be continued based on the ongoing investigation and anticipated filing of criminal or civil action or both. 42 C.F.R. §§ 405.371(b)(3)(i), (ii).

### Rebuttal Statement

29.    A provider or supplier whose payments are suspended without notice, as in this case, is given by the Medicare contractor an opportunity to submit a rebuttal statement as to why the suspensions should be removed. 42 C.F.R. § 405.372(b)(2). *See also* 42 C.F.R. § 405.374. When a rebuttal statement is submitted, CMS, or its contractor, must within 15 days from the

date of its receipt issue written notice the determination. The rebuttal determination is not an appealable decision. 42 C.F.R. §§ 405.375(a)-(c).[6]

## CONDITIONS PRECEDENT

30.     All conditions precedent have been performed or have occurred.

## FACTS

### Medicare Ambulance Supplier

31.     Acute Care is an ambulance supplier located in Mercedes, Texas, and it participates in the Medicare program.

32.     Plaintiff has been in operation in the Rio Grande Valley-area for approximately nine years. It employs some 43 medics, drivers and administrative assistants. The provider derives approximately 90% of its revenue from Medicare payments. In 2019, total revenues were approximately $700,00.00. The supplier has an estimated value of approximately $2.1 million.

33.     The ambulance supplier has a diverse census of approximately 50 regular patients it transports on a scheduled and/or nonrepetitive basis. Many of its transports are due to COVID-19.

### COVID-19 Pandemic and National Emergency

34.     President Donald Trump declared on March 13, 2020 a national emergency because of the COVID-19 pandemic.

35.     Governor Gregg Abbott also declared a state of disaster in Texas due to COVID-19 on March 13, 2020.

36.     When the national emergency was declared, the U.S. Government COVID-19

---

[6] The suspension is not considered an "initial determination" and no appeal rights, including right to ALJ hearing, are extended to a provider to contest the adverse action.

Response Plan was issued outlining the coordinated federal response activities for COVID-19. The Government's response plan makes two things clear: (1) the pandemic "will last 18 months or longer" and (2) the COVID-19 outbreak will result in the implementation of drastic measures to contain its spread throughout the nation. Society as a whole may soon be faced with strict containment and social distancing measures for an extended period of time.

37.     Dr. Deborah Birx, White House Coronavirus Response Coordinator, has reported that U.S. deaths cause by COVID-19 may be catastrophic.   She said that Dr. Anthony Fauci, National Institute of Allergies and Infectious Diseases, has predicted U.S. deaths could range from 1.6 to 2.2 million in a worst-case scenario and projects 100,000 to 200,000 in a best case scenario.  With the surge of confirmed coronavirus cases, America's hospitals are being overwhelmed.  And it is having a cascading effect on ancillary providers and practitioners, including home health agencies.

38.     According to the Centers for Disease Control and Prevention as of August 7, 2020 there have been 4,802,491 confirmed cases and 157,631 COVID-19-related deaths in the United States.

### Coronavirus Spreading in Texas at an "Unacceptable Rate"

39.     "COVID-19 is now spreading at an unacceptable rate in the state of Texas, and it must be corralled," said Governor Abbott. "Office of the Texas Governor, Press release: *Governor Abbott Provides Update On COVID-19 Response, Urges Texans To Follow Guidelines*, June 22, 2020.

### Rio Grande Valley is a "Hot Spot"

40.     The surge in confirmed coronavirus cases is overwhelming south-Texas.

14

41.     Dr. Ivan Melendez, Hidalgo County Health Authority, was quoted as saying that "The Rio Grande Valley has become the hotspot of a hotspot of a hotspot."

42.     Indeed, the Rio Grande Valley is particularly vulnerable to COVID-19 with more than 90% of its residents being Latinx and having one of the highest poverty rates in the State. Chronic health conditions abound.  For example, the rate of diabetes is triple that of the national average.

43.     Recently, Governor Abbott sent Navy teams to assist the area's hard-hit hospitals in dealing with the COVID-19 outbreak.   The valley health community is so overrun by coronavirus that a field hospital or some other type of repurposed facility is now being built because current resources are failing in the fight to curb the COVID-19 outbreak.

44.     Ambulance companies in the Rio Grande Valley are in crisis due to the pandemic. Hospitals are in "divert" status – unable to accept new patients through ER.  Ambulances are being forced to wait in hospital parking sometimes for as long as 12 hours for beds to become available for their patients.  Ambulance strike teams are now being deployed by the State to the Rio Grande Valley to help the local ambulance companies deal with such problems associated with the COVID-19 emergency.

45.     The problems caused by COVID-19 are exacerbated by Hurricane Hanna striking the south-Texas coast on July 25, 2020.

### Medicare Payment Suspension

46.     On July 24, 2020, Qlarant issued to Plaintiff a notice of suspension of Medicare payments that informed the hospice that CMS had suspended its Medicare payments effective that day.  The suspension took effect on July 22, 2020.  CMS based its decision to suspend upon its belief the ambulance supplier had failed to describe beneficiaries' symptoms at the time of

transport and that any other means of transportation would be contraindicated. The list of sample claims indicates a *single incident* where a patient's transportation claim was denied due to deficient documentation. As a result, *all* Medicare payments owed to the ambulance company are being withheld pending resolution of the ongoing investigation.

### No Appeal or Right to a Hearing to Contest Adverse Action

47.     Acute Care has no appeal or right to a hearing to dispute and contest the imposition of the Medicare payment suspension action.

### Suspension Will Force Plaintiff's Shutdown and Bankruptcy

48     Impact of the Medicare payment suspension threatens to force Plaintiff's closure and filing of bankruptcy.

49.     If Acute Care is forced to close, it is much more than the loss of a very much needed ambulance company, the supplier's existing patients will have to obtain their scheduled medical transportation services elsewhere.

### Violation of Plaintiff's Due Process Rights

50.     Plaintiff has a constitutional property interest in payments for services rendered and now indefinitely suspended during the investigation into the adequacy of its documentation. Defendant violates Due Process of law by imposing the adverse action during the COVID-19 pandemic and national emergency without extending to the provider notice and an opportunity for a hearing to contest the Medicare payment suspension. Clearly, there is a high risk that Plaintiff will be erroneously deprived of its property interest in Medicare payments it has earned for services rendered and indefinitely withheld by suspension, pursuant to 42 C.F.R. § 405.371(a)(2), because the provider is not entitled under the available process to an

16

administrative appeal to dispute and contest the suspension, and there is absolutely no established time frame for resolving the investigation of its documentation.

### Violation of Plaintiff's Patients' Due Process Rights

51.     Patients at Acute Care have a constitutional Due Process right (consistent with principles of equal protection) to access safe and reliable services under the federal Medicare program. HHS violates the patients' right to access such healthcare by imposing the suspension during the COVID-19 pandemic and national emergency. Again, due to the COVID-19 outbreak securing such services are an uncertainty. Clearly, good cause exists not to suspend the supplier's Medicare payments where, as here, the beneficiary's access to items or services are jeopardized by the payment suspension and cause a danger to life or health. See 42 C.F.R. § 405.371(b)(1)(ii). Plaintiff is not entitled to an administrative appeal to contest the suspension or HHS's abuse of discretion in not finding good cause to not impose the adverse action.

### Abuse of Discretion in Not Exercising Good Cause Exception

52.     Had Defendant acted properly, it would not have continued the suspension. CMS may find good cause exists not to suspend a provider's Medicare payments, pursuant to 42 C.F.R. § 405.371(b)(1)(ii), when a beneficiary's access to items or services would be so jeopardized by a payment suspension as to cause a danger to life or health. It is a clear abuse of discretion for CMS to not find that good cause exists here when the COVID-19 pandemic and the surge of confirmed coronavirus cases will soon overwhelm America's healthcare system, including hospice providers. Not only will Plaintiff be forced to shut down, the government's suspension action places an even greater burden on a south-Texas healthcare community that may soon may be on the brink of collapse.

17

## Rebuttal Statement

53. A Rebuttal Statement was presented on August 3, 2020 by Plaintiff to Qlarant informing the UPIC that the Medicare suspension during the COVID-19 epidemic and national emergency was improper because, among other things, (1) it violates Plaintiff's constitutional right in payments for services rendered by failing to give notice and an opportunity for a hearing while payments are indefinitely suspended during the pendency of an investigation into the adequacy of its documentation, and (2) it violates the provider's patients' constitutional right to access essential healthcare services.

## Presentment of Claim

54. On August 3, 2020, Plaintiff gave formal Presentment of its Claim to Defendant informing HHS that imposing the Medicare suspension during the COVID-19 epidemic and national emergency was improper because, among other things, (1) it violates Plaintiff's constitutional right in payments for services rendered by failing to give notice and an opportunity for a hearing while payments are indefinitely suspended during the pendency of an investigation into the adequacy of its documentation, and (2) it violates the provider's patients' constitutional right to access essential healthcare services.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

55. Defendant's failure to give notice and an opportunity for hearing to dispute and contest the July 24,2020 suspension of Medicare payments violates constitutionally required procedures. Plaintiff is deprived of an administrative process that conforms to the concept of Due Process of law and that effectively prevents the provider from exhausting administrative remedies to challenge the illegal action. No administrative or judicial review is otherwise available to contest Defendant's adverse action. Such failure violates Plaintiff's constitutional

18

right of Due Process of law guaranteed by the U.S. CONST. amend. V, § 1. Under these facts, the administrative exhaustion requirement is excused.

## CLAIMS FOR RELIEF

### Count 1 - Violation of Procedural Due Process of Law

56.     Plaintiff hereby incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

57.     The Fifth Amendment to the U.S. Constitution guarantees that no person shall be deprived of life, liberty, or property without Due Process of law.

58.     Plaintiff has a constitutional property right in earned payments for services rendered and now indefinitely suspended during the pendency of the investigation into the adequacy of its documentation.

59.     Defendant's failure to give meaningful notice and an opportunity for a hearing to dispute and contest the suspension of Plaintiff's Medicare payments violates Due Process of law.

60.     Despite the lack of appeal rights to challenge the adverse action, Defendant initiated 100% suspension of the provider's Medicare payments for an indefinite period of time, which will irreparably harm the ambulance supplier by forcing its closure and filing of bankruptcy.

61.     Indeed, Defendant's failings have denied Plaintiff the fundamental requisites of Due Process, notice and an opportunity to be heard.

62.     Accordingly, Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19 pandemic and national emergency or until it can provide notice and a hearing in conformance with constitutionally required procedures.

## Count 2 – Violation of Patients' Due Process Right of Access to Healthcare

63.     Plaintiff hereby incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

64.     Patients at Acute Care have a Due Process right (consistent with principles of equal protection) to access safe and reliable services under the federal Medicare program.

65.     Defendant violates these patients' right to access such healthcare by imposing the suspension during the COVID-19 pandemic and national emergency.

66.     Due to the COVID-19 outbreak securing such ambulance transportation is an uncertainty.

67.     Defendant jeopardizes the health and safety of Plaintiff's patient by suspending the ambulance supplier's Medicare payments when the availability of alternative services is unsure and access to an ambulance is at risk during the COVID-19 pandemic and national emergency.

68.     Defendant's ill-advised suspension of Plaintiff's Medicare payments deprives the ambulance supplier's patients of their constitutional right to access essential healthcare services.

69.     A patient cannot secure ambulance services without the aid of an ambulance supplier, and a Medicare beneficiary cannot secure necessary ambulance services without the ambulance being paid by the Medicare program. Clearly, a patient's right to access safe and reliable ambulance services under the federal Medicare program is at stake here. Moreover, the patient's constitutional right of access is one in which the supplier is intimately involved. *See Singleton v. Wulff*, 428 U.S. 106 (1976). Therefore, Plaintiff is uniquely qualified to litigate the constitutionality of the government's interference with, or discrimination against, such access, and the supplier appropriately asserts the rights of beneficiaries against governmental interference with access to ambulance services.

70.     Accordingly, Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19

pandemic and national emergency or until it can provide notice and a hearing in conformance with constitutionally required procedures.

## Count 3 – Defendant's Suspension of Payments is Arbitrary and Capricious

71. Plaintiff hereby incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

72. The Federal regulations 42 C.F.R. § 405.371(b)(1)(ii) provide that Defendant may find good cause exists *not* to suspend a supplier's Medicare payments over credible allegations of fraud where it is determined that beneficiary access to such services would be so jeopardized by a payment suspension in whole or in part as to cause a danger to life or health.

73. Due to the COVID-19 outbreak securing such ambulance services is an uncertainty.

74. Defendant jeopardizes the health and safety of Plaintiff's patient by suspending the ambulance's Medicare payments when the availability of alternative services is unsure and access to an ambulance is at risk during the COVID-19 pandemic and national emergency.

75. It is a clear abuse of discretion for Defendant to not find that good cause exists here where the COVID-19 pandemic and the surge of confirmed coronavirus cases will soon overwhelm south-Texas' Rio Grande Valley healthcare system, including ambulance suppliers like Acute Care.

76. Defendant's ill-advised action not only will force Plaintiff to shut down its operation, it will place an even greater burden on the Rio Grande Valley healthcare community that soon may be on the brink of collapse due to the COVID-19 epidemic and national emergency.

77. Accordingly, Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19

pandemic and national emergency or until it can provide notice and a hearing in conformance with constitutionally required procedures.

## Count 4 – Ultra Vires

78.     Plaintiff hereby incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

79.     Defendant acts *ultra vires* in failing to give notice and an opportunity for a hearing to dispute and contest the adverse action in conformance with Due Process of law yet imposing Medicare payment suspension during the COVID-19 pandemic and national emergency.

80.     Despite the failure to give notice and an opportunity for hearing to dispute and contest the adverse action, Defendant has suspended 100% of Plaintiff's payments, which will irreparably harm the ambulance supplier by forcing it to close and file bankruptcy.

81.     Indeed, Defendant's failings effectively deprive Plaintiff of the fundamental requisites of Due Process, notice and an opportunity to be heard.

82.     Accordingly, Plaintiff is entitled to injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19 pandemic and national emergency or until it can provide notice and a hearing in conformance with constitutionally required procedures.

## REQUEST FOR PRELIMINARY INJUNCTION

83.     Plaintiff will suffer irreparable injury if Defendant is not required to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19 pandemic and national emergency or until it can provide a hearing in conformance with constitutionally required procedures. Defendant's failure to give meaningful notice and an opportunity for a

hearing to dispute and contest the suspension of Plaintiff's Medicare payments violates Due Process of law. Also, Plaintiff's patients have a Due Process right (consistent with principles of equal protection) to access safe and reliable services under the federal Medicare program, and Defendant violates their right to access essential healthcare by imposing the suspension during the COVID-19 pandemic and national emergency. The government's egregious *ultra vires* conduct can only be remedied by a form of injunctive relief otherwise unavailable through the administrative process. Clearly, the combined threats of Plaintiff going out of business and its patients' loss of access to essential healthcare services are sufficient for irreparable harm. *Family Rehabilitation, Inc. v. Azar*, 886 F.3d at 506.

84.     There is no adequate remedy at law to contest and dispute the Medicare payments suspension imposed during the COVID-19 pandemic and national emergency. *See Family Rehabilitation, Inc. v. Azar*, 886 F.3d at 504 (jurisdiction to hear procedural due process and *ultra vires* claims). Indeed, when the administrative process is not accessible, extraordinary relief is available. *See U.S. Ex Rel. Rahman v. Oncology Associates*, P.C., 198 F.3d 502 (4th Cir. 1999) (mandamus available when HHS failed to make overpayment determinations).

85.     There is a substantial likelihood that Plaintiff will prevail on the merits because Defendant's failure to give notice and an opportunity for hearing to contest the suspension imposed during the COVID-19 pandemic and national emergency violates Due Process of law. Plaintiff seeks only to temporarily rescind the Medicare payment suspension until the COVID-19 national emergency ends or until Defendant can provide a hearing in conformance with constitutionally required procedures. Procedural due process protects against governmental deprivation of a property interest, such as Plaintiff's interest in receiving Medicare payments earned for ambulance services rendered. *See Adams*, No. 4:18-cv-01422 (S.D. Tex. July 11,

2018); *Family Rehabilitation, Inc. v. Azar*, 2018 WL 2670730, *5-6 (N.D. Tex. June 4, 2018). *See also Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998) and *Oberlander v. Perales*, 740 F.2d 116 (2d Cir. 1984) (property interest in "earned" Medicaid payments). This is derivative of the protected property interest recognized in one's ownership of money. *See Board of Regents v. Roth*, 408 U.S. 564, 571-72 (1971). Accordingly, Plaintiff has a property interest in receiving the Medicare payments it has earned for services rendered and that interest is violated by Defendant's imposition of the Medicare payment suspension during the COVID-19 pandemic and national emergency, and where it fails to give notice and an opportunity for hearing to dispute and contest the adverse action. Inasmuch as Defendant has failed to give notice and an opportunity for hearing to contest the Medicare payments suspension, and Defendant violates Plaintiff's patients' right to access essential healthcare by imposing the suspension during the COVID-19 pandemic, Plaintiff demonstrates a substantial likelihood of success on the merits of its procedural due process claim.

86.     The harm faced by Plaintiff outweighs the harm that would be sustained by Defendant if injunctive relief is not granted. The ambulance supplier will be forced to close its doors and file bankruptcy because of Defendant's *ultra vires* acts and its patients will be forced to secure alternative services in the midst of the COVID-19 pandemic and national emergency when such essential healthcare services are at risk of being unavailable. Defendant, on the other hand, will only be required to pay for the current claims of Medicare beneficiaries that it is otherwise obligated to reimburse under law.

87.     Issuance of an injunction would not adversely affect the public interest. On the contrary, such relief ensures that Defendant will continue to provide essential healthcare to Medicare program beneficiaries during the COVID-19 pandemic and national emergency.

88      Plaintiff is willing to post a bond in the amount the Court deems appropriate, but it should not be required to do so on the facts of this case because Defendant is otherwise obligated to pay for the ambulance services of beneficiaries under the Medicare program.

89.     Plaintiff asks the Court to set its application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction.

## REQUEST FOR PERMANENT INJUNCTION

90.     Plaintiff asks the Court to set its application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendant.

## REQUEST FOR DECLARATORY RELIEF

91.     Plaintiff asks the Court for declaratory relief in accordance with Rule 57 and 28 U.S.C. § 2201 that declares Defendant's July 24, 2020 Medicare payment suspension during the COVID-19 pandemic and national emergency (1) violates Plaintiff's constitutional right in payments for services rendered and now indefinitely suspended during the pendency of an investigation into the adequacy of its documentation, (2) and violates the supplier's patients' constitutional right to access essential healthcare services, and (3) is arbitrary and capricious and a clear abuse of discretion for Defendant to not find good cause exists not to suspend the supplier's Medicare payments when the beneficiary's access to items or services is jeopardized by the payment suspension and it causes a danger to life or health.

## ATTORNEY FEES & COSTS

92.     Plaintiff is entitled to an award of attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, upon showing the applicant is a "prevailing party;" a showing that the applicant is "eligible to receive an award; and a statement of "the amount sought,

including an itemized statement from any attorney . . . stating the actual time expended and the rate charged. The prevailing party is entitled to such attorney fees unless the government's position was "substantially justified" or special circumstances make an award unjust.

## PRAYER

93.     For these reasons, Plaintiff asks for judgment against Defendant for the following:

a.    Mandatory injunctive relief that requires Defendant to temporarily rescind the Medicare payment suspension during the pendency of the COVID-19 pandemic and national emergency or until HHS can provide a hearing in conformance with constitutionally required procedures.

b.    Declare that Defendant's July 24, 2020 Medicare payment suspension violates Plaintiff's constitutional right to notice and an opportunity for hearing to contest the adverse action.

c.    Declare that Defendant's July 24, 2020 Medicare payment suspension violates Plaintiff's patients' constitutional right to access essential healthcare services.

d.    Declare that Defendant's July 24, 2020 Medicare payment suspension is arbitrary and capricious and a clear abuse of discretion for Defendant to not find good cause exists not to suspend the ambulance supplier's Medicare payments when the beneficiary's access to such services is jeopardized by the payment suspension and it causes a danger to life or health.

e.    Reasonable attorney fees.

f.    Court costs.

Case 7:20-cv-00217 Document 1 Filed on 08/07/20 in TXSD Page 27 of 28

g.    All other relief the Court deems appropriate.

                              Respectfully submitted,

                              KENNEDY
                              Attorneys and Counselors at Law

                              */s/ Mark Kennedy*
                              MARK S. KENNEDY
                              State Bar of Texas No. 24000122
                              LURESE A. TERRELL
                              State Bar of Texas No. 24008139
                              C. TREY SCOTT
                              State Bar of Texas No. 24083821
                              12222 Merit Drive, Suite 1750
                              Dallas, TX 75251
                              Telephone: (214) 445-0740
                              Fax: (972) 661-9320
                              markskennedylaw@msn.com

                        **ATTORNEYS FOR PLAINTIFF**

27

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ACUTE CARE AMBULANCE SERVICE, L.L.C., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | |
| ALEX M. AZAR II, Secretary, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | § § § § § | CIVIL ACTION NO. 7:20-cv-217 |
| Defendant. | § § | |

## VERIFICATION

"I, Juan Carlos Rojas, declare from my personal knowledge that the following facts are true:

1.     I, Juan Carlos Rojas, am owner and the President of Acute Care Ambulance Services, L.L.C.,

2.     I have read the Verified Complaint for Injunctive and Declaratory Relief and Attorney Fees.

3.     The facts stated in that complaint are within my personal knowledge and are true and correct.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2020."


_____
JUAN CARLOS ROJAS

**WESTLAW CLASSIC**

🚩 **Declined to Follow by** Infinity Healthcare Services, Inc. v. Azar,  ⫶ S.D.Tex.,   November 19, 2018

2018 WL 5264244

🚩 **Adams EMS, Inc. v. Azar**
United States District Court, S.D. Texas, Houston Division.   October 23, 2018   Not Reported in Fed. Supp.   2018 WL 5264244   *(Approx. 13 pages)*

ADAMS EMS, INC., Plaintiff,

v.

Alex M. AZAR II, Secretary, United States Department of Health and
Human Services Defendant.

Civil Action No. H-18-1443
Signed 10/23/2018

### Attorneys and Law Firms

Calvin Trey Scott, Mark Stephen Kennedy, Kennedy Attorneys and Counselors at Law,
Dallas, TX, for Plaintiff.

Jose Vela, Jr., United States Attorney's Office, Houston, TX, Jennifer M. Mendola, Pro Hac
Vice, Neel Gandhi, Pro Hac Vice, HHS - Office of the General Counsel, Dallas, TX, for
Defendant.

### MEMORANDUM AND OPINION

Lee H. Rosenthal, Chief United States District Judge

**\*1** In May 2018, Adams EMS, Inc. sued Alex M. Azar II, the Secretary of the United States
Department of Health and Human Services ("HHS"), over a Medicare reimbursement
dispute. (Docket Entry No. 1). Adams seeks an injunction, a declaratory judgment,
mandamus relief, attorney fees, and costs. (Docket Entry No. 1 at ¶ 89). In July 2018, the
court temporarily restrained the government from recouping the alleged overpayment to
Adams. (Docket Entry No. 17, 21, 22). The parties argued the government's motion to
dismiss for lack of subject-matter jurisdiction and Adams's request for a preliminary
injunction in August 2018. (Docket Entry No. 35). In September, Adams supplemented its
financial disclosures, the government responded, and Adams replied. (Docket Entries No.
36, 43, 46).

Based on the parties' briefs, counsels' arguments, the record, and the applicable law, the
court denies the government's motion to dismiss. The court also enjoins the government
from withholding any Medicare receivables from Adams to recoup the alleged
overpayments in the claim pending an administrative-law-judge hearing. The reasons are
set out in detail below.

### I. Background

#### A. Medicare Program and Appeal of Audited Payment Decisions

Medicare Administrative Contractors reimburse beneficiaries' ambulance transport when
other transport means are unavailable or inadvisable. See 42 U.S.C. § 1395x(s)(7); 42
C.F.R. § 410.40(d). HHS hires contractors, known as Zone Program Integrity Contractors,
to complete post-payment review of reimbursements to identify and investigate cases of
suspected fraud. See 42 U.S.C. § 1395kk-1. "When a [Zone Program Integrity Contractor]
identifies an overpayment, it notifies the relevant [Medicare Administrative Contractor],
which then issues a demand letter to the provider." Family Rehab., 886 F.3d at 499.
Ambulance suppliers participating in Medicare can appeal a Zone Program Integrity
Contractor's adverse audit. 42 U.S.C. § 1395ff. This audit and related appeals are at issue
in this case.



EXHIBIT
E

The Fifth Circuit recently explained the four-step administrative appeals process available to providers like Adams:

First, [a provider] may submit to the [Medicare Administrative Contractor] a claim for redetermination of the overpayment. Second, it may ask for reconsideration from a Qualified Independent Contractor ... hired by [HHS's Centers for Medicare and Medicare Services] for that purpose. If the [Qualified Independent Contractor] affirms the [Medicare Administrative Contractor's] determination, the [Medicare Administrative Contractor] may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider.

Third, the provider may request *de novo* review before an [administrative law judge] within the Office of Medicare Hearings and Appeals[,] an agency independent of [the Centers for Medicare and Medicaid Services]. The [administrative-law-judge] stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact. The [administrative law judge] "shall conduct and conclude a hearing ... and render a decision ... not later than" 90 days after a timely request. Fourth, the provider may then appeal to the Medicare Appeals Council[,] an organization independent of both [the Centers for Medicare and Medicaid Services] and [the Office of Medicare Hearings and Appeals]. The [Medicare Appeals] Council reviews the [administrative law judge's] decision *de novo* and is similarly required to issue a final decision within 90 days. Furthermore, if [administrative law judge] fails to issue a decision within 90 days, the provider may "escalate" the appeal to the [Medicare Appeals] Council, which will review the [Qualified Independent Contractor's] reconsideration.

*2 *Family Rehab.*, 886 F.3d at 499–500 (footnotes and citations omitted).

When a party escalates the appeal to the Medicare Appeals Council under 42 C.F.R. § 405.1016, the Council must issue a final decision, dismiss the claim, or remand the case to the chief administrative law judge within 180 days of receiving the escalation. 42 C.F.R. § 405.1100. Because escalated appeal can occur only after the administrative law judge has failed to issue an order within 90 days, and because the Council has 180 days to issue a decision, it can take a party 270 days, or more, to receive a decision after requesting review before an administrative law judge.

Adams alleges that a large and growing backlog of Medicare appeals from an increased number of claims has slowed the time for a supplier to complete the Medicare appeals process. (Docket Entry No. 1 at ¶¶ 15–16). From January to September 1, 2017, 167,899 new claims for adjudication had been filed, but only 76,000 of a total of 595,000 outstanding claims were adjudicated. (*Id.* at ¶ 20). The predicted wait times between obtaining a reconsideration decision from a Qualified Independent Contractor and appearing before an administrative law judge is between three to five years, and sometimes longer. (*Id.* at ¶ 22); *Family Rehab.*, 886 F.3d at 500 ("According to [the plaintiff]—and effectively conceded by the government—it will be unable to obtain an administrative-law-judge hearing for at least another three to five years."). The government admits that "it is uncertain when Adams will receive an [administrative-law-judge] hearing." (Docket Entry No. 9 at 6).

### B. Facts

On December 27, 2016, Health Integrity, L.L.C., a Zone Program Integrity Contractor, determined that Adams had received $418,035 in overpayments for reimbursement claims submitted from July 17, 2012, to January 15, 2016. (Docket Entry No. 1 at ¶ 26). The known overpayment was $14,846; the $418,035 amount was extrapolated through statistical sampling. (*Id.*). Novitas Solutions, a Medicare Administrative Contractor, notified Adams of the alleged overpayment and recoupment obligation. (*Id.* at ¶ 27). Adams claims that the notice "was not accompanied by any of the essential statistical data used to calculate the overpayment, nor did it include critical evidence regarding the audit." (*Id.*).

On February 7, 2017, Adams initiated the first step of the Medicare appeals process by asking Novitas Solutions for a redetermination of Health Integrity's overpayment determination. (*Id.* at ¶ 28). Adams argued that Health Integrity failed to adhere to the statutory and regulatory guidelines in denying the claims comprising the extrapolation sample. (*Id.* at ¶ 29). Adams also argued that the extrapolation was not accurate because Health Integrity's statistical sampling methodology did not conform to statutory and regulatory guidelines. (*Id.*). On April 5, 2017, Novitas Solutions sustained the overpayment determination. (*Id.* at ¶ 30).

On June 9, 2017, Adams initiated the second step of the appeals process by asking a Qualified Independent Contractor to reconsider the Novitas Solutions decision. (*Id.* at ¶ 31). On August 15, 2017, the Qualified Independent Contractor, C2C Innovative Solutions, Inc., affirmed the Novitas Solutions redetermination, stating that "the sample size used by [Health Integrity] was not adequate to justify this demand amount," and that Health Integrity "would have had to recalculate the demand amount based on a different (more conservative) extrapolation methodology." (*Id.* at ¶ 32). On December 15, 2017, C2C Innovation Solutions reopened its August 15 decision and revised it as "partially favorable." (*Id.* at ¶ 33). Adams still lost on each individual claim in the C2C Innovation Solutions' revised decision, which again stated that the sample size used by Health Integrity was inadequate to justify the demand amount. (*Id.* at ¶ 34). Health Integrity then issued a reconsideration decision, but that decision did not recalculate the overpayment amount. (*Id.* at ¶¶ 34–35).

*3 On February 12, 2018, Adams requested a hearing before an administrative law judge, arguing that C2C Innovation Solutions failed to adhere to the statutory and regulatory guidelines when it denied the sample claims, and that the statistical sampling methodology was improper. (*Id.* at ¶ 36). Adams alleges that, "[b]ased on Defendant's recent reports, the hearing and decision that is required within 90 days may not be available for at least another three to five years due to the serious backlog of agency appeals." (*Id.* at ¶ 37).

Novitas Solutions recalculated the recoupment amount and reduced Adams's liability to $401,611.80 from $418,035, stating that it had used a new methodology.[1] (*Id.* at ¶ 38). Adams alleges that, because the use of statistical sampling was invalidated, Novitas Solutions should have limited its overpayment and recoupment to $14,846, the actual overpayment amount. (*Id.*). Instead, HHS has threatened to collect $418,035, the original overbilling estimate. (*Id.* at ¶ 39).

Federal courts have jurisdiction over a "final decision" of HHS "arising under" the Medicaid Act. 42 U.S.C. § 405(g)–(h); 42 U.S.C. § 1395ff(b)(1)(A). Although Adams did not escalate its case to the Medicare Appeals Council, the final level of administrative appeals, Adams claims it has exhausted administrative remedies because HHS failed to provide a hearing before an administrative law judge within 90 days, as required. (Docket Entry No. 1 at ¶ 40).

Adams claims that if the government initiated recoupment of the $418,035, "[a] successful business valued at $1 million would be destroyed. Twelve valuable employees would be terminated." (*Id.* at ¶ 1). To prevent that injury, Adams seeks injunctive relief, a declaratory judgment, attorney fees, and costs. (*Id.* at ¶ 89). Adams also requests mandamus relief, arguing that the court must compel HHS to issue another reconsideration decision in accordance with C2C Innovation Solutions' findings because Health Integrity did not recalculate the overbilling amount in its reconsideration decision. (*Id.* at ¶¶ 66–73).

**II. The *Family Rehab* Case**

In *Family Rehab., Inc. v. Azar*, 886 F.3d 496 (5th Cir. 2018), a Zone Program Integrity Contractor determined that Family Rehabilitation, Inc., a home-health agency that generated most of its revenue from Medicare, received $7.8 million in Medicare overpayments. *Family Rehab.*, 886 F.3d at 498–499. The Zone Program Integrity Contractor did not calculate the exact overpayment amount; instead, it determined an estimate "us[ing] a statistical method to extrapolate the alleged overbilling rate." *Id.* at 499. A Medicare Administrative Contractor then demanded that Family Rehab repay the $7.8 million. *Family Rehab., Inc. v. Azar*, No. 17-3008, 2018 WL 3155911, at *2 (N.D. Tex. June 28, 2018).

Family Rehab, "challenging both the initial audit results and the extrapolation methodology, exhausted the first two stages of th[e] administrative appeals process." *Family Rehab.*, 886 F.3d at 499. First, Family Rehab petitioned the Medicare Administrative Contractor for a redetermination of its initial findings. *Id.* The Medicare Administrative Contractor reduced the amount owed from $7.8 million to $7.6 million. *Id.* Second, Family Rehab "appealed the [Medicare Administrative Contractor's] redetermination to the [Qualified Independent Contractor]." *Family Rehab.*, 2018 WL 3155911, at *2. Although Family Rehab, in accordance with administrative requirements, requested an administrative-law-judge hearing, the government began to recoup the alleged overpayment. *Id.* Family Rehab laid off almost 89% of its staff and cut its patient numbers from 289 to 8 as a result of the recoupment. *Family Rehab., Inc. v. Azar*, No. 17-3008, 2018 WL 2670730 (N.D. Tex. June 4, 2018), at *1. Family Rehab brought due process and *ultra vires* claims against HHS,

seeking injunctive relief. *Id.* at 2. The plaintiff had not escalated its case to the Medicare Appeals Council before filing suit. *Family Rehab.*, 886 F.3d at 499.

*\*4* The Fifth Circuit held that the district court had jurisdiction over Family Rehab's due process and *ultra vires* claims under the *Eldridge* collateral-claim exception to the final agency decision requirements of 42 U.S.C. § 405(g) and (h). *Family Rehab.*, 886 F.3d at 500–01. The panel reasoned that Family Rehab's due process and *ultra vires* claims were "plainly collateral" because "Family Rehab seeks only a hearing before the recoupment of its Medicare revenues," which does "not require the court to wade into the ... merits of recoupment." *Id.* at 503.

The Fifth Circuit rejected Family Rehab's assertion of federal-question jurisdiction under *Illinois Council*'s preclusion-of-judicial review exception. *See Shalala v. Ill. Council on Long Term Health Care, Inc.*, 529 U.S. 1, 23 (2000). The panel explained that the "exception is narrow and applies only when channeling a claim through the agency would result in the '*complete* preclusion of judicial review.' " *Family Rehab.*, 886 F.3d at 504–05 (emphasis in original). Family Rehab failed to show "either that bringing its claim administratively is 'a legal impossibility,' or that it faces 'a serious practical roadblock to having [its] claims reviewed in any capacity, administratively or judicially.' " *Id.* at 504–05; *see also Ill. Council*, 529 U.S. at 19.

Finally, the panel held that the district court lacked mandamus jurisdiction under 28 U.S.C. § 1361. Although "§ 405(h) does not preclude mandamus jurisdiction," which "exists if the action is an attempt to compel an [agency] to perform an allegedly nondiscretionary duty owed to the plaintiff," the mandamus statute "does not provide jurisdiction over requests 'for ... injunctive relief.' " *Id.* at 505–06. The Fifth Circuit also clarified that a plaintiff is not required to exhaust administrative remedies to invoke mandamus jurisdiction. *Id.* at 506. But because Family Rehab requested only an injunction, and not mandamus, "§ 1361 does not confer jurisdiction because [the provider did] not seek mandamus relief." *Id.*

## III. The Motion to Dismiss

### A. The Government's Primary Argument—Lack of Subject-Matter Jurisdiction

#### 1. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction. "Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation omitted). "Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cty.*, 798 F.2d 736, 741 (5th Cir. 1996) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) ).

The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of the plaintiff's cause of action, the district court has substantial authority to "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson*, 645 F.3d at 413. "[A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle [the] plaintiff to relief." *Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) ).

*\*5* "The Medicare Act severely restricts the authority of federal courts by requiring 'virtually all legal attacks' under the Act be brought through the agency." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 653 (5th Cir. 2012). In the normal course, because a claimant must obtain a final decision from HHS before seeking relief in federal court, a provider like Adams "may come to district court only after either (1) satisfying all four stages of administrative appeal, i.e., after the [Medicare Appeals] Council has rendered a decision, or (2) after the provider has escalated the claim to the [Medicare Appeals] Council and the Council acts or fails to act within 180 days. *Family Rehab.*, 886 F.3d at 501 (citations omitted); U.S.C. §§ 405(g)–(h); 42 C.F.R. § 405.1132. Three narrow exceptions excuse exhaustion: (1) the *Eldridge* collateral-claim exception under § 405(g); (2) the preclusion-of-judicial-review exception under 28 U.S.C. § 1331; and (3) mandamus jurisdiction under 28 U.S.C. § 1361. *Family Rehab.*, 886 F.3d at 501; *See Mathews v. Eldridge*, 424 U.S. 319, 330–31 (1976); *Ill. Council*, 529 U.S. at 19; *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635

F.3d 757, 764 (5th Cir. 2017). Adams concedes that its claims arise under the Medicare Act. (Docket Entry No. 1 at ¶¶ 7, 14; Docket Entry No. 25 at 1–2, 10–11). Adams also admits that it did not escalate its appeal to the Medicare Appeals Council. (Docket Entry No. 1 at ¶¶ 36–40; Docket Entry No. 25 at 1–2, 10–11). Adams must therefore satisfy an exception for the court to adjudicate this action. While Adams's complaint asserts jurisdiction under the collateral-claim, preclusion-of-judicial-review, and mandamus exceptions, its response to the government's motion to dismiss invokes only collateral-claim and mandamus jurisdiction.

The government argues that the court does not have jurisdiction because "Congress has not waived sovereign immunity." (Docket Entry No. 9 at 8). But Congress enacted 42 U.S.C. § 405(g), permitting claimants to sue HHS in federal court. The government contends that § 405(g)'s final agency requirement is a condition precedent of the statute's waiver of sovereign immunity. Fifth Circuit case law, however, implies that if a plaintiff satisfies one of the exceptions to the final agency requirement, the government consents to suit. *See Family Rehab.*, 886 F.3d at 501.

### 2. The Collateral-Claim Exception

The *Eldridge* collateral-claim exception is governed by a two-pronged test. Jurisdiction exists over Medicare claims: (1) "that are 'entirely collateral' to a substantive agency decision" and (2) "for which 'full relief cannot be obtained at a postdeprivation hearing.' " *Family Rehab.*, 886 F.3d at 501 (citing *Eldridge*, 424 U.S. at 330–32). "For a claim to be collateral, it must not require the court to 'immerse itself' in the substance of the underlying Medicare claim or demand a 'factual determination' as to the application of the Medicare Act." *Id.* (citing *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285–286 (5th Cir. 1999) ). And because "the claim must seek ... relief that would be unavailable through the administrative process," the plaintiff cannot request " 'administrative,' i.e., ... substantive, permanent relief." *Id.* In short, a plaintiff "may bring claims that sound only in constitutional or procedural law ... and request that benefits be maintained temporarily until the agency follows the statutorily or constitutionally required procedures." *Id.* at 503. Under the second prong, a party must "rais[e] at least a colorable claim' that erroneous recoupment will 'damage [it] in a way not recompensable through retroactive payments.' " *Id.* at 504 (citing *Eldridge*, 424 U.S. at 331).

Applying these principles in *Family Rehab.*, the Fifth Circuit held that the district court had jurisdiction under § 405(g). First, the panel found that Family Rehab's claims were "plainly collateral." *Id.* The panel reasoned that "Family Rehab seeks only [temporary relief and] a hearing before the recoupment of its Medicare revenues," which "only require the court to determine how much process is [due] under the Constitution and federal law before recoupment." *Id.* Family Rehab also satisfied the exception's second prong by alleging that it would suffer the irreparable harm of bankruptcy if the government imposed recoupment. That contention " 'rais[ed] at least a colorable claim' that erroneous deprivation will 'damage [it] in a way not recompensable through retroactive payments.' " *Id.* at 504 (citing *Eldridge*, 424 U.S. at 331).

*6 Adams seeks identical relief, an injunction "that requires [HHS] to suspend recoupment until it can provide a hearing and decision within 90 days." (Docket Entry No. 1 at ¶¶ 3, 47, 53, 59, 65). Because that relief is temporary and "unrelated to the merits of the recoupment," *Family Rehab.*, 886 F.3d at 503, it is collateral under *Eldridge*. And, as in *Family Rehab.*, Adams asserts that it will suffer irreparable injury, bankruptcy, if the government collects the alleged overpayment. It is apparently undisputed that Adams has already downsized from 12 to 2 employees since 2016. Adams cannot obtain full relief at a postdeprivation hearing. Because Adams satisfies the collateral-claim exception's two prongs, the court has jurisdiction over its due process and *ultra vires* claims.

### 3. Federal-Question Jurisdiction

Jurisdiction exists over Medicare claims under 28 U.S.C. § 1331 if administrative obstacles "would not simply channel review through [HHS,] but would mean no review at all." *Ill. Council*, 529 U.S. at 19. "This exception is narrow and applies only when channeling a claim through the agency would result in the '*complete* preclusion of judicial review.' " *Family Rehab.*, 886 F.3d at 504–05 (emphasis in original) (citing *Ill. Council*, 529 U.S. at 23). A plaintiff asserting jurisdiction under the exception "must show either that bringing its claim administratively is 'a legal impossibility,' or that it faces 'a serious practical roadblock to having [its] claims reviewed in any capacity, administratively or judicially.' " *Id.* at 505. The Fifth Circuit has "required channeling so long as 'there potentially were other parties with an interest and a right to seek administrative review.' " *Id.*

In *Family Rehab.*, the panel held that the district court did not have federal-question jurisdiction because, "[g]iven the thousands of ongoing Medicare appeals[,] there is no dearth of third parties with both the incentives and capacity to challenge the timeliness of [administrative-law-judge] hearings." *Id.* Here, the court does not have jurisdiction under § 1331 because Adams has not alleged facts that if proven would show that administrative review is "a legal impossibility." As in *Family Rehab.*, Adams contends that administrative-law-judge review is significantly delayed; Adams does not claim that review is altogether unavailable.

### 4. Mandamus Jurisdiction

Under 28 U.S.C. § 1361, "mandamus jurisdiction exists if the action is an attempt to compel an officer or employee of the United States or its agencies to perform an allegedly nondiscretionary duty owed to the plaintiff." *Wolcott*, 635 F.3d at 766. Because mandamus requires the government to affirmatively perform an action, injunctive relief that mandates forbearance does not confer jurisdiction under § 1361. *Id.* at 766–67. Here, the government argues that Adams must have exhausted all available remedies to invoke mandamus jurisdiction. (Docket No. 9 at 11). That contention, however, conflates jurisdiction with the merits. *Family Rehab.*, 886 F.3d at 506 ("We have cautioned to 'avoid tackling the merits under the ruse of assessing jurisdiction.' "). Further, in dicta, the Fifth Circuit has clarified that plaintiffs are not required "to exhaust all other avenues of relief" to establish mandamus jurisdiction. *Id.* at 506.

In *Family Rehab.*, the Fifth Circuit held that mandamus was unavailable because the provider requested an injunction instead of an order compelling the government to affirmatively discharge a duty. *Id.* By contrast, in *Wolcott*, the panel held that mandamus jurisdiction existed over three counts "because the ultimate relief [the plaintiff] seeks ... is an order compelling the defendants to perform a nondiscretionary duty." *Wolcott*, 635 F.3d at 766. In this case, Adams asserts mandamus jurisdiction to compel Novitas Solutions to issue a new recalculation letter limiting its liability from $418,035 to $14,846 because C2C Innovative Solutions invalidated Health Integrity's extrapolation methodology. (Docket Entry No. 1 at ¶¶ 66–73).

*7 But case law limits mandamus to due process rights, not particular outcomes. In *Family Rehab.*, the Fifth Circuit implied that mandamus jurisdiction would exist if the provider sought an order compelling the government to provide a timely hearing before an administrative law judge. *Family Rehab.*, 886 F.3d at 506. In *Wolcott*, the panel found mandamus jurisdiction because the plaintiff sought an order compelling the government to abide by the law and binding administrative decisions. *Wolcott*, 635 F.3d at 766. By contrast, Adams asks for an order that compels a certain result, the limitation of its liability to $14,846. That request is not analogous to the relief sought in *Family Rehab.* or *Wolcott*.

Further, the duty at issue is discretionary. The authority cited, 42 U.S.C. § 1395ff(c) and 42 C.F.R. §§ 405.960–405.978, affords process through the establishment of the Medicare appeals system. The statute and regulations do not impose a government obligation to reissue a recalculation letter limiting Adams's recoupment obligation to the actual overpayment amount. The Medicare Claims Processing Manual is instructive. The Manual provides that "[if] the payment amount must be ... recomputed, it effectuates the decision within 30 days ... The amount must be computed as soon as possible." MEDICARE CLAIMS PROCESSING MANUAL Ch. 29 § 320.9. While the Manual establishes a duty to recalculate, it does not mandate a particular result or methodology.

Adams has failed to allege a nondiscretionary duty, and the court cannot exercise jurisdiction under § 1361.

### B. The Government's Alternative Argument—Failure to State a Claim

The government's motion to dismiss and reply brief contest only the requested mandamus relief. (Docket Entry No. 9 at 13–15; Docket Entry No. 29 at 4). The government does not argue for dismissal because Adams failed to state a claim under Count 1 (Violation of Procedural Due Process of Law); Count 2 (Violation of the Medicare Act); Count 3 (Violation of the Statutory Limitation on Recoupment); and Count 4 (*Ultra Vires*). Notwithstanding, the government seeks dismissal of all claims by framing the case that is, "[a]t its heart [sounds] in mandamus," because Adams "seeks to reduce the amount of an overpayment determination that is still subject to the administrative review process." (Docket Entry No. 29 at 1).

That argument is unavailing. While Adams seeks mandamus relief in the form of an order compelling HHS to reduce its overpayment liability, Adams also seeks declaratory and injunctive relief that are not mandamus in nature. The complaint states that the "[p]laintiff is

entitled to injunctive relief that requires Defendant to suspend recoupment until it can provide a hearing and decision within 90 days or otherwise can follow the statutorily and constitutionally required procedures." (Docket Entry No. 1 at ¶¶ 3, 47, 53, 59, 65). The complaint is not limited to mandamus, and the court only reviews whether Adams failed to state a claim under Count 5 (Mandamus).

### 1. The 12(b)(6) Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P.12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P.8(a)(2). A complaint must contain "enough facts to state a claim to relief that is possible on its face." *Bell Atl. Corp.v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550, U.S. at 556).

*\*8* To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,' " and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* (internal quotation marks and alteration omitted) (quoting *Twombly*, 550 U.S. at 558).

### 2. The Mandamus Standard

"Mandamus may only issue when (1) the plaintiff has a clear right to relief, (2) the defendant a clear duty to act, and (3) no other adequate remedy exists." *Wolcott*, 635 F.3d at 768. The Fifth Circuit has clarified that "[m]andamus is only appropriate when the duty is 'so plainly prescribed as to be free from doubt'; thus, mandamus is not available to review discretionary acts of agency officials." *Id.* Further, "[a]n alternative remedy, including an administrative remedy, is adequate if it is 'capable of affording full relief as to the very subject matter in question.' " *Id.*

Even if this court had mandamus jurisdiction, Adams's complaint alleges contradictory facts that undermine its claim for mandamus relief. First, Adams alleges that C2C Innovative Solutions' "reviewers stated 'the sample size used by [Health Integrity] was not adequate to justify [$418,035]' and that the [Health Integrity] must recalculate the overpayment 'using a different (more conservative) extrapolation methodology.' " (Docket Entry No. 1 at ¶¶ 34, 67). Second, Adams alleges that Novitas Solutions, which issued a recalculation letter that lowered the demand amount to $401,661 from $418,035, "was required to have limited recovery to the actual overpayment or $14,846." (*Id.* at ¶ 70). But, as the government observes, (Docket Entry No. 9 at 6), Novitas Solutions calculated the reduced sum using "a *new* methodology." (Docket Entry No. 1 at ¶ 69). Adams does not explain whether Novitas Solutions "us[ed] a different (more conservative) extrapolation methodology" as required by C2C Innovative Solutions in August 2017. From the face of the complaint, it seems plausible that Novitas Solutions followed C2C Innovative Solutions' guidance because the recalculation amount was lower than the original overpayment estimate and the result of a new methodology. It appears that the Novitas Solutions discharged the duty allegedly owed to Adams that it now seeks this court to enforce through mandamus.

Adams responds that "[i]nstead of limiting overpayment to the actual amount," $14,846, HHS "extrapolated and determined an *entirely new* overpayment of $401,661 contrary to" the statutory and regulatory guidelines. (Docket Entry No. 25 at 14–15). But that contention contradicts the central premise of Adams's mandamus claim—C2C Innovative Solutions required a new estimate and, according to the complaint and response, Novitas Solutions delivered a reduced overbilling amount based on a new methodology. The government

correctly argues that Adams "provides no factual or legal basis for its belief that it has a clear right and the Secretary a non-discretionary duty to recalculate the overpayment in the specific manner requested by Adams." Count 5 (Mandamus) is dismissed, with prejudice.

## IV. The Preliminary Injunction

*9 Adams maintains that HHS has threatened to recoup the original overbilling estimate of $418,035. (Docket Entry No. 1 at ¶ 1). In June 2018, Adams claimed that the government had imposed recoupment. (Docket Entry No. 5 at 2). In July, the court temporarily restrained HHS from collecting the alleged overpayment amount. (Docket Entries No. 17, 21, 22). In August 2018, the court heard argument on whether to enjoin the government from recouping any Medicare funds from Adams. (Docket Entry No. 35). Adams asserts that if the government collects the alleged overpayment amount, it will be forced to file for bankruptcy before it has an opportunity to contest the recoupment before an administrative law judge. (Docket Entry No. 1 at ¶ 1; Docket Entry No. 46 at 1). Adams requests that recoupment be suspended until HHS complies with the statutory procedures that protect against premature and excessive collection. (Docket Entry No. 5 at 9).

### A. The Legal Standard

To obtain a preliminary injunction, Adams must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

### B. Analysis

In *Family Rehab.*, the district court, on remand, preliminarily enjoined the government "from withholding Medicare payments ... to Family Rehab to effectuate recoupment." *Family Rehab.*, 2018 WL 3155911, at *7. The court found that: (1) Family Rehab had demonstrated a substantial likelihood of success on its procedural due process claim by showing that HHS had not complied with statutory procedures; (2) Family Rehab had established a substantial threat of irreparable injury if HHS continued to collect the alleged overpayment; (3) the balance of injury weighed in favor of granting relief because Family Rehab would be forced to shut its doors, employees would lose jobs, and patients would lose services if the preliminary injunction was not granted, while HHS would be able to recoup any overpayments if an administrative law judge eventually ruled in the government's favor; and (4) no public interest would be disserved by granting the relief; instead, the public interest would benefit from the continued access to the services Family Rehab provided. *Id.* at 3–7. The court waived a bond. *Id.* at 7. The analysis in the opinion is useful and thorough. *See Han Ma Eum, Inc. d/b/a Coastal Home Health Care v. Azar*, No. H-18-2946 (S.D. Tex. Sep. 26, 2018) (enjoining the government from recouping Medicare payments because of the backlog of administrative-law-judge hearings). This court applies a similar analysis to these similar facts and issues, and reaches a similar result.

#### 1. Substantial Likelihood on the Merits

Adams's procedural due process claim provides a basis for finding a likelihood of success on the merits. Adams claims that HHS's "discretionary recoupment has begun without first providing [it with] the procedural due process mandated under the [Constitution and] statute." *Family Rehab.*, 2018 WL 3155911, at *4. Three factors are weighed when determining whether adequate procedural due process has been provided:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail.

*10 *Eldridge*, 424 U.S. at 335.

Adams has a property interest in receiving and retaining the Medicare payments it has earned. That interest is violated by the government's failure to timely adjudicate Adams's administrative appeal, as required by 42 U.S.C. § 1395ff(d)(1)(A). Adams requested a

hearing before an administrative law judge in February 2018. (Docket Entry No. 1 at ¶ 36).
It was entitled to a decision within 90 days. Adams still has not received a hearing. Because
the government conceded that it will take three to five *years* to provide one, (*Id.* at ¶ 22);
*Family Rehab.*, 886 F.3d at 500, there is a high risk that the government will deprive Adams
of its property interest without affording Adams the required procedural protections.

Adams's right to escalate the appeal from the administrative-law-judge level to the
Medicare Appeals Council, the final administrative step, does not cure the government's
due process violation. When a party requests review before an administrative law judge,
that judge must "conduct and conclude a hearing." 42 U.S.C. § 1395ff(d)(1)(A). By contrast,
when a party escalates their claim to the Medicare Appeals Council, the Council may, but is
not required to, conduct additional proceedings, including a hearing. 42 C.F.R. § 405.1108.
The Council may instead issue a decision based on the record without supplementation,
remand the case to the administrative law judge, or dismiss the request. *Id.* Escalation does
not adequately protect the procedural safeguards the statute provides the appealing party.

Because Adams has demonstrated a substantial likelihood of success on the merits of its
procedural due process claim, this factor weighs in favor of granting the preliminary
injunction.

### 2. Irreparable Injury

"In the Medicare withholding context, going out of business can be sufficient evidence of
irreparable injury." *MaxMed Healthcare, Inc. v. Burwell*, No. SA:14-CV-988-DAE, 2015 WL
1310567, at *3 (W.D. Tex. Mar. 23, 2015). HHS seeks to collect $418,035 from Adams.
Adams alleges that it will file for bankruptcy and close its doors if HHS continues to recoup
that amount. (Docket Entry No. 1 at ¶¶ 1, 44, 50, 56, 62, 76, 80, 83). Adams's owner,
Obiefuna Monwe, stated:

> Prior to [the government's] imposition of recoupment in 2017, [Adams]
> submitted an extended repayment plan. However, Novitas Solutions, Inc.
> was unable to arrange for the ... repayment plan because the $418,035
> overpayment had already been referred to the Department of Treasury for
> collection. Furthermore, [Adams's] annualized gross proceeds were
> approximately $233,559.70 when recoupment was imposed in 2017, and
> when it contemplated a repayment plan. However, a 60-month repayment
> plan required an approximate $8,880.00 initial payment, and the supplier
> lacked sufficient cash resources for the first payment. Additionally, the
> supplier could not make monthly payments because, ultimately, such
> payments would have cost the supplier approximately $106,500.00 per year,
> which amounted to about 45% of gross annual revenues and was not
> feasible.

*\*11* (Docket Entry No. 8 at ¶ 5).

The government argues that Adams "cannot show that it going out of business is the result
of the [government's] actions." (Docket Entry No. 43 at 2). The government claims that the
"financial information [Adams] produce[d] demonstrates that it was losing money in the
years before [the government] sought to recoup an overpayment, and that Adams ... is not
wholly reliant on Medicare payments for its continued existence. (*Id.*). Lastly, the
government contends that because Adams's disclosures were incomplete and inaccurate,
the court "cannot credibly rely on the financial documentation ... to support its claims of
irreparable harm." (*Id.* at 4).

In July 2018, Adams presented evidence that it has two employees, down from 12 in 2016,
and has had to sell one of its transport vehicles due to financial constraints. (Docket Entry
No. 17). While the court takes note of Adams's incomplete disclosures, Adams
supplemented the record in September 2018. (Docket Entry No. 36-2). Adams's 2016 tax
return shows income of $357,839 and losses of $62,945. (*Id.* at 16). Its 2017 return shows
income of $657,203 and losses of $17,832. (*Id.* at 5). It is clear that Adams's financial
health was improving before the government initiated recoupment. Permitting HHS to
recoup the alleged overpayment throughout the next three to five years will cause Adams to
close its doors. The only remedy that will adequately protect Adams is ordering the
government to suspend its recoupment efforts. This factor weighs in favor of granting the
preliminary injunction.

### 3. Balancing the Injury to the Plaintiffs Against the Harm to the Defendants

Case 7:20-cv-00217   Document 9-1   Filed on 10/02/20 in TXSD   Page 78 of 147

If the preliminary injunction is not granted, Adams will go out of business and more employees will lose jobs. (Docket Entry No. 5 at 2). The harm to Adams is irreparable and severe. The harm to HHS is minimal. The overpayment amount the government seeks to recoup is small in comparison to the $7.5 million overpayment amount in *Family Rehab*, and the government will recoup the money if an administrative law judge rules in its favor. The government is not prejudiced by the delay; Adams is. This factor weighs in favor of granting the preliminary injunction.

### 4. The Public Interest

Like the provider in *Family Rehab*, Adams is not under HHS scrutiny for providing poor or inadequate services to Medicare patients. *Family Rehab.*, 2018 WL 3155911, at *7. While the public has an interest in seeing that government programs are not abused, the harm to the government from granting the preliminary injunction is minimal. Adams's patients, and others in need of ambulance services in the area Adams serves, will be harmed if Adams files for bankruptcy and closes its doors. This factor weighs in favor of granting the preliminary injunction.

Although the government suggests that the alleged overpayment to Adams was the product of fraud, the government does not make a factual or legal showing necessary to support recoupment at this stage, on that ground. The suggestion raises issues outside the narrow questions of jurisdiction and whether the court should enjoin the government from recouping the alleged overpayment in advance of a hearing. On this record, Adams has established that it is entitled to a preliminary injunction.

### C. Conclusion

*12 For the reasons explained above, Adams's request for a preliminary injunction, (Docket Entry No. 1 at ¶¶ 80–86), is granted. The government is enjoined from withholding Medicare payments to Adams to recoup the alleged overpayments until the entry of final judgment in this case. The court issues a separate order.

## All Citations

Not Reported in Fed. Supp., 2018 WL 5264244

| Footnotes | |
|---|---|
| 1 | Adams does not explain how Novitas Solutions' new methodology differed from the original methodology. |

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.



**WESTLAW CLASSIC**

🏳️ **Appeal Filed by** FAMILY REHABILITATION, INC. v. ALEX AZAR, II, SECRETARY HHS, ET AL, | 5th Cir., March 12, 2020

🏳️ **Family Rehabilitation, Inc. v. Azar**
United States District Court, N.D. Texas, Dallas Division.    January 15, 2020    Slip Copy    2020 WL 230615    Med & Med GD (CCH) P 306,695    *(Approx. 12 pages)*

FAMILY REHABILITATION, INC., d/b/a Family Care Texas, d/b/a
Angels Care Home Health, Plaintiff,

v.

Alex M. AZAR, II, Secretary of the United States Department of Health
and Human Services; and Seema Verma, Administrator for the Centers
for Medicare and Medicaid Services, Defendants.

Civil Action No. 3:17-CV-3008-K
Signed 01/15/**2020**

## Attorneys and Law Firms

Wes Loegering, Jones Day, James Alphonso Cox, Dallas, TX, Laura A. Bunten, Jones Day, Rebekah N. Plowman, Arnall Golden Gregory LLP, Atlanta, GA, for Plaintiff.

Nicholas Cartier, Department of Justice, Washington, DC, Brian Walters Stoltz, U.S. Attorney's Office, Dallas, TX, for Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

ED KINKEADE, UNITED STATES DISTRICT JUDGE

*\*1* Before the Court are (1) Plaintiff's Motion for Summary Judgment on Its Application for Permanent Injunctive Relief (Doc. No. 79) and (2) Defendants' Motion for Summary Judgment (Doc. No. 82). The Court considered the motions, briefs, responses, replies, and applicable law. Because the Court finds that denying Family Rehab a hearing before an Administrative Law Judge ("ALJ") prior to implementing recoupment that would result in the end of its business violates Family Rehab's right to procedural due process, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its Application for Permanent Injunctive Relief. Because the Court grants Family Rehab's motion but finds no grounds for an *ultra vires* action or mandamus relief, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

### I. Factual and Procedural History

Family Rehab provides home healthcare services to patients in Texas, serving approximately 280 patients as of October 2017. Nearly all of its revenue—between 88 and 94 percent—comes from Medicare-reimbursable services. To be reimbursed, Family Rehab is required to perform an initial home health certification for each patient in conformity with various regulatory requirements. 42 C.F.R. § 424.22.

Defendant Alex M. Azar II ("Azar") is the Secretary of the U.S. Department of Health and Human Services ("HHS"). The Centers for Medicare and Medicaid Services ("CMS") is a division of HHS and is responsible for overseeing the Medicare program. CMS contracts with Medicare Administrative Contractors ("MACs"), which are private government contractors, to process and make these reimbursements. *See* 42 U.S.C. § 1395kk-1; 42 C.F.R. §§ 405.904(a)(2), 405.920–405.928. These payments may then be audited by Zone Program Integrity Contractors ("ZPICs"), again private contractors working for CMS. When a ZPIC identifies an overpayment, it notifies the initial private contractor (the MAC), which then issues a demand letter to the provider.



In 2016, Family Rehab's ZPIC audited 43 claims an alleged representative sample of the hundreds of thousands of claims filed by Family Rehab between August 5, 2014 and April 12, 2016. The ZPIC determined that Family Rehab had overbilled Medicare on 93% of them and was overpaid $124,107.53 on the sampled claims. Notably, the ZPIC based a substantial majority of the findings on Family Rehab's alleged failure to properly certify its patients as "home-bound" and thus eligible for home health care. *See* CMS IOM, Publication 100-02, MBPM, Ch. 7, § 30.1.1 (The patient's physician must provide certification that a patient is homebound. A patient is considered "homebound" if (i) the patient needs the assistance of a supportive device (*e.g.*, a wheelchair) or the assistance of another person to leave the home, or has a condition making leaving the home medically contraindicated; and (ii) a normal inability to leave the home exists, and leaving the home would require a considerable and taxing effort). The ZPIC then used a statistical method to extrapolate the alleged overbilling rate for all of Family Rehab's billing and concluded that Family Rehab had received $7,885,803.23 in excess reimbursements. Family Rehab's MAC sent it a demand for that amount, and Family Rehab began the Medicare appeals process, claiming that its patients were adequately certified as "home-bound" which meant it did not overbill.

**\*2** A provider must go through a four-level appeals process. First, it may submit to the MAC a claim for redetermination of the overpayment. 42 U.S.C. § 1395ff(a)(3)(A). Second, it may ask for reconsideration from another private contractor known as a "Qualified Independent Contractor" ("QIC") hired by CMS for that purpose. *Id.* § 1395ff(c), (g); 42 C.F.R. § 405.904(a)(2). If the QIC affirms the MAC's determination, the private contractor MAC may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider. 42 U.S.C. § 1395ddd(f)(2); 42 C.F.R. § 405.371(a)(3).

Third, the provider may request *de novo* review before an ALJ within the Office of Medicare Hearings and Appeals (OMHA), an agency independent of CMS. 42 U.S.C. § 1395ff(d); 42 C.F.R. § 405.1000(d). The ALJ stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact. 42 C.F.R. § 405.1036(c)–(d). The ALJ shall conduct and conclude a hearing ... and render a decision ... *not later than 90 days after a timely request.* 42 U.S.C. § 1395ff(d)(1)(A) (emphasis added). Fourth, the provider may appeal to the Medicare Appeals Council ("Council"), an organization independent of both CMS and OMHA. 42 C.F.R. § 405.1100. The Council reviews the ALJ's decision *de novo* and is similarly required to issue a final decision within 90 days. *Id.* If the ALJ fails to issue a decision within 90 days, the provider may "escalate" the appeal to the Council, which will review the QIC's reconsideration. *Id.*

Family Rehab, challenging both the initial audit results and the extrapolation methodology, exhausted the first two stages of that administrative appeals process. It sought redetermination from the MAC and reconsideration from a QIC, which calculated its liability as $7,622,122.31. After the MAC indicated it intended to begin recoupment on November 1, 2017, Family Rehab, on October 24, 2017, timely requested an ALJ hearing.

Due to an overwhelming backlog of appeals, Family Rehab was informed at the outset that it would be unable to obtain an ALJ hearing for at least three to five years. And based on HHS's own admissions in open court and in its pleadings, the logjam of Medicare appeals shows no signs of abating anytime soon.

On October 31, 2017, Family Rehab sued for a temporary restraining order and an injunction to prevent the MAC from recouping the overpayments until its administrative appeal is concluded. Family Rehab alleges that, well before the end of its administrative appeal, it will be forced to shut down from insufficient revenues because of the MAC's recoupment. This situation, Family Rehab asserted, (1) violated its rights to procedural due process, (2) infringed its substantive due-process rights, (3) established an "*ultra vires*" cause of action, and (4) entitled it to a "preservation of rights" injunction under the Administrative Procedure Act, 5 U.S.C. §§ 704–05.

This Court held that it lacked subject-matter jurisdiction because Family Rehab had not exhausted administrative remedies. *See Family Rehab., Inc. v. Hargan*, No. 3:17-CV-3008-K, 2017 **WL** 6761769, at \*3 (N.D. Tex. Nov. 2, 2017)(Kinkeade, J.), *aff'd in part, rev'd in part sub nom.* Family Rehab appealed and the Fifth Circuit reversed in part, holding that the Court has jurisdiction to hear a collateral challenge on both procedural due process grounds as well as an *ultra vires* action. *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 (5th Cir. 2018). The Fifth Circuit affirmed the Court's finding that it lacked federal question jurisdiction. *Id.* at 505–06. On remand, the Court granted a preliminary injunction enjoining Azar from recouping any payment until further proceedings could be completed. *Family*

*Rehab., Inc. v. Azar*, No. 3:17-CV-3008-K, 2018 WL 3155911, at *7 (N.D. Tex. June 28, 2018) (Kinkeade, J.).

*3 Family Rehab was granted leave to amend the mandamus request in its complaint (Doc. No. 27) and now moves for summary judgment on its Application for Permanent Injunctive Relief. Family Rehab alleges that Azar violated its right to procedural due process and acted *ultra vires* when attempting recoupment without providing an ALJ hearing within the statutory timeframe. Family Rehab also argues that it is entitled to a mandamus that orders a hearing in a timely manner. Azar responds that Family Rehab is provided two levels of administrative review prior to recoupment, which is more than the Constitution requires, and is not entitled to a live hearing in order to satisfy its procedural due process rights. It also argues that any risk of error that arises from depriving Family Rehab of an ALJ hearing is ameliorated by Family Rehab's right to escalate the case to the Council and then to Federal District Court.

### II. Applicable Law

Summary judgment is appropriate when the pleadings, affidavits, and other summary-judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "material fact" is a fact that under the applicable substantive law "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of "a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

The moving party bears the burden of identifying those portions of the record it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial; however, the nonmovant may not rest upon allegations in the pleadings to make such a showing. *Anderson*, 477 U.S. at 256–57. Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence cannot defeat a motion for summary judgment. *See id.* at 249–52; *Boudreaux*, 402 F.3d at 540. "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999). If the nonmovant fails to make a sufficient showing to prove the existence of an essential element to the case and on which the nonmovant will bear the burden of proving at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322. The nonmovant must cite specific facts in the record to survive a motion for summary judgment, as "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)); *see* FED. R. CIV. P. 56(c)(3).

Family Rehab requests that the Court permanently enjoin Azar from recouping payment until Family Rehab has received a hearing with the ALJ. The party seeking a permanent injunction must satisfy a four-part test: it must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest. *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492–93 (5th Cir. 2017).

### III. Analysis

*4 To determine whether a permanent injunction is warranted, the Court first looks to see if the requesting party has established success on the merits of the underlying claim. *Id.* at 492. In its Motion for Summary Judgment on its Application for Permanent Injunctive Relief, Family Rehab specifically relies on its procedural due process claim. While the statutory timelines are relevant, a procedural due process inquiry does not turn on the agency's adherence to its own guidelines. *See Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (referring to the Due Process Clause as "more tolerant" than the relief provided by statute); *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 682 (5th Cir. 1986) ("If a state or local government demands that its officials afford a more elaborate process than the Constitution requires, its demands alone cannot expand the boundaries of what concerns us here: federal constitutional due process."); *Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224,

1230 (5th Cir. 1985) ("There is not a violation of due process every time a university or other government entity violates its own rules.").

Because the Court is engaging in the "floor" inquiry of due process, it views Family Rehab's claims from a constitutional perspective and not in relation to the statute. *See Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)("[T]he adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms."); *Family Rehab., Inc.*, 886 F.3d at 503 ("Family Rehab's procedural due-process and *ultra vires* claims ... require the court to determine how much process is required under the Constitution and federal law before recoupment."). The question is whether Family Rehab has received adequate due process when the money to be seized is so large (compared to the budget of the entity) that the entity will be forced to dissolve and will no longer be in existence before it could ever receive a hearing. To make the need for a hearing even more obvious, this Court made a finding that the entity has a substantial likelihood of negating the validity of that collection.

### A. Success on the Merits

The Court finds that the failure to provide an ALJ hearing before engaging in recoupment that would put Family Rehab out of business violates its right to procedural due process. In order to receive a permanent injunction, Family Rehab must demonstrate success on the merits on at least one of the underlying claims. *United Motorcoach Ass'n, Inc.*, 851 F.3d at 492. For the reasons outlined below, the Court finds that Family Rehab has a substantial private interest in the receipt of Medicare payments for covered services it has rendered that ultimately affects its private interest in the survival of the business. The Court finds that a substantial risk of erroneous deprivation is present due to the rate at which ALJs reverse the lower administrative decisions. These two factors combine to outweigh Azar's interest in efficient administration and preservation of the Medicare fund because there is no significant threat to these interests imposed by delaying recoupment. Because the *Mathews* factors favor Family Rehab, the Court finds success on the merits for Family Rehab's procedural due process claim.

The Fifth Amendment to the Constitution provides, in part, that "no person shall be ... deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Due process is a flexible inquiry that, at a minimum, requires notice and the opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). There is no dispute that Family Rehab was given notice and some sort of opportunity to be heard. The question is whether the hearing process was constitutionally adequate for the substantial private interest that would be affected. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due."); *Gibson v. Texas Dept. of Ins.*, 700 F.3d 227, 239 (5th Cir. 2012) (emphasizing that due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner."). There are three factors the Court must consider when answering that question:

> *5 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substituted procedural safeguards; 3) the Government's interest, including the function and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 335.

While the Court has already had the occasion to pass on these factors as they apply to Family Rehab's facts, our previous analysis was under the lower bar required to grant a preliminary injunction. *See Family Rehab., Inc.*, 2018 **WL** 3155911, at *4–*7 (granting a preliminary injunction). The Court must now examine each factor in whole to determine whether Family Rehab has fully carried its burden.

### I. Family Rehab has a Substantial Private Interest in the Medicare Payments

The Court finds that Medicare providers have a legitimate claim of entitlement to payment for services that are covered under the act and actually rendered. "[T]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "The important question to be resolved therefore is a determination of the nature of the interest plaintiffs have." *Smith v. N. Louisiana Med. Review Ass'n*, 735 F.2d 168, 172

(5th Cir. 1984). "Property interests ... are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 158 (5th Cir. 2011) (citing *Roth*, 408 U.S. at 577). Under the Medicare system, providers render services prospectively and then file for reimbursement. *See* 42 U.S.C § 1395fff ("The Secretary shall provide ... for payments for home health services in accordance with a prospective payment system established by the Secretary under this section."). The question is whether this system of prospective payment creates "more than a unilateral expectation" of reimbursement. Family Rehab argues that the Medicare program creates a mutual expectation of repayment when a registered provider renders a covered service. Azar argues that the expectation is unilateral because Medicare has the right to deny any requested payment.

The Court finds that providers would not render the services to a Medicare patient unless they had a reasonable expectation of being reimbursed by the Medicare program. Under Azar's view of Medicare, a provider is supposed to dutifully administer services with the mere hope that the Medicare system would show it mercy when deciding what amount to reimburse. A provider would be expected to plug along knowing that, if Medicare chose not to reimburse, it would not have any property interest upon which to claim. That position is so ludicrous as to be specious. If there were no recognized property interest, providers would be expected to treat every Medicare patient as a charity case where reimbursement would just be a nice bonus. Those who predominately administer services to Medicare patients would not have any reasonable expectation of payment and could not function as a business. Because the Medicare providers would not provide service to Medicare patients without the reasonable expectation of payment, the Medicare statute constitutes an "independent source" that "support[s] claims of entitlement" filed by Medicare providers. Because the Medicare statute outlines a program for reimbursement, a provider who renders service to Medicare patients has more than a unilateral expectation.

*6 Family Rehab is a Medicare provider who actually rendered services that are covered under the act. There is no dispute that Family Rehab is a recognized provider under the Medicare system. *See* 42 U.S.C. § 1395x ("The term "provider of services" means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund."). There is no dispute that Family Rehab rendered services that are covered by the act. See Def.'s Mot. Sum. J., ECF No. 83, at 32 (arguing that the underlying dispute is about the sufficiency of the paperwork). The dispute is whether Family Rehab's patients qualified for those services based on the findings reported by Family Rehab physicians. *Id.*

The Court rejects Azar's argument that Family Rehab lacks a property interest merely because Azar characterizes the requested reimbursements as "bad claims." Azar contends that the underlying dispute renders Family Rehab's claims to be "bad claims" and therefore no reasonable expectation of reimbursement exists. Azar directs the Court to *Smith*, 735 F.2d 168, where the Fifth Circuit stated that "[a] provider has no reasonable expectation or entitlement to be paid on a bad claim." *Id. at* 173. Our sister courts have similarly relied on this sentence when finding that no property interest exists in disputed Medicare claims. *Supreme Home Health Servs., Inc. v. Azar*, 380 F. Supp. 3d 533, 555–56 (W.D. La. 2019); *Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 572–73 (S.D. Tex. 2018). Not only is the *Smith* case distinguishable for reasons discussed below, but Azar is misguided in his premise as well. The collateral challenge here is that Azar failed to provide sufficient process in reaching the conclusion that the requested reimbursements are "bad claims." Despite this, Azar asks the Court to find that Family Rehab has no property interest because he characterized the reimbursements as "bad" and, pursuant to *Smith*, a provider has no interest in "bad claims." If the Court were to accept Azar's allegation that the claims are bad, despite the exact challenge revolving around the fairness in reaching that conclusion, Family Rehab would have no interest to claim. If the Court permitted this back-door deprivation of Family Rehab's interest, Azar would be free to provide even less protections (or none at all) in reaching the conclusion that the claims are bad. This outcome would render due process protection a mirage. You see the chance for an appeal on the horizon, but in reality that chance is only the ghostly image of the heat on the asphalt ahead. No hearing would be held for years and years and years.

The *Smith* case is inapposite because it is addressing a property interest wholly separate from that being claimed by Family Rehab. Under the Medicare system, doctors or patients may not know that the requested service is not covered. *Smith*, 735 F.2d at 169. When a service is rendered and both parties were not aware that it was not covered, HHS used to

Family Rehabilitation, Inc. v. Azar, Slip Copy (2020)

apply a presumption in favor of coverage when reviewing. *Id.* This provision is referred to as a "Waiver of Liability" ("WOL"). *Id.* at 170. Smith was a Medicare provider who was informed that he invoked the WOL provision on multiple occasions despite having knowledge that the services were not covered. *Id.* at 171. As a result, the review board revoked his WOL privilege, meaning he was not entitled to the presumption on review. *See id.* Smith challenged the revocation by claiming he had a property interest *in the WOL presumption itself. Id.* at 172 ("the question presented is whether ... the WOL presumption be accorded the status of property."). The Fifth Circuit rejected Smith's argument, stating, "The loss of the WOL presumption is clearly inconvenient to a health provider; the nature of that interest, however, does not rise to the level of a protected property interest." *Id.* at 173. In that context, the sentence offered by Azar makes sense. Smith could not invoke the WOL when he was rendering services that he knew were not covered. In other words, Smith "ha[d] no reasonable expectation or entitlement to be paid on a bad claim, that is a claim not covered under the Act." *Id.*

**\*7** Under *Smith*'s description of property interests, Family Rehab has a legitimate claim of entitlement to the funds for services rendered. The Fifth Circuit held that, "[t]he benefit created by Medicare's statutory and regulatory scheme is not the waiver of liability or the waiver of liability presumption; the benefit created is the payment of necessary expenses for certain covered medical expenses." *Id.* at 172. In fact, the Court found relevant that "[t]he revocation of plaintiffs' WOL presumption does not automatically result in the loss of any claims for services covered under the Act." *Id.* Also relevant was that Smith would not be denied payment on claims despite the revocation of the presumption. *Id.* In our case, Family Rehab is seeking payment for medical services it rendered. Due to the backlog, the current Medicare Appeals system would deprive Family Rehab of funds permanently, because Family Rehab would cease to exist after the seizure of the money through recoupment. And, most importantly, there is no allegation that Family Rehab knew these services were not covered or was attempting to commit fraud. *But Cf. Pers. Care Prods., Inc.,* 635 F.3d at 159 (holding that a provider did not have a property interest in the withholding of *present* reimbursement claims while *past* claims were under investigation for fraud – provided the withholding was authorized by statute). Azar wants the Court to accept the assertion that the claims are "bad" despite the exact challenge revolving around whether Family Rehab received adequate process in arriving at that conclusion. Absent fraud, the Court is not persuaded to agree. Because there is more than a unilateral expectation of payment and Family Rehab is not accused of fraud, the Court joins our sister courts in finding that a property interest in Medicare payments exists. *See Adams EMS, Inc. v. Azar,* 2018 **WL** 5264244, at *10 (S.D. Tex. Oct. 23, 2018) ("Adams has a property interest in receiving and retaining the Medicare payments it has earned."); *Med-Cert Home Care, LLC v. Azar,* No. 3:18-CV-2372-G, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019)(Fish, J.) ("Precedent makes clear that Med-Cert has a valid property interest in receiving Medicare payments for services rendered.").

Because the sizable recoupment would put Family Rehab out of business, there is an elevated interest that the Court must consider. Whether a party has received adequate process is a flexible inquiry that depends on the circumstances. *Morrissey,* 408 U.S. at 481 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *Jones v. Louisiana Bd. of Sup'rs of Univ. of Louisiana Sys.,* 809 F.3d 231, 236 (5th Cir. 2015)("The type of hearing necessary—the process due—is a function of the context of the individual case."); *Keough v. Tate,* 748 F.2d 1077, 1081 (5th Cir. 1984) ("The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved."). Due to the magnitude of the attempted recoupment, Family Rehab is virtually guaranteed to go out of business. *See* Pl.'s Mot. Summ. J., ECF No. 80, at 32–33 (documenting the substantial harm that occurred during the seven months of recoupment). Depriving Family Rehab of its existence would essentially be a greater deprivation of property (the business) that would result from the narrower deprivation of property such as withheld payments.

On top of the magnitude of the private interest, the delay in time similarly elevates the impact on Family Rehab. "The possible length of wrongful deprivation of ... benefits (also) is an important factor in assessing the impact of official action on the private interests." *Eldridge,* 424 U.S. at 341 (citation omitted). In that case, the delay between the cutoff of benefits and a final decision after hearing was greater than one year. *Id.* Here, the wait time for an ALJ hearing is projected between three and five years at the outset. While Family Rehab would go out of business in mere months were recoupment to begin, the draconian backlog emphasizes the insufficiency of the process for a provider in Family Rehab's position. Because Family Rehab had a reasonable expectation of payment and is not facing allegations of fraud, the Court finds that Family Rehab has a valid property interest in

receiving Medicare payments. The Court also finds that the relevant circumstances, including the fact that Family Rehab would go out of business, call for elevated safeguards. *Cf. Jones*, 809 F.3d at 236 (citing *Babin v. Breaux*, 587 Fed. Appx. 105, 110 (5th Cir. 2014) (per curiam)) ("To determine the requisite process, a court must analyze the 'interests at stake in a given case.'"). The interest in the Medicare payments, combined with the collateral effects of withholding such payments, combine to establish a significant private interest that will be affected by the official action.

II. OMHA statistics show that there is a substantial risk of erroneous deprivation if a provider is denied an ALJ hearing

*8 Because of the high rate at which lower administrative decisions are fully overturned, denying Family Rehab an ALJ hearing creates a substantial risk of erroneous deprivation. Under the second *Mathews* factor, the Court must examine whether the processes provided by Azar are likely to provide the truth. "The second factor focuses upon the procedures provided and the possibility of error." *Supreme Home Health Servs., Inc.*, 380 F. Supp. 3d at 557. The nature of a due process hearing is shaped by the "risk of error inherent in the truth finding process as applied to the generality of cases, not the rare exceptions." *Mathews*, 424 U.S. at 344. "[A]ny inquiry under the second *Eldridge* heading must necessarily be very fact-specific.... [A] slight modification of the facts, suddenly 'smack[s] ... of administrative tyranny.' " *Cont'l Air Lines, Inc. v. Dole*, 784 F.2d 1245, 1248 (5th Cir. 1986). Here, the risk of erroneous deprivation is quantified in statistics provided by OMHA. *See OMHA Decision Statistics*, HHS (Oct. 31, 2019, 12:00 PM), https://www.hhs.gov/about/agencies/omha/about/current-workload/decision-statistics/index.html.

OMHA provides a chart that documents the rate at which providers received a fully favorable, partially favorable, or unfavorable decision and which cases were dismissed outright. *Id.* As Family Rehab points out, a correct analysis would examine the rulings that reached the merits because they speak to the accuracy of the QIC, as opposed to the failure of a provider to comply with procedures on appeal. For Fiscal Year 2017, 39.9% of the cases decided by the ALJs on the merits were fully favorable to providers. *Id.* For Fiscal Year 2018, that number increased to 44% fully favorable decisions. *Id.* For Fiscal Year 2019, the number decreased to 38.8%. *Id.* On a similar inquiry, Justice Douglas noted that a 25% reversal rate was "not insignificant." *Arnett*, 416 U.S. at 219 (Douglas, J., dissenting). The Court is not inclined to attach a number to a due process inquiry that is inherently "flexible." *Cf. Morrissey*, 408 U.S. at 481. But when the statistics show that full reversals are occurring at a clip of 38% to 44%, the Court finds that the risk of erroneous deprivation arising from the pre-ALJ proceedings is substantial.

Azar's rebuttals to the OMHA data are unconvincing. In response to Family Rehab's statistical assertions arising from OMHA's data, Azar instead criticizes the 60-72% rate cited by the Court in its preliminary injunction order. Azar claims that those rates depend on data that is misleading and outdated. Because Family Rehab has provided current data directly from OMHA itself, the Court does not depend on the previous data in reaching its conclusion. In response to the data currently on OMHA's website, Azar points the Court to *Mathews*, where the Supreme Court upheld the sufficiency of a process even though it resulted in a 58.6% reversal rate. *Mathews*, 424 U.S. at 346. Azar aptly points out that the Supreme Court cautioned against reliance on bare statistics. *See id.* This extends to the bare comparison as well. Here, the impact on the private interest is substantially greater than that on the government's interest. Because the relative interests do not align with those weighed in *Mathews*, the Court is not persuaded that the "bare statistics" of that case control here. Because of the high rate at which QICs are being fully overturned by ALJs, the current process creates a substantial risk of erroneous deprivation.

The probable value of the "additional" safeguard in providing an ALJ hearing is apparent. The accuracy of a determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause. *See Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 95 n 5. (1978). Here, the ALJ is the only opportunity for Family Rehab to receive a *de novo* review and compile a full record prior to escalation. Compare 42 C.F.R. § 405.1000(d) ("The ALJ or attorney adjudicator conducts a *de novo* review.") with 42 U.S.C. § 1395ff(a)(3)(A); § 1395ff(c), (g) (outlining the "redetermination" and "reconsideration" stages without any reference to *de novo* standard). Azar asserts in response that plaintiff has already received two levels of *de novo* review prior to any recoupment. Under the statutory construction canon *expressio unius est exclusio alterius* (the express mention of one thing excludes all others), Congress does not mandate *de novo* review prior to the ALJ hearing and there is nothing other than Azar's assertion to

demonstrate *de novo* reviews are occurring at the QIC stage. Neither the relevant statute nor the record support Azar's assertion.

*9 There is not a violation of due process merely because the government violated the statute by failing to provide a hearing within 90 days, but the inclusion of the ALJ *is* the congressionally-sanctioned step that decreases the risk of erroneous deprivation. Azar also curiously raises the argument that, even if the ALJ hearing occurred, the ALJ lacks subpoena power and therefore cannot require the decision makers to participate. If anything, this speaks further to the unfairness of the process available to a provider. The government wins under that theory because the government were never going to provide due process even if there was a hearing. What an argument.

Escalation does not remedy the foible created by the preclusion of the ALJ. The Court must similarly examine the probable value of escalation in ascertaining the truth. *See Mathews, 424 U.S. at 335.* Azar argues that escalation, which would have been available to Family Rehab 90 days after the filing of its request for an ALJ hearing, decreases the risk associated with the substantial error rates of QICs by providing an alternative avenue of review. If escalation decreased the risk of erroneous deprivation, then Family Rehab's procedural due process claim would be undermined. Because the Council relies on the same record that is being overturned at a substantial rate, the Court is not persuaded that escalation cures the procedural ill. It is true that the Council conducts a *de novo* review. 42 U.S.C. § 1395ff ("[T]he Departmental Appeals Board shall review the case *de novo*."). This does not cure the fact that the Council defers to the QIC's finding in all but the "extraordinary" occasions. OMHA Medicare Appellant Forum Presentation (Feb. 12, 2014), available at https://www.hhs.gov/sites/default/files/omha/OMHA% 20Medicare% 20Appellant% 20F orum/omha_medicare_appellant_forum_presentations.pdf.

The Court is not alone in finding that escalation is an insufficient remedy. In response to the escalation rebuttal, Senior Judge Fish held that "[b]ecause escalation would not guarantee a hearing with the opportunity to cross examine witnesses, the court finds that escalation does not provide the same procedural safeguards offered by an ALJ appeal." *Med-Cert Home Care, LLC,* 365 F. Supp. 3d at 753. The Southern District of Texas concluded the same. *See Adams EMS, Inc.,* 2018 WL 5264244, at *10 ("[Escalation] does not adequately protect the procedural safeguards the statute provides the appealing party."). Nor is the elevation to District Court a remedy because of the deference required to administrative rulings. *See Superior Home Health Services, LLC,* 2018 WL 3717121, at *3 (W.D. Tex. Aug. 3, 2018) (applying the Administrative Procedure Act's arbitrary and capricious standard, which is deferential to administrative proceedings, when reviewing the Council's overpayment determination); *Med-Cert Home Care, LLC,* 365 F. Supp. 3d at 754 (a district court's review of a QIC's decision is more deferential [than the ALJ's review].). The Fourth Circuit's recent holding that escalation was sufficient is distinguishable on two grounds. *See Accident, Injury, & Rehabilitation v. Azar,* 943 F.3d 195, 204 (4th Cir. Nov. 21, 2019) (holding that the District Court's emphasis on the ALJ hearing "relies on a faulty understanding of the relative benefits of an ALJ hearing and judicial review."). First, this Court has already found that the escalation process does not adequately protect Family Rehab's due process rights. *Family Rehab., Inc.,* 2018 WL 3155911, at *5–*6. Second, the interest of the plaintiff in *Accident, Injury, & Rehab* was not elevated to that of Family Rehab —as demonstrated by its ability to withstand recoupment losses for 2 years. *Accident, Injury, & Rehabilitation,* 943 F.3d at 199. The fact that Family Rehab would be forced to close its doors long before receiving a hearing controls the analysis. Whether it be the impartiality of the ALJ or the opportunity to flesh out the record, the statistics show that the ALJ hearing is critical to decreasing the risk of erroneous deprivation. Because escalation requires a provider to give up its right to the ALJ hearing and permits the Council to rely solely on the QIC record, the Court sides with our sister courts in finding that escalation is an insufficient remedy against the risk of erroneous deprivation.

### III. Azar's interest in efficient administration and preserving the Medicare fund is not substantially harmed by delaying recoupment

*10 Azar's interest in protecting the Medicare fund and ensuring its efficient administration is undercut by the lack of any substantial threat arising from delayed recoupment. The third *Mathews* factor weighs the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Jones,* 809 F.3d at 238 (citing *Mathews, 424 U.S. at 335*). The requisite amount of process due decreases with the increased government's interest. Here, Azar argues that he has an interest in protecting the Medicare fund and administering it efficiently. The Court acknowledges that Azar's interest is valid. *See Mathews* at 424 U.S. at 348 ("[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be

weighed.); *Supreme Home Health Servs., Inc.*, 380 F. Supp. 3d at 557 ("The costs of making continued payments for an additional three to five years to hundreds of thousands of providers that have been determined by multiple independent reviews to have been overpaid, with little hope of later recovering the overpayment, would likewise be enormous."). These cases, however, support the notion that the government should not be barred from collecting where recoupment would not substantially disrupt the provider's operations or threaten its existence. *See Supreme Home Health Servs., Inc.*, 380 F. Supp. 3d at 557 (refusing to engage the "going out of business" argument because plaintiff had enrolled in the payment plan and successfully managed for years prior to filing suit). Because recoupment would shut Family Rehab down prior to a hearing (ironically, this threat arises from *inefficient* administration), Family Rehab's interest is greater than that involved in a typical claim dispute. Azar argues that his interest is elevated because an injunction would harm his ability to recoup if the ALJ affirms the QIC. This argument is circular. There is nothing in the record to show that Family Rehab was a failing business prior to the initial recoupment. While Family Rehab did lose operating capacity because of the initial recoupment, it has slowly rebuilt and resumed operations. To say that delaying recoupment will increase the risk that Family Rehab shuts down when recoupment seems to be the only substantial threat to its existence is nonsensical. Furthermore, Medicare debt is not dischargeable in bankruptcy. *Med-Cert Home Care, LLC*, 365 F. Supp. 3d at 754. Because the threat of failing to collect is not substantial, the government's interest in efficient administration and preservation of the Medicare fund is not substantially threatened by delayed recoupment.

         IV. <u>Family Rehab has established a violation of procedural due process</u>

Weighing the *Mathews* factors together, the Court finds that Azar has violated Family Rehab's right to due process by proceeding with recoupment that denies any real chance at an appeal in an ALJ hearing. Family Rehab has demonstrated that the current process would deprive it of both its property interest in Medicare payments and its existence generally. Family Rehab has also demonstrated that the error rates of the QICs are substantial and that those errors are not remedied by escalation. Azar has failed to demonstrate that the government's interest in efficient administration and preservation of the fund would suffer significant harm by delaying collection until the ALJ renders a decision. Because the significant private interest combined with the high risk of erroneous deprivation outweighs the impact on the government's interest, the factors lead the Court to find the current process insufficient. Having found success on the merits, the Court turns to the remaining elements necessary for a permanent injunction.

     **B. Failure to Grant the Injunction Will Result in Irreparable Injury**

**\*11** Because going out of business is debilitating and permanent, Family Rehab will suffer an irreparable injury if the Court does not grant the permanent injunction. To receive a permanent injunction, Family Rehab must demonstrate that the failure to grant the injunction will result in irreparable injury. *United Motorcoach Ass'n, Inc.*, 851 F.3d at 49. Going out of business is an irreparable injury. *Family Rehab., Inc.*, 886 F.3d at 504 ("The combined threats of going out of business and disruption to Medicare patients are sufficient for irreparable injury."); *Adams EMS, Inc.*, 2018 WL 5264244, at \*10 (citing *MaxMed Healthcare, Inc. v. Burwell*, 2015 WL 1310567, at \*3 (W.D. Tex. Mar. 23, 2015))("In the Medicare withholding context, going out of business can be sufficient evidence of irreparable injury."). Family Rehab has demonstrated that the failure to enjoin Azar would cause it to go out of business. Prior to the first round of recoupment, Family Rehab had 44 employees and provided services to 289 patients. Pl.'s Mot. Summ. J., ECF No. 80, at 32. In the few months of recoupment that occurred before this Court granted a preliminary injunction, Family Rehab lost 94.7% of its revenue and cease providing service to all but 8 of its patients. *Id.* While Family Rehab has been able to rebuild in the months following the injunction, there is no dispute that full recoupment would cause Family Rehab to close its doors.

The payment plan option does not nullify the risk of irreparable injury. Azar asserts that the damage suffered by Family Rehab does not constitute irreparable injury because it can allegedly enter the payment plan and stay afloat. Azar argues that Family Rehab cannot claim an injury that is allegedly self-inflicted because it chose not to adopt a payment plan of some sort. This argument fails for two reasons. First, the payment plan would need to extend decades to keep it from substantially harming Family Rehab's operations. *See* TRO Hr'g Tr., Doc. No. 21, 16–17. Considering that Family Rehab is not guaranteed a hearing within five years, enrollment in the payment plan could just be a prolonged termination. Second, Azar's argument that the "self-inflicted" injury bars relief is based on a double-standard. Azar is quick to point out that its failure to comply with the statute has no place in the Court's analysis but, in the same breath, argues that Family Rehab is barred from relief

because it did not pursue an *optional* program under the statute. Azar is attempting to "have it both ways" by exempting the agency from compliance while seeking to penalize Family Rehab for not electing one option provided by the statute. "We must 'be especially sensitive' to irreparable injury where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the [rights] they should have been afforded in the first place." *Family Rehab., Inc.*, 886 F.3d at 504 (citing *Bowen*, 476 U.S. 467, 484 (1986)). Because going out of business is permanent and the payment plan does not provide a viable solution, Family Rehab will face irreparable harm if the injunction is not granted.

### C. The Injury to Family Rehab Outweighs the Injury to Azar

Going out of business outweighs the burden of delayed recoupment. The third element the Court must consider in its permanent injunction analysis is whether "the injury [to the seeking party] outweighs any damage that the injunction will cause the opposing party." *United Motorcoach Ass'n, Inc.*, 851 F.3d at 493. Going out of business is irreparable and severe. *Adams EMS, Inc.*, 2018 **WL** 5264244, at *11. The harm to Azar is minimal because he can recoup the funds if an ALJ rules in his favor. *See id.* Because the injury to Family Rehab would outweigh the injury to Azar, Family Rehab has satisfied this element of the permanent injunction inquiry.

### D. The Injunction Does Not Disserve Public Interest

Because Family Rehab provides quality healthcare in a rural area and there is no harm to the public created by a grant, an injunction would not disserve the public interest. Our initial pass at this stands true.

"The quality of healthcare service Family Rehab provides to patients is not at issue, only the reimbursements for those services. No public interest would be adversely affected by granting the [ ]injunction. If anything, the public would benefit from continued access to Family Rehab's home healthcare services." *Family Rehab., Inc.*, 2018 **WL** 3155911, at *7.

*\*12* Azar argues that this element fails because patient care would not be affected by Family Rehab's closure and granting the injunction would have "harmful consequences" to the government. This argument is a reiteration of the "weighing injuries" prong and does not provide any argument past the bare assertion about patient care. It is undisputed that Family Rehab is in a relatively rural area. There is nothing on the record past bare assertions that Family Rehab's patients would be able to find replacement healthcare without going to great lengths. The Court reiterates its finding that the injunction does not disserve the public interest.

### E. Family Rehab is Entitled to a Permanent Injunction

After reviewing the arguments of both parties, the Court concludes that Family Rehab is entitled to a permanent injunction. Family Rehab achieved success on the merits of the underlying procedural due process claim because the *Mathews* factors weigh heavily in its favor. The Court's failure to grant an injunction will result in Family Rehab being put out of business, which is an irreparable injury. The burden on Azar is, at most, a delay in recoupment, which is outweighed by the door-closing impact on Family Rehab. The public interest is not disserved by permitting a quality healthcare provider to continue to provide service while it awaits a fair opportunity to test the merits of recoupment. Because Family Rehab satisfied the four-part test, the Court finds that an injunction is the appropriate remedy. *See United Motorcoach Ass'n, Inc.*, 851 F.3d at 492–93.

### F. Family Rehab's *Ultra Vires* Claim

Family Rehab has not stated a viable *ultra vires* claim. An *ultra vires* action is appropriate where the government actor is "not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Here, Azar is permitted by the statute to begin recoupment after the reconsideration stage. The real *ultra vires* question is whether the government can recoup once Family Rehab has not received the ALJ hearing after 90 days. This is where escalation does sanction the right to collect while waiting. Complying with the statute does not mean Azar has satisfied Family Rehab's procedural due process rights. *See Section III.A., supra* (explaining that procedural due process is a constitutional, not statutory, inquiry). Complying with the statute does mean that Family Rehab has no viable *ultra vires* claim. Because Family Rehab has no grounds for an *ultra vires* claim, the Court **GRANTS** Azar's Motion for Summary Judgment as to the *ultra vires* claim.

### G. Mandamus

Family Rehab has not established a right to mandamus relief. The Fifth Circuit expressly held that mandamus is not appropriate where the relief is injunctive in nature. *Family Rehab., Inc.*, 886 F.3d at 506. Family Rehab filed an Amended Complaint (Doc. No. 27) requesting a mandamus that orders the ALJ to provide a hearing within 90 days of the order. "Mandamus may only issue when (1) the plaintiff has a clear right to relief, (2) the defendant has a clear duty to act, and (3) no other adequate remedy exists." *Wolcott v. Sebelius*, 635 F.3d 757, 768 (5th Cir. 2011). Because Family Rehab's requested relief is that the Court prevent Azar from recouping prior to providing an ALJ hearing, an injunction will provide the necessary relief. Because another adequate remedy exists, Family Rehab's mandamus petition fails and the Court must **GRANT** Azar's Motion for Summary Judgment on the mandamus issue.

### IV. Conclusion

Family Rehab has been put to the task of Sisyphus but, adding to his task, Sisyphus dies before he can reach the top of the hill for a chance at an appeal. Family Rehab is entitled to a permanent injunction. Because the ALJ stage is critical in decreasing the risk of erroneous deprivation and the impact on Family Rehab's private interest is substantially greater than that on Azar, precluding Family Rehab from such a hearing before recoupment begins violates its right to procedural due process. Because going out of business is a severe and irreparable harm, the second and third elements of a permanent injunction are satisfied. Because Family Rehab provides quality healthcare in a rural area, the public interest will not be disserved by the injunction. Family Rehab has carried its burden; the Court **GRANTS** Family Rehab's Motion for Summary Judgment on its Application for Permanent Injunction and **DENIES** Azar's Motion for Summary Judgment on the procedural due process issue. The backlog of appeals does not protect the government actor when it violates the procedural due process of the other side.

*\*13* Because Family Rehab has not demonstrated that it can sustain an *ultra vires* action or is entitled to mandamus, Azar's Motion for Summary Judgment is **GRANTED** as to those two claims. Azar is enjoined from recouping any payment from Family Rehab until it has provided the ALJ hearing.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 230615, Med & Med GD (CCH) P 306,695

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Family Rehabilitation, Inc. v. Azar | Westlaw

**WESTLAW CLASSIC**

🚩 Order Clarified by Family Rehabilitation, Inc. v. Azar,   N.D.Tex.,   October 30, 2018

2018 WL 3155911

🚩 **Family Rehabilitation, Inc. v. Azar**
United States District Court, N.D. Texas, Dallas Division.   June 28, 2018   Not Reported in Fed. Supp.   2018 WL 3155911

**FAMILY** REHABILITATION, INC., d/b/a **Family** Care Texas, d/b/a
Angels Care Home Health, Plaintiff,

v.

Alex M. AZAR, II, Secretary of the United States Department of Health
and Human Services; and Seema Verma, Administrator for the Centers
for Medicare and Medicaid Services, Defendants.

Civil Action No. 3:17-CV-3008-K
Signed 06/28/2018

### Attorneys and Law Firms

Wes Loegering, James Alphonso Cox, Jones Day, Dallas, TX, Laura A. Bunten, Rebekah
N. Plowman, Jones Day, Atlanta, GA, for Plaintiff.

Brian Walters Stoltz, U.S. Attorney's Office, Dallas, TX, Nicholas Cartier, Department of
Justice, Washington, DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

ED KINKEADE, UNITED STATES DISTRICT JUDGE

*\*1* Before the Court is Plaintiff **Family** Rehabilitation, Inc.'s Verified Amended Complaint
(Doc. No. 27) and Motion for Temporary Restraining Order and Preliminary Injunction (Doc.
No. 34). The Court has carefully considered the motion, the response, the reply, the *amicus
curiae* brief in support of the motion, the parties' arguments at the preliminary injunction
hearing before the Court on June 26, 2018, and the law. Because Plaintiff **Family**
Rehabilitation, Inc., has demonstrated a likelihood of success on the merits of its procedural
due process claim and irreparable harm, the Court **GRANTS** the motion for preliminary
injunction.

### I. Factual and Procedural Background

Plaintiff **Family** Rehabilitation, Inc. ("**Family** Rehab") is a Medicare-certified home health
agency in Waxahachie, Texas, that, until recently, provided medical services to 289 patients
in their homes, assisted living facilities, and retirement communities. **Family** Rehab
employed over 40 nurses and staff. Defendants Alex M. **Azar**, II, Secretary of the United
States Department of Health and Human Services and Seema Verma, Administrator for the
Centers for Medicare and Medicaid Services ("Defendants" or "CMS") allege further
investigation indicates **Family** Rehab is associated with and managed by AngMar Medical
Holdings, Inc., which also manages other home health agencies in eight states.
Reimbursements from CMS for medical services provided to Medicare beneficiaries made
up approximately 94% of **Family** Rehab's revenue stream. A post-payment review process
by a third-party contractor determined CMS overpaid **Family** Rehab for services. Based on
that determination, CMS informed **Family** Rehab it owed over $7.5 million in
overpayments.

### A. An Overview of the Medicare Payment System, Post-Payment Review, and the Appeals Process

Under the Medicare program enacted in 1965 under Title XVIII of the Social Security Act,
the Medicare program reimburses Medicare providers with payments for covered claims. 42
U.S.C. § 1395 *et seq.* CMS, acting as the administrator of the Medicare program, contracts
with Medicare Administrative Contractors ("MACs") to process and make payments on

**SELECTED** TOPICS

Preliminary and Interlocutory Injunctions

Purposes of Irreparable Harm Element of
Preliminary Injunction Test

**Secondary Sources**

Med & Med GD (CCH) P 306,325   (Approx. 7 pages)

§ 2948.1   Grounds for Granting or
Denying a Preliminary Injunction—
**Irreparable Harm**

11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.)

...Perhaps the single most important
prerequisite for the issuance of a preliminary
injunction is a demonstration that if it is not
granted the applicant is likely to suffer
irreparable harm before a deci...

§ 11:67.   Kimberly-Clark Worldwide,
**Inc**. v. First Quality Baby Products,
LLC

4 Federal Circuit Patent Case Digests §
11:67

...Preliminary Injunction. [A combined petition
for panel rehearing and rehearing en banc
was filed by and a response thereto was
invited by the court. The petition for rehearing
was referred to the panel...

§ 23:46.   Injunctions—Preliminary
injunctions

6 Callmann on Unfair Comp., Tr. & Mono. §
23:46 (4th Ed.)

...In unfair competition cases a temporary
restraining order or preliminary
injunctionissued pendente lite (i.e., prior to
the final hearing on the merits)is of special
importance. As one court said: "If ...

See More Secondary Sources

**Briefs**

Brief in Opposition to Petition for Writ
of Certiorari

2000 WL 34000451
THE PITT NEWS, Petitioner, v. D. Michael
FISHER, Major Francis Koscelnak, and John
E. Jones, III, Respondents.
Supreme Court of the United States
Dec. 15, 2000

...FN* Counsel of Record 1.This petition
arises out of petitioner's efforts to
preliminarily enjoin the respondents from
enforcing a statute against others, pending
petitioner's challenge to its constitut...

JOINT APPENDIX, VOL. II

2016 WL 4659055
UNITED STATES OF AMERICA, et al.,
Petitioners, v. STATE OF TEXAS, et al.
Supreme Court of the United States
Mar. 01, 2016

...U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director (MS 2000) Washington,
DC 20529-2000 [SEAL OMITTED] U.S.
Citizenship and Immigration Services [Oct. ...

Brief for the Respondents in
Opposition



claims. *See* 42 U.S.C. §§ 1395u(a), 1395kk-1(a), 1395dd. While MACs typically pay the Medicare claims up front, the payments may later be subject to substantive review. MACs submit review claims for post-payment review, at which point a third party contractor audits the MACs decision to pay the claims and often reverses the MAC's decision.

Zone Program Integrity Contractor ("ZPIC") is a particular type of third-party contractor that performs post-payment reviews. ZPICs identify cases of suspected fraud, investigate them, and take action to recoup any Medicare payments that were improperly paid out. ZPICs generally use statistical sampling to calculate an estimated amount of overpayments, which **Family Rehab** alleges often results in a large overpayment amount derived from a relatively small number of claims. Defendants allege similar "[s]tatistical sampling has been used by the Medicare program since 1972 as an accepted method of estimating Medicare overpayments...." Doc. No. 36 at 5–6. ZPICs are paid on a contractual basis and have the opportunity to earn all or part of an "award fee" based on CMS's evaluation of the ZPIC's performance. CMS determines whether to extend a ZPIC's contract based on its evaluation of the ZPIC's performance. **Family Rehab** alleges that this contract and payment structure incentivizes ZPICs to overturn the MAC's original payment decisions. **Family Rehab** alleges ZPICs' claim denials were overturned on appeal 72% of the time in the first quarter of 2013. *See* Doc. No. 28 at 7.

**\*2** A healthcare agency can appeal post-payment claim denials through a four-level administrative appeals process before seeking judicial review. *See* 42 U.S.C. § 1395ff.

First, a MAC reviews the denied claim for redetermination and is required to issue its decision within 60 days of receiving the request for review. *Id.* at § 1395ff(a)(3).

Second, the healthcare agency can appeal the MAC's redetermination to a Qualified Independent Contractor ("QIC") within 180 days of receiving the redetermination decision. *Id.* at § 1395ff(c). The QIC is statutorily required to issue its decision within 60 days of its receipt of the reconsideration request. *Id.*

Third, the healthcare agency can appeal the QIC reconsideration decision within 60 days of receiving the decision by requesting a hearing before an ALJ. *Id.* at § 1395ff(d)(1)(A). The statute requires the ALJ to hold the requested hearing and render its decision within 90 days of the request for hearing. *Id.* **Family Rehab** alleges ALJs grant relief to healthcare providers and find against ZPICs in 60% to 72% of cases. If an ALJ does not hear the case and render a decision within the required 90 day period, the healthcare agency may escalate its appeal to the fourth level of review before the Medical Appeals Council, using the record established in the previous levels of review. *Id.* at § 1395ff(d)(3)(A). The Appeals Council must render a decision or remand the case within 180 days of a timely review request. 42 C.F.R. § 405.1100(d).

Fourth, within 60 days of an ALJ decision, a dissatisfied party may appeal its claim to the Medicare Appeals Council ("Appeals Council") within the Health and Human Services Departmental Appeals Board. 42 U.S.C. § 1395(d)(2). The independent council must render a decision or remand the case to the ALJ within 90 day of the request for review. *Id.*

Finally, if a party is still dissatisfied, the party may request judicial review in federal district court.

During the first two levels of the review process, healthcare agencies can avoid recoupment by requesting appeals within specified time frames. 42 U.S.C. § 1395ddd(f)(2). However, the statute does not provide a way to avoid recoupment during the third or fourth levels of the review process. *Id.* Thus, CMS has the discretionary authority to recoup the alleged overpayment while the appeal is pending before an ALJ. *Id.*

"[T]here is a massive backlog in Medicare appeals." *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 498 (5th Cir. **2018**). **Family Rehab** alleges that as of September 1, 2017, there were 595,000 outstanding claims for adjudication. **Family Rehab** contends that its appeal will not be heard by an ALJ for three to five years.

**B. CMS's Post-Payment Review of Family Rehab's Services and the Resulting Appeal**

In 2016, a ZPIC began the post-payment review process for some of **Family Rehab**'s services by reviewing 43 claims. ZPIC found **Family Rehab** was not entitled to receive payment for certain services, amounting to $124,107.53 in overpayments. ZPIC then used an allegedly unproven extrapolation method based on those 43 claims to find CMS had overpaid **Family Rehab** roughly $7.8 million. On January 27, 2017, the MAC issued an Overpayment Demand Letter for $7,885,803.23 based on the ZPIC's determination. **Family**

this case. The opinion of the court of appeals (Pet. App. 1a-9a) is not published in the Federal Reporter but is repri...

See More Briefs

**Trial Court Documents**

**AT&T OPERATIONS, INC.**, v. **Stephen J. BYE.**

2006 WL 4401682
AT&T OPERATIONS, **INC.**, v. Stephen J. BYE.
District Court of Texas.
Sep. 08, 2006

...On August 31, 2006 and on September 5, 2006, the Court considered Plaintiff, AT&T Operations, Inc.'s ("AT&T"), Application for Temporary Injunction (the "Application"). AT&T appeared by and through its...

**Federal Land Bank Ass'n of South Alabama, FLSA v. H & H Worldwide Financial Services, Inc.**

2007 WL 4455206
FEDERAL LAND BANK ASS'N OF SOUTH ALABAMA, FLSA, Plaintiff, **v.** H & H WORLDWIDE FINANCIAL SERVICES, **INC.**, Tri-Star Financial, **Inc.**, and Southwest Securities, **Inc.**, Defendants.
District Court of Texas.
July 12, 2007

...On this date the Court considered the verified Application of Plaintiff, Federal Land Bank Association of South Alabama, FLSA (the "Bank"), for a Temporary Restraining Order (the "Application"). The Ba...

**Bookman v. Prince**

2007 WL 4081014
Ronald BOOKMAN and 7303 Entertainment, LLC, Plaintiffs, **v.** James PRINCE, RAP-A-LOT 2K Records, **Inc.**, and Nicholas Brown, Defendants.
District Court of Texas.
Apr. 12, 2007

...On this day came to be heard Plaintiffs' Request for Injunctive Relief, and the Court, having reviewed the pleadings and motions on file in this cause, is of the opinion that the Request for Injunctive...

See More Trial Court Documents

Rehab timely requested a redetermination of the denial of the claims at issue. When the MAC only slightly decreased the amount owed in overpayments, **Family Rehab** timely appealed the MAC's redetermination to the QIC. The QIC affirmed all but one of the claims it reviewed. On September 27, 2017, **Family Rehab** received a final Overpayment Demand Letter for the amount of $7,622,122.31. Throughout this process **Family Rehab** never requested a repayment plan because it alleges such plan would still require too high a monthly payment to be feasible.

*3 On October 24, 2017, **Family Rehab** timely requested an ALJ hearing of the individual claim denials and the statistical methodology the ZPIC used to calculate the alleged overpayments. As of the date of this opinion eight months later, no hearing has occurred and no hearing has even been set despite the statutory requirement that a hearing before an ALJ occur within 90 days of the request. On November 1, 2017, CMS began recouping the alleged $7.5 million in overpayments by withholding Medicare reimbursements to **Family Rehab**. Prior to the recoupment, **Family Rehab** relied on Medicare reimbursements for approximately 88% to 94% of **Family Rehab's** revenues. Since recoupment, **Family Rehab** has been forced to lay off 39 employees (89% of its staff) and to terminate healthcare services for 281 of its 289 patients.

On October 31, 2017, **Family Rehab** filed its complaint and emergency motion for temporary restraining order, seeking to enjoin CMS from beginning the recoupment process until after **Family Rehab's** case has been heard and determined by the ALJ. The Court reluctantly dismissed the initial temporary restraining order for lack of jurisdiction based on its understanding of binding Fifth Circuit case law and prior decisions from this Court. **Family Rehab** appealed to the Fifth Circuit. In reversing this Court's decision, the Fifth Circuit noted "these [collateral-claim exception] requirements have led to disharmony among our district courts" and took the opportunity to clarify the relevant case law. *Family Rehab., Inc.,* 886 F.3d at 502. On remand, **Family Rehab** has now filed an amended motion for temporary restraining order and preliminary injunction. Having granted the temporary restraining order and held a hearing on the preliminary injunction, the Court now considers **Family Rehab's** motion for preliminary injunction.

### II. Legal Standard

" 'The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits.' " *Serna v. Tex. Dept. of State Health Servs., Vital Statistics Unit,* No. 1-15-CV-446-RP, 2015 **WL** 6118623, at 13 (W.D. Tex. Oct. 16, 2015) (quoting *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.,* 441 F.2d 560, 560 (5th Cir. 1971) ). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985). To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974); *see also Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012) (quoting *Bluefield Water Ass'n, Inc. v. City of Starkville,* 577 F.3d 250, 252-53 (5th Cir. 2009) ).

"None of the four requirements has a fixed quantitative value." *Monumental Task Comm., Inc. v. Foxx,* 157 F. Supp. 3d 573, 582 (E.D. La. 2016) (citing *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975) ). "Therefore, in applying the four part test, 'a sliding scale is utilized, which takes into account the intensity of each in a given calculus.' " *DeFranceschi v. Seterus, Inc.,* Civ. Action. No. 4:15-CV-870-O, 2016 **WL** 6496323, at *2 (N.D. Tex. Aug. 2, 2016) (O'Connor, J.) (citing *Monumental Task Comm.,* 157 F. Supp. 3d at 582). "This requires 'a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief.' " *Monumental Task Comm.,* 157 F. Supp. 3d at 582 (citing *Klitzman, Klitzman & Gallagher v. Krut,* 744 F.2d 955, 958 (3d Cir. 1984) ). As long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden. *Productos Carnic, S.A. v. Central Amer. Beef and Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir. 1980).

### III. Analysis

### A. Family Rehab Has a Substantial Likelihood of Success on the Merits of Its Procedural Due Process Claim.

**\*4 Family Rehab** bases its motion for preliminary injunction on its procedural due process claim and contends it is "likely, if not certain, to prevail" on this claim because the CMS's discretionary recoupment has begun without first providing **Family Rehab** the procedural due process mandated under the statute. Defendants argue **Family Rehab** is not likely to succeed on the merits of its due process claim because the statute allows CMS to begin recouping overpayments at the third level of the appeals process, the hearing before the ALJ, and provides **Family Rehab** an alternative to receive meaningful, independent review when an ALJ cannot hear the case within the prescribed 90 days.

"When the other factors weigh strongly in favor of an injunction, 'a showing of some likelihood of success on the merits will justify temporary injunctive relief.' " *DeFranceschi,* 2016 **WL** 6496323, at \*2 (citing *Monumental Task Comm.,* 2016 **WL** 311822, at \*5 (quoting *Productos Carnic, S.A.,* 621 F.2d at 685) ). "However, no matter how severe and irreparable the threatened harm and irrespective of the hardships in which a preliminary injunction or lack of one might cause the parties, 'the injunction should never issue if there is no chance that the movant will eventually prevail on the merits.' " *Id.* (quoting *Monumental Task Comm.,* 2016 **WL** 311822, at \*5 (citing *Texas v. Seatrain Intern.,* 518 F.2d 175, 180 (5th Cir. 1975) ) ). The district court "look[s] to 'standards provided by the substantive law' " to determine likelihood of success on the merits. *Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990) ). The substantive law to be considered here is procedural due process.

Procedural due process protects against governmental deprivation of a liberty or property interest. *See Matthews v. Eldridge,* 424 U.S. 319, 332 (1976). Courts weigh three factors in determining whether the procedural due process provided is adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. **Family Rehab** does not argue that the statutory appeals process does not provide adequate due process but that CMS's failure to follow Congress's mandated procedures results in inadequate procedural due process.

**Family Rehab** has a property interest in the Medicare payments for services rendered. While Defendants make a cursory argument in a footnote that **Family Rehab** has no interest in participating in Medicare, the Court is not persuaded by the readily distinguishable, non-binding Sixth Circuit case law that Defendants cite. *See Cathedral Rock of North College Hill, Inc. v. Shalala,* 223 F.3d 354, 365 (6th Cir. 2000). The Sixth Circuit in *Cathedral Rock of North College Hill, Inc.* held that the nursing facility did not have a private interest in being a Medicare provider because the program is intended to benefit patients. Here, however, **Family Rehab** has a property interest in receiving payments owed to it for services rendered.

**\*5** Having found **Family Rehab** has a property interest, the Court next considers whether there is a high risk of an erroneous deprivation of **Family Rehab**'s property interest under the current appeals process due to the extreme backlog of cases before the ALJs. *See Eldridge,* 424 U.S. at 335. **Family Rehab** contends it will go out of business before receiving the procedural due process it is owed and that is statutorily provided by way of an evidentiary hearing before an ALJ. **Family Rehab** alleges 60%–72% of cases are overturned at the ALJ hearing stage of the review process, making it highly likely the ALJ will overturn the finding of alleged overpayments in this case. Defendants respond that the statute allows CMS to begin recoupment at this stage and that it provides for the sole remedy to any delays in receiving an ALJ hearing—escalation of the claims to the Appeals Council.

The language requiring an ALJ to hear an appeal and render a decision within 90 days is clearly mandatory. Section 1395ff(d)(1)(A) states "an administrative law judge *shall* conduct and conclude a hearing ... and render a decision on such hearing by not later than the end of the 90-day period beginning on the date a request for hearing has been timely filed." 42 U.S.C. § 1395ff(d)(1)(A) (emphasis added). Whereas the statutory language allowing a

party to escalate its appeal to the Appeals Council if an ALJ has not rendered a decision in
90 days is discretionary: "... the party requesting the hearing *may* request a review by the
Departmental Appeals Board." *Id.* at 1395ff(d)(3)(A) (emphasis added). Thus, the appealing
party has the option of waiting for an evidentiary hearing before an ALJ or escalating its
appeal to the Appeals Council who would review the record established at the QIC
reconsideration stage of the appeals process.

**Family Rehab** alleges the Office of Medicare Hearing and Appeals' own data shows
alleged overpayments are overturned at the ALJ level 60%–72% of the time. **Family Rehab**
is a small home healthcare provider, serving 289 patients until recently, and relies on
Medicare reimbursements for services rendered for approximately 94% of **Family Rehab**'s
revenue stream. By beginning to recoup alleged Medicare overpayments, CMS is
essentially forcing **Family Rehab** to subsist off a small fraction of its usual revenue. A
healthcare agency may be able to float its expenses and survive for the statutorily imposed
90-day period for an ALJ to hear and decide the appeal even while its alleged
overpayments are in recoupment. However, it is unreasonable to expect a healthcare
agency to scrape by for three to five years waiting for a hearing and decision while CMS
recoups the alleged overpayments.

The extreme backlog in cases before ALJs began in 2010, long after the Medicare program
was enacted in 1965. While the statute allows CMS to begin recouping the alleged
overpayments before the ALJ renders a decision, Congress likely did not anticipate that
decision being delayed much longer than the statutorily prescribed 90 days and certainly
not a delay of three to five years. Allowing CMS to continue recouping the alleged
overpayments while **Family Rehab** waits for a hearing effectively forces **Family Rehab** to
close its business without providing the statutorily mandated procedural due process. The
Court finds that forcing **Family Rehab** to wait three to five years for a hearing while
overpayments are in recoupment creates a high risk of erroneous deprivation of **Family
Rehab**'s property interest. The Court must determine whether escalating its appeal
provides **Family Rehab** sufficient procedural due process for CMS to begin recoupment of
alleged overpayments before an ALJ has heard the appeal and rendered a decision.

Defendants contend *Matthews v. Eldridge* supports their argument that escalation meets
procedural due process requirements and an evidentiary hearing is not necessary. 424 U.S.
at 343–47. Defendants argue that the Supreme Court held that an evidentiary hearing is not
required before terminating an individual's disability benefits because a review of medical
documents and the written record provides sufficient procedural due process and witness
testimony is not required. *Id.* at 343–344. However, *Eldridge* is clearly distinguishable from
the case before the Court. The issue before the Supreme Court centered on whether
procedural due process required an evidentiary hearing *prior* to terminating disability
benefits. *Id.* at 339–340. The plaintiff still had an opportunity to appeal the termination of his
disability benefits and have an evidentiary hearing before an ALJ within a year after his
benefits were terminated. *Id.* at 341–343. In the case before this Court, the issue involves
whether, *after* beginning the process of recouping alleged overpayments, procedural due
process requires an evidentiary hearing within the statutorily provided 90 days. If **Family
Rehab** chose to escalate its appeal, **Family Rehab** would never get the opportunity to be
heard and present witnesses at an evidentiary hearing. The Appeals Council would simply
review the record that was before the QIC and any further appeal to the federal district
court would similarly be limited to that written record. Thus, unlike the plaintiff in *Eldridge*,
**Family Rehab** would not have the benefit of an evidentiary hearing within a year of the
alleged overpayments going into recoupment. Escalation does not provide a remedy to the
backlogged ALJs because it does not provide adequate procedural due process.

*\*6* As to the third factor in determining whether the procedural due process provided is
adequate, the Court finds the Defendants' interest will not be adversely affected by delaying
the recoupment of alleged overpayments until after the ALJ hearing and determination,
assuming the determination is in the Defendants' favor. The Defendants argue that if the
recoupment is delayed and the Defendants are successful at the ALJ stage, **Family Rehab**
will declare bankruptcy and not repay the alleged overpayments. While the Court is
sympathetic to this argument, this hypothetical risk makes a number of assumptions and
does not outweigh **Family Rehab**'s ongoing deprivation of its property interest without
sufficient procedural due process.

The Court determines that **Family Rehab** has established a substantial likelihood of
success on the merits of its procedural due process claim. There is a high risk that **Family
Rehab** will be erroneously deprived of its property interest because CMS will continue
recouping alleged overpayments from **Family Rehab** without providing the statutorily

mandated ALJ hearing. Because an ALJ hearing will not occur for three to five years, **Family Rehab** will be forced to close its business before ever receiving the procedural due process it is owed.

### B. Family Rehab Has a Substantial Threat of Irreparable Injury If the Recoupment of Alleged Overpayments Continue.

**Family Rehab** argues irreparable injury exists because continued recoupment will force **Family Rehab** to close its doors long before an ALJ hears its case and issues its decision. Defendants contend no threat of irreparable injury exists because **Family Rehab** can escalate its appeal instead of waiting three to five years for an ALJ hearing.

To establish threat of irreparable harm in a preliminary injunction, **Family Rehab** must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). "In the Medicare withholding context, going out of business can be sufficient evidence of irreparable injury. *MaxMed Healthcare, Inc. v. Burwell*, No. SA:14-CV-988-DAE, 2015 **WL** 1310567, at *3 (W.D. Tex. Mar. 23, 2015).

Here, CMS continues the process of recouping over $7.5 million in alleged overpayments without **Family Rehab** receiving the statutorily required hearing and decision on the MAC's overpayment determination. Having already laid off most of its employees and limiting home healthcare services to only 8 of its previous 289 patients, **Family Rehab** will be forced to permanently close its doors long before receiving an ALJ hearing if CMS continues recoupment in this manner.

Defendants argue **Family Rehab** fails to establish a substantial threat of irreparable injury because it has other options besides waiting three to five years for a hearing, such as escalating its appeal or entering into a repayment plan. Neither of these options, however, establishes that **Family Rehab** has no substantial threat of irreparable injury. Under Defendants' theory, what is an alternative appeals process under the statute would instead become a mandatory appeals process, which was not the intended purpose of escalation. *See* 42 U.S.C. § 1395ff(d)(3)(A). Also, as discussed above, escalating its appeal deprives **Family Rehab** of an evidentiary hearing and offers inadequate procedural due process. **Family Rehab** alleges the 60-month repayment plan would not provide relief because the required monthly payments, while feasible based on its prior revenue, are no longer feasible given **Family Rehab**'s dramatically reduced number of patients and much reduced revenue stream.

Defendants argue no irreparable harm exists because **Family Rehab** is a subsidiary of a much larger healthcare agency with subsidiaries and related home health providers in multiple states. As a result, **Family Rehab**'s related entities allegedly have the resources to finance **Family Rehab** and allow it to survive the recoupment of the alleged overpayments while waiting for the ALJ hearing and decision. Defendants cite no Fifth Circuit case law supporting this argument. The Fifth Circuit and Texas case law have clearly established that liability cannot be imposed on a separate entity merely because it is a related entity unless the party seeking to hold the entity responsible pierces the corporate veil. *See W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994); *see also Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). Defendants have not attempted to pierce the corporate veil and there appears no reason to do so. Thus, **Family Rehab**'s related entities and their financial solvency are not relevant to determining whether it will suffer irreparable harm.

*7 The Court finds **Family Rehab** has sufficiently established a substantial threat of immediate and irreparable harm for which no adequate remedy at law exists.

### C. The Threatened Injury to Family Rehab Outweighs the Threatened Harm to the Defendants.

The balance of harms in granting the preliminary injunction between **Family Rehab** and Defendants weighs in favor of granting the relief. **Family Rehab** will shutter its doors, employees will lose their jobs, and patients will lose their home healthcare provider while waiting for the statutorily mandated ALJ hearing if the preliminary injunction is not granted. Whereas, Defendants will not suffer harm from granting the injunctive relief because they will have the opportunity to later recoup any overpayments if the ALJ reaches a decision in their favor. The facts sufficiently support a finding that any harm to Defendants caused by enjoining the recoupment of alleged overpayments does not outweigh the harm faced by **Family Rehab** if the preliminary injunction is denied.

### D. Granting the Injunctive Relief Does Not Disserve the Public Interest.

The quality of healthcare service **Family Rehab** provides to patients is not at issue, only the reimbursements for those services. No public interest would be adversely affected by granting the preliminary injunction. If anything, the public would benefit from continued access to **Family Rehab**'s home healthcare services.

### IV. Conclusion

The Court finds at this preliminary stage that **Family Rehab** has a substantial likelihood of success on the merits of its procedural due process claim because of the extreme backlog of cases on appeal to ALJs. The Court also finds **Family Rehab** will likely be forced to permanently close its doors immediately if this injunction is not granted. Because these and the remaining factors support a preliminary injunction, the Court **GRANTS Family Rehab**'s preliminary injunction. The Court **ORDERS** that the Defendants are restrained and enjoined from withholding Medicare payments and receivables to **Family Rehab** to effectuate the recoupment of the alleged overpayments in the underlying claims until such time as an ALJ has heard and rendered a decision on **Family Rehab**'s appeal of CMS's overpayment determination. This preliminary injunction does not enjoin Defendants from withholding Medicare payments for any new alleged claims of overpayments that may occur in the intervening time. In its discretion, the Court waives the bond requirement for **Family Rehab**. See *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3155911, Med & Med GD (CCH) P 306,325

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# "SOME KIND OF HEARING"*

### HENRY J. FRIENDLY†

It was particularly affecting to be invited to give the Owen J. Roberts lecture at this law school, of which my father-in-law, Chief Justice Horace Stern of Pennsylvania, was a distinguished graduate, a part-time teacher and a long-time trustee. The honor accorded me is even greater in that this is the hundredth anniversary of Justice Roberts' birth. Although I did not have the good fortune to know the Justice more than casually, I accept the eloquent characterization by Chief Justice Stern who knew him so well:

> With Owen Roberts integrity was never a problem but an instinct. He was utterly devoid of arrogance, of pretension, of intrigue, of corroding ambitions. He was modest and simple, as all truly great men are modest and simple, and his lovely, radiant smile was the outward expression of the warm friendliness in his heart.[1]

## I.  INTRODUCTION

My rather enigmatic title, "Some Kind of Hearing," is drawn from an opinion by Mr. Justice White rendered not quite a year ago. He stated, "The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests."[2] The Court went on to hold that the same not altogether pellucid requirement prevailed where the deprivation was of liberty.

Despite the efforts by some of the Justices to find roots for so broad a constitutional principle deep in the past,[3] these had produced only a few Supreme Court constitutional decisions

---

* This article is an expansion of the Owen J. Roberts Memorial Lecture delivered at the University of Pennsylvania Law School on April 3, 1975.

† Judge, United States Court of Appeals for the Second Circuit. LL.B. Harvard University, 1927.

The writer is more than ordinarily indebted to his law clerks, Gregory K. Palm, J.D. Harvard University, 1974, and James R. Smoot, J.D. Yale University, 1974, for their help in preparing this lecture.

[1] 3 U. PA. L. ALUMNI NEWS, June 1958, at 3.

[2] Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974).

[3] *Id.* (citing, *e.g.*, Grannis v. Ordean, 234 U.S. 385 (1914) (taking of private property)).


EXHIBIT
H

with respect to executive or administrative action until *Goldberg v. Kelly*[4] in 1970. Since then we have witnessed a due process explosion in which the Court has carried the hearing requirement from one new area of government action to another, an explosion which gives rise to many questions of major importance to our society. Should the executive be placed in a position where it can take no action affecting a citizen without a hearing? When a hearing is required, what kind of hearing must it be? Specifically, how closely must it conform to the judicial model?

For a long time we had labored under the illusion that the two latter questions could be answered rather easily. We needed only to determine whether the issue was one of adjudicative or of legislative fact. If the former, a full trial-type hearing was demanded; if the latter, something substantially less would do.[5] Although this approach is useful in many circumstances, it is only an approach. Moreover, it suffers from several significant defects. For one thing it does not indicate very accurately how to determine which issues are adjudicative and which are legislative.[6] For another, with the vast increase in the number and types of hearings required in all areas in which the government and the individual interact, common sense dictates that we must do with less than full trial-type hearings even on what are clearly adjudicative issues. By contrast, more than mere notice and comment procedures may sometimes be desirable and even constitutionally necessary on subjects that conceptually would be regarded as rulemaking.

---

[4] 397 U.S. 254 (1970).

[5] "Adjudicative facts are the facts about the parties and their activities, businesses, and properties. . . . Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." 1 K. Davis, Administrative Law Treatise § 7.02, at 413 (1958) [hereinafter cited as Davis]. This distinction stems from the opposite results in Londoner v. Denver, 210 U.S. 373 (1908), and Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441 (1915), and was first developed by Professor Kenneth Culp Davis in an article, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 402-16 (1942), later set forth in Davis, *supra*, § 7.04, at 420-26.

[6] The classifying test—that adjudicative facts "are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavorable to them," Davis, *supra* note 5, § 7.02, at 413, is somewhat circular and not always satisfactory. *See* Nathanson, Book Review, 70 Yale L.J. 1210, 1211 (1961). Professor Davis himself recognizes the existence of a "borderland" area between these broad categories where "the distinction often has little or no utility." Davis, *supra* note 5, § 7.02, at 414 (citing New York Water Serv. Corp. v. Water Power & Control Comm'n, 283 N.Y. 23, 27 N.E.2d 221 (1940). *See also* Davis, *supra* note 5, § 15.00, at 520-21 n.43, § 15.03, at 529 (Supp. 1970).

Although some may regret the loss of the old simplicity, its passing is all to the good. In an early opinion Mr. Justice Frankfurter, who had been a great administrative law teacher, explained that differences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts."[7] Despite this wise observation, the tendency to judicialize administrative procedures has grown apace in the United States.[8] English judges and scholars consider that we have simply gone mad in this respect. Lord Diplock, who headed the English administrative law "team" in a 1969 exchange of views in which I participated,[9] is reported to have said that the main value of the enterprise from the English standpoint had been to observe the horrible American examples of over-judicialization of administrative procedures and undue extension of judicial review, and to learn not to do likewise.[10] The

---

[7] FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143 (1940). Lord Shaw had said almost twenty-five years before: "[T]hat the judiciary should presume to impose its own methods on administrative or executive officers is a usurpation. And the assumption that the methods of natural justice are ex necessitate those of Courts of justice is wholly unfounded." Local Gov't Bd. v. Arlidge, [1915] A.C. 120, 138 (1914).

[8] This trend is symbolized by the ultimately successful effort of the "examiners" in the federal agencies, a title eminently appropriate to the administrative function as originally conceived, to be yclept "administrative law judges."

[9] The exchange resulted in a splendid book, B. SCHWARTZ & H. WADE, LEGAL CONTROL OF GOVERNMENT: ADMINISTRATIVE LAW IN BRITAIN AND THE UNITED STATES (1972) [hereinafter cited as SCHWARTZ & WADE], from which I have drawn heavily.

[10] Despite their professed aversion to judicialization, our English friends consider the principle *audi alteram partem* to be one of the two elements of "natural justice," the other being the right to an unbiased decisionmaker, *see* Board of Educ. v. Rice, [1911] A.C. 179; H. WADE, ADMINISTRATIVE LAW 171-218 (3d ed. 1971) [hereinafter cited as WADE], even tracing its origin back to Genesis, Rex v. University of Cambridge, 1 Str. 557, 568 (1723). Moreover, unlike "due process" which can be invoked only when the government is somehow involved in the alleged abridgment of an individual's rights, *see, e.g.,* Jackson v. Metropolitan Edison Co., 95 S. Ct. 449 (1974), the concept of natural justice affects other areas of British society, to the extent of regulating the course of dealing between individuals in situations that Americans would generally regard as private. *See, e.g.,* Labouchere v. Earl of Wharncliffe, 13 Ch. D. 346 (1879) (resolution of a club expelling a member was without force since adopted without notice of the precise charge and a full inquiry); W. ROBSON, JUSTICE AND ADMINISTRATIVE LAW 227-30 (2d ed. 1947) (discussing application of the principle to clubs, trade unions and various other voluntary associations). In that regard it is similar to, although broader in scope than, the common law principle recognized in the United States that public policy may require certain private associations "to refrain from arbitrary action" with respect to the admission, disciplining, or expulsion of members; "the association's action must be both substantively rational and procedurally fair." Pinsker v. Pacific Coast Soc'y of Orthodontists, 12 Cal. 3d 541, 550, 526 P.2d 253, 260, 116 Cal. Rptr. 245, 252 (1974) (en banc). *See, e.g.,* James v. Marinship Corp., 25 Cal. 2d 721, 731, 155 P.2d 329, 335 (1944) ("Where a union has . . . attained a monopoly of the supply of labor . . . such a union occupies a quasi public

matter, however, is not that clear. Professor Davis was undoubtedly right when he observed in 1970, "The best answer to the overall question of whether we want more judicialization or less is probably that we need more in some contexts and less in other contexts."[11]

## II. DEVELOPMENT OF THE HEARING REQUIREMENT

A brief survey of the historical development of the hearing requirement, both statutory and constitutional, may be useful before engaging in analysis of that requirement's content.

The term "hearing," like "jurisdiction," is "a verbal coat of too many colors."[12] Professor Davis has defined it as "any oral proceeding before a tribunal."[13] Broad as that definition is, it may not be broad enough. Although the term "hearing" has an oral connotation, I see no reason why in some circumstances a "hearing" may not be had on written materials only.[14] In addition the term "tribunal" is hardly apt to convey the notion that hearing requirements may be applied to bodies as diverse as an

---

position . . . and has certain corresponding obligations. It may no longer claim the same freedom from legal restraint [to choose its members] enjoyed by golf clubs or fraternal organizations"; union's policy of excluding blacks from full membership invalidated); Falcone v. Middlesex County Medical Soc'y, 34 N.J. 582, 170 A.2d 791 (1961). *See generally* Chafee, *The Internal Affairs of Associations Not for Profit,* 43 HARV. L. REV. 993, 1014-20 (1930). The precise content of the common law "fair procedure" requirement is far more flexible than that which the Supreme Court has found to be mandated by due process where it has found sufficient state action. Compare the procedures considered necessary in Goldberg v. Kelly, 397 U.S. 254 (1970), with Justice Tobriner's statement in *Pinsker*:

> The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial . . . nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising method which provides an applicant adequate notice of the "charges" against him and a reasonable opportunity to respond.

12 Cal. 3d at 555, 526 P.2d at 263-64, 116 Cal. Rptr. at 255-56 (citations omitted).

[11] DAVIS, *supra* note 5, § 1.04-9, at 34 (Supp. 1970).

[12] United States v. Tucker Truck Lines, Inc., 344 U.S. 33, 39 (1952) (Frankfurter, J., dissenting). Compare Mr. Justice Rehnquist's remark, "[t]he term 'hearing' in its legal context undoubtedly has a host of meanings." United States v. Florida East Coast Ry., 410 U.S. 224, 239 (1973). *See* DAVIS, *supra* note 5, § 6.05, at 375.

[13] DAVIS, *supra* note 5, § 7.01, at 407.

[14] Professor Davis seems to take a contrary view in the context of the Administrative Procedure Act, *id.* § 7.01, at 310-11 (Supp. 1970). However, § 7(d) of the Act, 5 U.S.C. § 556(d) (1970), sanctions the use of only written materials in some types of "hearings"—rulemaking, or determining claims for money or benefits, or applications for initial licenses—"when a party will not be prejudiced thereby." In any event my discussion is not limited to the APA.

administrative law judge on the one hand or a city council on the other.[15] The purpose of the hearing may range from the determination of a specific past event—did a government employee steal $50?—to an endeavor to ascertain community feeling about a proposed change in zoning or to determine the efficacy of a new drug.

The first great federal regulatory statute, the Interstate Commerce Act of 1887,[16] made sparing use of the term "hearing."[17] The general charter of the Commission, section 15, used the language, "if in any case in which an investigation shall be made by said Commission it shall be made to appear to the satisfaction of the Commission, either by the testimony of witnesses or other evidence."[18] However, in proceedings in the circuit courts with respect to violations of the Act or refusals to obey an order of the Commission under section 15, the report of the Commission was regarded as merely prima facie evidence of the facts, which might be rebutted by the defendant.[19] It was only in 1906, when the Hepburn Act greatly increased the powers of the Commission, that section 15 was altered to require a "full hearing,"[20] apparently in line with what had become Commission practice.[21] Shortly thereafter, Mr. Justice Lamar, speaking for the Supreme Court in the well-known *Louisville & Nashville*[22] case, said that this requirement, even in a proceeding relating to future rates,

> conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. . . . All parties must be

---

[15] This was the situation in one of the leading early cases, Londoner v. Denver, 210 U.S. 373 (1908).

[16] Ch. 104, 24 Stat. 379. *See generally* R. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 37-64 (1941).

[17] With respect to the inquiries to be engaged in by the Commission the term appeared only in a sentence in § 17 disqualifying a Commissioner from participating "in any hearing or proceeding" in which he had a pecuniary interest. Interstate Commerce Act of 1887, ch. 104, § 17, 24 Stat. 385-86.

[18] *Id.* at 384. To a similar effect the famous long-and-short haul clause permitted a dispensation "after investigation by the Commission." *Id.* § 4, at 380.

[19] *See id.* § 16, at 384-85.

[20] Ch. 1, § 15, 34 Stat. 589.

[21] Judge Cooley, former Chief Justice of Michigan, who was appointed as the first chairman of the ICC, "is often cited as being responsible for turning the ICC into a quasi-judicial body and for providing a precedent which future commissions have followed." M. BERNSTEIN, REGULATING BUSINESS BY INDEPENDENT COMMISSIONS 34 (1955). *See generally* 1-4 ICC ANN. REP. (1888-91) (summary histories of proceedings).

[22] ICC v. Louisville & N. R.R., 227 U.S. 88 (1913).

fully apprised of the evidence submitted or to be con-
sidered, and must be given opportunity to cross-
examine witnesses, to inspect documents and to offer
evidence in explanation or rebuttal.[23]

Scores of later federal statutes adopted the "hearing" lan-
guage of the Hepburn Act, sometimes retaining the adjective
"full," sometimes not. So far as action under such statutes was
concerned, it was immaterial for many years whether Mr. Justice
Lamar and his colleagues were simply construing a statute or
were acting under the force of the Constitution as well.[24]

Meanwhile, federal agencies became busily engaged in
rulemaking, and until enactment of the Administrative Proce-
dure Act[25] (APA) in 1946, they generally were permitted to do
this in whatever manner they chose.[26] Even with the passage of
the APA, only notice and comment procedures that fell far short
of those described by Mr. Justice Lamar were prescribed for
most agency rulemaking.[27] Furthermore, as the Supreme Court
held in a subsequent case a rule made in compliance with these
limited procedures could justify dismissal, without hearing of an
application that would otherwise have required a "full hear-
ing."[28] The APA prescribed trial-type procedures only "when
rules are required by statute to be made on the record after
opportunity for an agency hearing."[29] When the question of the
scope of this exception finally reached the Supreme Court in
*United States v. Allegheny-Ludlum Steel Corp.*[30] and *United States v.
Florida East Coast Railway Co.*,[31] not only was the exception given
a narrow construction but the opinions (particularly the one in

---

[23] *Id.* at 91, 93.

[24] The same comment applies to Mr. Justice Holmes' statement in United States v.
Baltimore & O. S. R.R., 266 U.S. 14, 20 (1912), *cited in* ICC v. Louisville & N. R.R., 227
U.S. 88, 94 (1913). However, Mr. Justices Holmes' reliance on Washington *ex rel.* Oregon
R.R. & Nav. Co. v. Fairchild, 224 U.S. 510, 525 (1912), an appeal from a state court,
would indicate a belief that due process was implicated.

[25] Ch. 324, 60 Stat. 237, *as amended,* 5 U.S.C. §§ 551-59, 701-06 (1970).

[26] However, enabling legislation often contained specific requirements for rulemak-
ing procedures, such as requiring that a "hearing" be provided. Even then statutes
requiring a hearing were often interpreted to mean public meetings or arguments, and
not trials. *See, e.g.,* Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294 (1933).

[27] Administrative Procedure Act § 4, ch. 324, 60 Stat. 238 (1948), *as amended,* 5
U.S.C. § 553(c) (1970).

[28] United States v. Storer Broadcasting Co., 351 U.S. 192 (1956).

[29] 5 U.S.C. § 553(c) (1970).

[30] 406 U.S. 742, 757 (1972).

[31] 410 U.S. 224, 239 (1973).

*Florida East Coast*) opened wide and unexpected vistas for the use of less than full trial-type hearing procedures in business and social regulation.[32]

On the other hand, the number of nonregulatory areas in which the Court has insisted on hearings has mushroomed; indeed, we have witnessed a greater expansion of procedural due process in the last five years than in the entire period since ratification of the Constitution. Understandably, the first stirrings were in reaction to the outrages stemming from the activities of Senator Joseph McCarthy. The Court invalidated inclusion of an organization on the Attorney General's subversive list and denial of a security clearance without an opportunity to be heard.[33] After a turn in the other direction by a 5-4 vote in *Cafeteria & Restaurant Workers Local 473 v. McElroy*,[34] in which the interest involved was deemed insufficient to trigger the constitutional right to a hearing, the trial-type hearing forces scored a resounding victory in *Goldberg v. Kelly*.[35]

*Goldberg* has had considerable progeny in the Supreme Court and a much larger brood in the lower courts. Drawing also on a pre-*Goldberg* decision concerning a Wisconsin garnishment law,[36] the Court next struck down a Georgia statute which had provided for the suspension of the registration and driver's license of an uninsured motorist involved in an accident when the administrative hearing prior to suspension excluded any consideration of fault or responsibility but the statutory scheme made "liability an important factor in the State's determination . . . ."[37] *Fuentes v. Shevin*[38] invalidated statutes permitting a con-

---

[32] *See* text accompanying notes 187-242 *infra*.

[33] Greene v. McElroy, 360 U.S. 474 (1959); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123 (1951). The Court, however, was still proceeding very cautiously. Only four of the five-man majority (each writing his own opinion) in the *Joint Anti-Fascist* case placed their decisions on constitutional grounds. *Greene* took the form of a decision that Congress and the President had not intended to dispense with a hearing.

[34] Cafeteria & Restaurant Workers Local 473 v. McElroy, 367 U.S. 886 (1961).

[35] 397 U.S. 254 (1970) (holding that due process requires an adequate hearing —including notice and the opportunity to confront and cross-examine adverse witnesses, to present oral arguments, and to obtain counsel—before welfare benefits can be terminated even for a brief interval). A step on the road to *Goldberg* was Willner v. Committee on Character & Fitness, 373 U.S. 96 (1963) (denial of admission to the bar). This had been presaged long before by Goldsmith v. Board of Tax Appeals, 270 U.S. 117, 123 (1926).

[36] Sniadach v. Family Fin. Corp., 395 U.S. 337 (1969). Although this case and Fuentes v. Shevin, 407 U.S. 67 (1972), involved action by court employees, the difference does not seem significant.

[37] Bell v. Burson, 402 U.S. 535, 541 (1971).

[38] 407 U.S. 67 (1972).

ditional seller to utilize court process for repossession of chattels without a preliminary hearing. Hearings of a considerable degree of formality also have been held to be required for revocation of parole[39] or probation.[40] On the day of its parole revocation decision, the Court held that a teacher at a public institution may not be dismissed without a hearing if he had a tenure or its reasonable facsimile or the dismissal involved a stigma that would impair his ability to obtain future employment.[41]

The 1973 Term seemed to indicate some turning back. *Fuentes* was greatly narrowed—indeed, as thought by five members of the Court, including its author, overruled.[42] A badly divided Court held that a nonprobationary federal employee was not entitled to a hearing prior to removal from the service if he were given one later.[43] Perhaps most important of all, the Court rendered the decision whence the title of this lecture has been taken,[44] which, although asserting a broad scope for the requirement of "some kind of hearing" in matters of prison discipline, evinced a willingness to accept much less than the full judicial model for the determination of adjudicative facts when there was sufficient reason for doing so.

However, the most recent decisions of the 1974 Term show a resumption of the trend toward greater and greater insistence on hearings. As Mr. Justice Stewart observed, his own report of *Fuentes*' demise proved to be greatly exaggerated.[45] In *Goss v. Lopez*[46] the Court pushed the requirement of "some kind of hearing" into an area entirely new for it—a ten-day suspension from a public high school. A month later, in *Wood v. Strickland*,[47] a case that had been argued on the same day as *Goss* and the result in which must have been known when *Goss* was decided,

---

[39] Morrissey v. Brewer, 408 U.S. 471 (1972).

[40] Gagnon v. Scarpelli, 411 U.S. 778 (1973).

[41] Perry v. Sindermann, 408 U.S. 593 (1972); Board of Regents v. Roth, 408 U.S. 564 (1972).

[42] Mitchell v. W.T. Grant Co., 416 U.S. 600 (1974), *noted in The Supreme Court, 1973 Term*, 88 HARV. L. REV. 40, 72 (1974). Mr. Justice Powell, who joined the five-man majority, considered that only the *Fuentes* opinion, rather than its holding, had been overruled, 416 U.S. at 623-24 (Powell, J., concurring).

[43] Arnett v. Kennedy, 416 U.S. 134 (1974), *noted in The Supreme Court, 1973 Term*, 88 HARV. L. REV. 40, 83 (1974).

[44] Wolff v. McDonnell, 418 U.S. 539 (1974).

[45] *See* North Ga. Finishing, Inc. v. Di-Chem, Inc., 95 S. Ct. 719, 723 (1975) (concurring opinion).

[46] 95 S. Ct. 729 (1975).

[47] 95 S. Ct. 992 (1975).

the Court drove the knife deeper by holding that the Civil Rights Act[48] imposed civil liability on school authorities (including school board members) who made sufficiently wrong guesses concerning students' constitutional rights, presumably including procedural ones.[49] Particularly after *Goss v. Lopez* it becomes pertinent to ask whether government can do anything to a citizen without affording him "some kind of hearing."[50] The developments of the last five years, and the ebb and flow in the Court's decisions, make this an appropriate time for the *tour d'horizon* attempted here.

## III.   WHEN IS A HEARING NECESSARY?

Good sense would suggest that there must be some floor below which no hearing of any sort is required. One wonders whether even the most outspoken of the Justices would require one on the complaint of an AFDC recipient, recounted by Professor Bernard Schwartz, that "I didn't receive one housedress, underwears . . . . They gave me two underwears for $14.10 . . . it should have been $17.60 instead of $14.10."[51] Although the value

---

[48] 42 U.S.C. § 1983 (1970).

[49] In the Court's words the holding was

that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

95 S. Ct. at 1001. *See also id.* at 1004 n.3 (Powell, J., dissenting).

[50] While Mr. Justice White's opinion for a five-man majority in *Goss* reads blandly enough, it suffers from the vice, well documented in Mr. Justice Powell's dissent, of containing no limiting principle. *Id.* at 1003. Although the suspensions there at issue were for ten days, the maximum which Ohio permitted without a hearing, emanations of the opinion go well beyond this. For all that appears, a hearing may be required for a suspension of two days—or perhaps even two hours—at least when the sanction is noted on the student's record.

[51] SCHWARTZ & WADE, *supra* note 9, at 123. The quoted remarks were made by an AFDC recipient who was complaining that the special welfare grant she had received was less than the full grant for which she had applied. *See also* Baum, Mass Administrative Justice: AFDC Fair Hearings 52-53 (paper presented at ABA Section of Administrative Law, Center for Administrative Justice, Conference June 4-6, 1973).

The lengthy procedures now required with respect to reductions in, or denials of, special benefits to AFDC recipients are principally the result of federal regulations and state "fair hearing" statutes. *See, e.g.*, 45 C.F.R. § 205.10 (1973); 18 N.Y.C.R.R. § 358.16 (1974) (prescribing details of fair hearing in New York). *See also id.* §§ 358.4(a)-(c) (1974) (hearing protection for recipients of food stamps, cash assistance benefits, and social services). However, given the expressed dissatisfaction of state officials with federal hearing requirements, *see* Baum, *supra*, at 25, 32-38 and the recent loosening of the federal regulations, *see Developments in Welfare Law—1973*, 59 CORNELL L. REV. 859, 936-39 (1974), it is quite possible that state "fair hearing" statutes and regulations will be limited, thereby provoking a constitutional battle.

of even small benefits should not be deprecated, given the precarious financial condition of the recipients of AFDC, the cost of providing an evidentiary hearing in such a case must so far outweigh the likelihood or the value of more accurate determinations that final reliance should be placed on the informed good faith of program administrators. Until recently one would have thought there was also a floor with respect to school discipline,[52] but *Goss v. Lopez* seems to permit dispensing with a "rudimentary hearing" only in the case of "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process . . . ."[53]

It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the deserving.[54] This is particularly true in an area such as public housing where the number of qualified applicants greatly exceeds the available space, so that, from an overall standpoint, the erroneous rejection or even the eviction of one family may mean only that an equally deserving one will benefit.[55] However, particularly in the light of *Goss v. Lopez*, it seems impossible at the moment to predict at what level, if any, the Court will set the floor below which

---

[52] "At some point the sanction becomes a sufficiently innocuous part of the daily pattern that the adjudicatory character requiring due process becomes imperceptible, and disciplining the student becomes solely a matter of school or classroom administration. Buss, *Procedural Due Process for School Discipline—Probing the Constitutional Outline*, 119 U. PA. L. REV. 545, 577 (1971).

[53] 95 S. Ct. at 740. Even in such cases "the necessary notice and rudimentary hearing should follow as soon as practicable." *Id.*

[54] *See* Chief Justice Burger's dissent in Wheeler v. Montgomery, 397 U.S. 280, 282 (1973); Buss, *supra* note 52, at 574. Some of the potential dimensions of the problem are reflected by the fact that in 1972 more than 13 million persons received maintenance assistance under the federal government's various categorical assistance programs, at a cost of about $10.5 billion. By far the most significant category was Aid to Families with Dependent Children (AFDC) which numbered about 10.5 million persons as recipients and cost approximately $6.5 billion. Baum, *supra* note 51, at 1. Balanced against the assistance claimant's interest in receiving a full and fair hearing with respect to any proposed action affecting his aid is the legitimate interest of the states and federal government in expunging unqualified recipients from the welfare roles. For example, in 1971 the state of Michigan paid out about $450,000 to recipients awaiting negative action hearings and the initial decision was reversed in only 8% of a recent sample of such cases. *Id.* 32.

[55] Denial of admission to scarce higher education facilities on the basis of lack of superior qualifications stands similarly.

no hearing is needed. Perhaps there is more profit in the inquiry, if a hearing, what kind of hearing, to which I now turn.

## IV.  IF A HEARING, WHAT KIND OF HEARING?

The Court's early opinions on this score were rather vague. The pioneering case made the rather unilluminating statement, in the context of a special tax assessment, that while "[m]any requirements essential in strictly judicial proceedings may be dispensed with . . . . [A] hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."[56] In his concurring opinion in *Joint Anti-Fascist Refugee Committee v. McGrath*,[57] still the finest exposition of the need for a "hearing," Mr. Justice Frankfurter said only, even in the case of "a person in jeopardy of serious loss," that one must be given "notice of the case against him and opportunity to meet it."[58] Favorite adjectives have been "summary," "informal," "flexible," "effective," "meaningful," and now "rudimentary."[59]

All this sounds like the British concept of "natural justice" where the classic statement is Lord Loreburn's oft-quoted dictum concerning the duties of a local school board on a claim of salary discrimination against teachers in church schools:

> I need not add that . . . they must act in good faith and fairly listen to both sides for that is a duty lying upon everyone who decides anything. But I do not think they are bound to treat such a question as though it were a trial. They have no power to administer an oath, and need not examine witnesses. They can obtain information in any way they think best, always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting any relevant statement prejudicial to their view.[60]

One must doubt whether it is all that simple, even in England. Just how are the parties to be given "a fair opportunity . . . for correcting or contradicting anything prejudicial to their view"?

---

[56] Londoner v. Denver, 210 U.S. 373, 386 (1908).
[57] 341 U.S. 123 (1950).
[58] *Id.* at 171-72.
[59] *See, e.g.,* Goss v. Lopez, 95 S. Ct. 729, 740 (1974); Wolff v. McDonnell, 418 U.S. 539, 566 (1974); Goldberg v. Kelly, 397 U.S. 254, 267-69 (1970); Armstrong v. Manzo, 380 U.S. 545, 552 (1965).
[60] Board of Educ. v. Rice, [1911] A.C. 179, 182.

In fact, tribunals in England generally permit the calling of witnesses and cross-examination;[61] the apparent informality of the process derives rather from the character of the tribunal,[62] the less litigious habits of the English people, and the willingness of the English courts to abstain from rigid codification.

The Supreme Court's opinion in *Cafeteria & Restaurant Workers Local 476 v. McElroy*[63] has been cited less often for its holding that no hearing was required than for the statement that "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."[64] I have elaborated a bit on this theme:[65] The required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences[66] of affording it. Even amplified in this way, such a balancing test is uncertain and subjective,[67] but the more elaborate specification of the relevant factors may help to produce more principled and predictable decisions.

It may be useful to compile one list enumerating factors that have been considered to be elements of a fair hearing, roughly in order of priority, and another that arrays various types of government action that have been urged to call for a hearing, starting with the most serious. As we go down the second list from the more severe actions to the less, the needle would point to fewer and fewer requirements on the list of required

---

[61] *See, e.g.*, Osgood v. Nelson, L.R. 5 H.L. 636 (1872) (part of the procedure required under natural justice); WADE, *supra* note 10, at 213, 272. However, in some cases courts have found it proper for the authority to employ confidential sources. *In re* Pergamon Press Ltd., [1970] 3 W.L.R. 792 (C.A.); Regina v. Gaming Bd. for Great Britain, [1970] 2 W.L.R. 1009 (C.A.); University of Ceylon v. Fernando, [1960] 1 W.L.R. 223 (P.C.) (accusation against student taking an examination). *See* WADE, *supra* note 10, at 210, 218.

[62] *See* note 74 *infra* & accompanying text.

[63] 367 U.S. 886 (1961).

[64] *Id.* at 895. *See also* Arnett v. Kennedy, 416 U.S. 134, 167-71 (1974) (Powell, J., concurring); *id.* at 186-96 (White, J., concurring); Hannah v. Larche, 363 U.S. 420, 442 (1960).

[65] Frost v. Weinberger, No. 74-2020 (2d Cir., Apr. 17, 1975).

[66] For example, continued receipt of benefits by ineligibles, retention of unqualified government employees, inability to dislodge a disruptive tenant because neighbors are afraid to testify, polarizing student-teacher relationships, etc.

[67] This was the "burden" of Mr. Justice Black's dissent in Goldberg v. Kelly, 397 U.S. 254, 272 (1970).

safeguards.[68] With the probable exception of *Goldberg*[69] itself, the Court's decisions seem to conform to this scheme. I suggest also that the elements of a fair hearing should not be considered separately; if an agency chooses to go further than is constitutionally demanded with respect to one item, this may afford good reason for diminishing or even eliminating another.[70]

### A.  Elements of a Fair Hearing[71]

### 1. An Unbiased Tribunal

Although an unbiased tribunal is a necessary element in every case where a hearing is required, sharp disagreement can arise over how much in the way of prior participation constitutes bias.[72] In addition, there is wisdom in recognizing that the further the tribunal is removed from the agency and thus from any suspicion of bias, the less may be the need for other procedural safeguards; while all judges must be unbiased, some may be, or appear to be, more unbiased than others. Instead of the *Goldberg* formulation permitting a welfare official (even with some involvement in the very case) to act as a decisionmaker as long as he had not "participated in making the determination under review,"[73] but requiring a corresponding heavy dose of judicialization, agencies might be offered an option of less procedural formality if the decisionmaker were not a member of the agency and of still less if, as in England, he were not a full-time government employee at all.[74] Distrust of the bureaucracy is

---

[68] After I was well along in preparing this lecture, I found that a rather similar approach had been taken by Professor William Buss with respect to school discipline. *See* Buss, *supra* note 52, at 547. I agree with Professor Buss' approach but, as will be seen, would give more weight to some negative factors than he does. *See id.* 579.

[69] 397 U.S. 254 (1970). *See* note 35 *supra* & text accompanying note 245 *infra*.

[70] This point is well developed in Buss, *supra* note 52, at 639-40.

[71] My discussion here will be in terms of constitutional requirements only. Also I generally assume continued reliance on the adversary system, although with serious misgivings on that score. *See* text accompanying notes 115-21 *infra*.

[72] *Compare* Arnett v. Kennedy, 416 U.S. at 134, 155 & n.21 (1974) (Rehnquist, J.) *with id.* at 196 (White, J., dissenting).

[73] 397 U.S. at 271. *See also* Wolff v. McDonnell, 418 U.S. 539, 570-71 (1974) (no constitutional bar to makeup of prison adjustment committee, consisting of Associate Warden for Custody, Correctional Industries Superintendent and Reception Center Director, to determine whether to revoke good time or impose severe punishment).

[74] SCHWARTZ & WADE, *supra* note 9, at 145; WADE, *supra* note 10, at 257-59. As a rule tribunals are staffed by independent persons, not by civil servants. A typical tribunal, especially if it is an appeals tribunal, will consist of three individuals. In many instances the chairman will be a local practicing attorney who is donating his services on a part-time basis. The other two members will be chosen from among volunteers outside the

surely one reason for the clamor for adversary proceedings in the United States.[75] But a better answer may not be more insistence on adversary proceedings but less reliance on the bureaucracy for decisionmaking.

## 2. Notice of the Proposed Action and the Grounds Asserted for It

It is likewise fundamental that notice be given and that it be timely and clearly inform the individual of the proposed action and the grounds for it.[76] Otherwise the individual likely would

---

government. In certain cases the two additional members will represent certain interests such as employer and employee in the case of National Insurance Tribunals. In some cases the chairman is paid while the other members regard the work as public service. In other cases, the panel is composed of individuals with special qualifications and each member is compensated; for example, Pensions Appeal Tribunals (certain members are paid physicians). *See id.* 258-60.

In the United States a particularly strong case for the employment of independent hearing officers is presented by evictions from private housing constructed with enough public aid so that evictions constitute government action, in states in which the function of passing on the justification is not performed by the courts. *See* Joy v. Daniels, 479 F.2d 1236, 1242-43 (4th Cir. 1973) (contrasting South Carolina procedures with those of New York and North Carolina where evictions in state court are summary in nature and, therefore, full administrative hearings must be afforded); Caulder v. Durham Housing Auth., 433 F.2d 998, 1002 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003 (1971) (North Carolina); Escalera v. New York Housing Auth., 425 F.2d 853 (2d Cir.), *cert. denied,* 400 U.S. 853 (1970). Since private housing projects normally do not have access to the state corps of hearing examiners, hearings in such cases are often conducted by an officer of a similar project under the management of the same organization, or even by individuals who were part of the group who initially made the eviction decision. *See* Wilson v. Lincoln Redev. Corp., 488 F.2d 339 (8th Cir. 1973) (a member of the committee that had voted to evict the tenant and the secretary-treasurer of the housing corporation who had apprised that committee of "the facts" concerning the tenant may serve on the hearings panel unless they are required to call on their own personal knowledge in weighing the evidence); Note, *Procedural Due Process in Government—Subsidized Housing,* 86 HARV. L. REV. 880, 908 (1973). While employment of officers from similar projects seems consistent with *Goldberg,* Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937 (2d Cir. 1974), would there not be much more confidence if the "tribunal" were, for example, a board of three retired social workers or one social worker and a tenant and a superintendent from another similar project? If the nature of the tribunal were thus altered, it should be permissible to dispense with many procedural safeguards now thought to be required, which at least cause serious delay and in the case of the confrontation requirement may prevent the eviction of a fractious tenant because his neighbors are afraid to testify. *See* text accompanying notes 83-104 *infra.*

[75] Even by Justices of the Supreme Court, ". . . when a grave injustice is wreaked on an individual by the presently powerful federal bureaucracy, it is a matter of concern to everyone . . . ." Richardson v. Perales, 402 U.S. 389, 413 (1971) (Douglas, J., dissenting).

[76] *See* Boddie v. Connecticut, 401 U.S. 371, 378 (1971); Goldberg v. Kelly, 397 U.S. at 267-68; Armstrong v. Manzo, 380 U.S. 545, 550 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950). Subsidiary questions are whether the notice must be written and how long prior to the hearing it must be given. *See* Holland v.

be unable to marshal evidence and prepare his case so as to benefit from any hearing that was provided.[77] I add, here again, that the more forthcoming the agency has been in disclosing its grounds, the stronger should be its position in asking curtailment of other procedures.

### 3. An Opportunity to Present Reasons Why the Proposed Action Should Not Be Taken

This also is fundamental. The open question is whether the opportunity must be for oral presentation. *Goldberg* held that it must be in the context of welfare terminations.[78] I have no quarrel with that in the situation there presented; but assuming for the moment that confrontation is not always required, I would object to requiring oral presentation as a universal rule. Determination whether or not an oral hearing is required should depend on the susceptibility of the particular subject matter to written presentation, on the ability of the complainant to understand the case against him and to present his arguments effectively in written form, and on the administrative costs.[79]

---

Oliver, 350 F. Supp. 485 (E.D. Va. 1972) (written notice of charges one hour before hearing to prisoner did not afford inmate due process even though he had been orally informed of the charges three days previously); Stewart v. Jozwiak, 346 F. Supp. 1062, 1064 (E.D. Wis. 1972) (prisoner charged with misconduct is entitled to "reasonable advance notice of such hearing"). Although many courts have concluded that oral notice is inadequate in some circumstances, *e.g.*, Wolff v. McDonnell, 418 U.S. at 563-64 (loss of good time credit and confinement in a disciplinary cell), written notice in all cases is not constitutionally mandated, and either written *or* oral notice, at the discretion of the administrative official, has been permitted in some cases, *e.g.*, Goss v. Lopez, 95 S. Ct. 729, 740 (1975).

A related question is whether notice, written or oral, must be in a language in which the intended recipient is fluent. Some commentators have argued that due process demands that so far as administratively feasible, written notice must be in a language which the recipient can read, Note, *El Derecho de Aviso: Due Process and Bilingual Notice*, 83 YALE L.J. 385 (1973); however, this argument seems not to have been accepted thus far. *See, e.g.*, Guerro v. Carleson, 9 Cal. 3d 808, 512 P.2d 833, 109 Cal. Rptr. 201 (1973).

[77] *Cf. In re* Gault, 387 U.S. 1, 33-34 & n.54 (1967).

[78] 397 U.S. 254, 268-69 (1970).

[79] In contrast with the mass justice cases, use of written direct testimony by expert witnesses is common in administrative hearings in the "big case" area and generally is not the subject of controversy. Allowing such written direct testimony affords great savings in time and money and often permits relatively complicated ideas, theories, or facts to be transmitted in a form best suited to complete understanding in situations where the value of observing demeanor is minimal. *See* W. GELLHORN & C. BYSE, ADMINISTRATIVE LAW—CASES AND COMMENTS 860-63 (6th ed. 1974); Boyer, *Alternatives to Administrative Trial-Type Hearings for Resolving Complex Scientific, Economic, and Social Issues*, 71 MICH. L. REV. 111, 127-28 (1972).

### 4, 5, and 6. The Rights To Call Witnesses, To Know the Evidence Against One, and To Have Decision Based Only on the Evidence Presented

Although these rights are different, they are so closely associated that it will be convenient to deal with them together.

Under most conditions there does not seem to be any disposition to deny the right to call witnesses, although the tribunal must be entitled reasonably to limit their number and the scope of examination.[80] A more debatable issue, which has not recently been raised in the Supreme Court, is the right to compulsory process.[81] No general rule is appropriate; rather, the alleged

---

[80] In the context of prison disciplinary proceedings, the Supreme Court has recognized that although the right to present evidence is "basic to a fair hearing," the unrestricted right to call witnesses from among the prison population carries "potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program . . . ." Wolff v. McDonnell, 418 U.S. 539, 566 (1974). Balancing the inmate's interest in avoiding loss of "good time" against the needs of the prison, the Court concluded that "prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* Although the Court then suggested that it would be "useful" for prison officials to state their reasons for not allowing a particular witness to be called, it refused to mandate any such requirement as a constitutional matter. While this aspect of *Wolff* arguably represents a departure from prior decisions, it is still too early to predict whether it will have a significant effect in areas other than prison discipline.

The most obvious areas for such application would be those in which there is a substantial state interest in preserving the overall integrity of institutions and programs, for example, secondary schools, and there is a substantial chance that the individual may be more interested in disruption than in proving his case. Goss v. Lopez, 95 S. Ct. 729, 740 (1975), would seem consistent with *Wolff* in this regard, since the Court "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge or to call his own witnesses to verify his version of the incident." As in *Wolff* it was left to the informed discretion of the administrative official to determine whether in a particular case any of these elements of a formal judicial hearing were desirable. However, the Court also emphasized that it had addressed itself only to the short suspension of ten days or less and that longer suspensions might require "more formal procedures." *Id.* at 741. Deep uncertainty over how "rudimentary" *Goss* hearings may be is created by the dictum: "Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than rudimentary procedures will be required." *Id.* While the Court did not put the possibility "aside," the Court neither embraced it nor gave any clue to what it meant by "unusual." Although this is the kind of remark often inserted in an opinion in order to forestall a separate concurrence, it would be hard to think of a sentence better calculated to breed lawsuits or less helpful to the lower courts in deciding them.

[81] Compulsory process is guaranteed by the sixth amendment only with respect to criminal trials. Several courts have held that the failure of an administrative adjudication procedure to provide compulsory process does not violate due process. *See* Low Wah

benefits to be derived must be weighed, largely on a case-by-case basis, against the possible detriments, notably harassment and delay.

There can likewise be no fair dispute over the right to know the nature of the evidence on which the administrator relies. But with this generalization agreement ends. The most debated issue is the right of confrontation.

Since the only provision in the Bill of Rights conferring the right of confrontation is limited to criminal cases, one might think the constitutional right of cross-examination was similarly confined. However, in *Greene v. McElroy*,[82] Chief Justice Warren said that the Court had applied this principle "in all types of cases where administrative and regulatory actions were under scrutiny."[83] Lofty sentiments on this score are usually accompanied by references to a passage in the Acts of the Apostles,[84] ignoring that it referred to a situation where a man was to be delivered to die, and to Wigmore's statement that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth,"[85] ignoring that most of the world's legal systems, which are equally intent on discovering the truth, have not seen fit to import the engine.[86] Other favorites are characters as diverse as the Emperor Trajan[87] and Wild Bill Hickok of Abilene, Kansas, immortalized by President

---

Suey v. Backus, 225 U.S. 460, 470-71 (1912) (Immigration and Naturalization Service hearing); Ubiotica Corp. v. FDA, 427 F.2d 376, 381 (6th Cir. 1970) (Food and Drug Administration hearing); *cf.* Hyser v. Reed, 318 F.2d 225, 239-40 (D.C. Cir.), *cert. denied*, 375 U.S. 957 (1963) (parole violation hearing). *But see* Jewell v. McCann, 95 Ohio St. 191, 116 N.E. 42 (1917).

[82] 360 U.S. 474 (1959).

[83] *Id.* at 497. In fact none of the decisions cited directly support the right of confrontation as a requirement of due process in such cases *under the Constitution*. *See* Reilly v. Pinkus, 338 U.S. 269 (1949); Carter v. Kubler, 320 U.S. 243 (1943); Morgan v. United States, 304 U.S. 1 (1938); Ohio Bell Tel. Co. v. Public Util. Comm'n, 301 U.S. 292 (1937); Southern Ry. v. Virginia, 290 U.S. 190 (1933).

[84] When Festus more than two thousand years ago reported to King Agrippa that Felix had given him a prisoner named Paul and that the priests and elders desired to have judgment against Paul, Festus is reported to have stated: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have licence [*sic*] to answer for himself concerning the crime laid against him." Acts 25:16.
Greene v. McElroy, 360 U.S. at 496 n.25.

[85] 5 J. WIGMORE, EVIDENCE § 1367, at 32 (Chadbourne rev. 1974). *See* 360 U.S. at 496 n.25.

[86] *See, e.g.*, Homburger, *Functions of Orality in Austrian and American Civil Procedure*, 20 BUFF. L. REV. 9, 36 (1970).

[87] *Quoted in* Carlson v. Landon, 342 U.S. 524, 552 n.7 (1952) (Black, J., dissenting).

Eisenhower.[88] Eloquent statements have been made, notably by Mr. Justice Douglas.[89]

While agreeing that these references were wholly appropriate to the witch-hunts of the McCarthy era[90] and that cross-examination is often useful, one must query their universal applicability to the thousands of hearings on welfare, social security benefits, housing, prison discipline, education, and the like which are now held every month[91]—not to speak of hearings on

---

[88] *Quoted in* Jay v. Boyd, 351 U.S. 345, 372-75 (1956) (Frankfurter, J., dissenting).

[89] Peters v. Hobby, 349 U.S. 331, 350-51 (1955) (concurring opinion); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 180 (1951) (concurring opinion).

[90] *See* Davis, *The Requirement of a Trial-Type Hearing,* 70 Harv. L. Rev. 193, 213-14 (1956) (need for confrontation and the dangers of "faceless" informers). For an account of other similar cases from the McCarthy era, see E. Bontecou, The Federal Loyalty-Security Program (1953).

[91] In the public welfare area alone there were 1,434,900 applications for public assistance during the period from January to March 1973. Social & Rehabilitation Serv., U.S. Dep't of Health, Educ. & Welfare, Applications and Case Dispositions for Public Assistance, [January-March 1973] 2 (U.S. Dep't of Health, Educ. & Welfare Pub. No. (SRS) 74-03109, 1973). Even though only a portion of these applications result in a full hearing, *cf.* Baum, *supra* note 51, at 49 (in a recent period in New York City only 5% of the cases in which benefits were decreased and only 20% of the cases in which a notice of intent to decrease was sent, resulted in a fair hearing), the burden is clearly massive. *See also* Social & Rehabilitation Serv., U.S. Dep't of Health, Educ. & Welfare, Fair Hearings in Public Assistance [January-June 1971] (U.S. Dep't of Health, Educ. & Welfare Pub. No. (SRS) 72-03253, 1971) (46,500 requests for hearings with respect to welfare claims during six month period); Baum, *supra* note 51, at 49 (approximately 2,000 requests for fair hearings received by New York City each month).

Similarly, recent statistics concerning the functioning of the social security system illustrate the enormous increase in the number of administrative hearings being provided in all areas. In fiscal 1970, 38,480 hearing requests were received; in 1974 the number increased to 122,793. During those same periods 38,480 hearings were conducted in the former and 80,779 in the latter. Because of this explosive growth in demand, the pending workload has continued to rise, with 77,501 hearing requests pending on June 30, 1974, and 99,524 cases awaiting hearing on November 9, 1974. *Social Security Litigation: An Inundation,* The Third Branch, Dec. 1974, at 1, col. 2.

The number of hearings that may be required in the public schools in cases of disciplinary suspensions after Goss v. Lopez, 95 S. Ct. 729 (1975), is likewise overwhelming. In an amicus brief filed in *Goss* the Children's Defense Fund states that at least 10% of the junior and senior high school students sampled in a five state survey—Arkansas, Maryland, New Jersey, Ohio, and South Carolina—conducted by the Office of Civil Rights of the Department of Health, Education, and Welfare, were suspended one or more times in the 1972-73 school year (approximately 20,000 students in New York City, 12,000 in Cleveland, 9,000 in Miami, and 9,000 in Memphis suspended at least once during 1972-73). An amicus brief submitted by several school associations in Ohio also indicates that the number of suspensions is very substantial: in 1972-73, 7,352 of 57,000 (12.8%) students were suspended in Akron; 4,054 students out of a school enrollment of 81,007 (4.9%) were suspended in Cincinnati; and 14,598 of 142,053 (10.3%) students were suspended in Cleveland. Brief for Buckeye Assoc. of School Adm'rs, Ohio Assoc. of Secondary School Principals, Ohio Assoc. of Elementary School Principals, *et al.* as Amici Curiae. Even these statistics may be somewhat conservative since some schools did not respond to the survey.

recondite scientific or economic subjects.[92] In many such cases the main effect of cross-examination is delay—an argument not really answered, as any trial judge will confirm, by the easy suggestion that the hearing officer can curtail cross-examination. Lawyers, including those who have gone on the bench, have a vivid recall of the few instances where they destroyed a dishonest witness on cross-examination and forget those where their cross-examination confused an honest one or was ineffective or worse—not to speak of the many cases when they had the good judgment to say "No questions."

Moreover, effective cross-examination of experts, and of most other witnesses, would almost inevitably require the aid of counsel. One wonders how Pedro Perales in his claim for Social Security disability benefits could have effectively subjected specialists in neurosurgery, neurology, psychiatry, orthopedics, and physical medicine to the "ordeal of cross-examination" vaunted in Mr. Justice Douglas' dissent[93]—a task shunned by most lawyers without special experience and often regarded as unproductive even by them. Why do we not have the good sense in such cases to use something like the English medical appeals tribunal, two of whose members are private physicians,[94] and avoid the calling of experts altogether? If "procedures adequate to determine a welfare claim may not suffice to try a felony charge,"[95] it is equally true that not all procedures required for the fair trial of a felony charge are needed to dispose of a claim that may lead to the denial of a disability pension.

The absolutes of *Greene v. McElroy*[96] and of *Goldberg v. Kelly*[97] with respect to confrontation arguably have now been ended by *Wolff v. McDonnell*.[98] There the Court considered whether a prisoner faced with the loss of up to eighteen months in "good time" credits had a constitutional right to confront and cross-examine adverse witnesses. It concluded that, in the special

---

[92] Even outside the area of mass justice, the prospect of lengthy and hectoring cross-examination may discourage the appearance of experts before agencies without subpoena powers. *See* Hamilton, *Rulemaking on a Record by the Food and Drug Administration*, 50 Texas L. Rev. 1132, 1149 (1972).

[93] Richardson v. Perales, 402 U.S. 413, 414 (1971) (Douglas, J., dissenting). Perales appears to have had counsel, but the point remains.

[94] *See* Friendly, *Foreword* to Schwartz & Wade, *supra* note 9, at xvi & n.5.

[95] Bell v. Burson, 402 U.S. 535, 540 (1971) (Brennan, J.).

[96] 360 U.S. 474, 496-97 (1959).

[97] 397 U.S. 254, 269-70 (1970).

[98] 418 U.S. 539 (1974).

circumstances of the prison,[99] interest-balancing would dictate a right to cross-examination only in a most limited range of cases.[100] In other situations, whether to allow cross-examination was left to the "sound discretion" of the prison authorities.[101]

While prisoner cases are doubtless the strongest ones for dispensing with an absolute requirement of confrontation and cross-examination, similar arguments (fear of witnesses in coming forward, undue exacerbation, and polarization of what in some instances must remain on-going relationships) exist in other situations as well—eviction of tenants from public housing,[102] discipline of students, or assignment of students to a class or school for retarded or disturbed children. The trouble is that these arguments prove too much. They suggest not only denial of cross-examination but suppression of the names of the witnesses and consequent serious curtailment of the right to know the evidence against one—something that should be permitted only when the penalty is small or the decision is preliminary or if the dangers of disclosure are exceedingly grave. In other words, the question whether cross-examination should be denied must generally be viewed from an incremental standpoint—assuming that the name of the witness and the content of his testimony will have been disclosed, how much further harm, if any, will be caused by allowing cross-examination when contrasted with its value.[103]

---

[99] Potential disruption of institutional programs as well as danger to inmate accusers resulting from resentment persisting after testimony and the concomitant demand for anonymity by inmate accusers were the special factors discussed by the Court. *Id.* at 566-72.

[100] *Id.* at 569.

[101] *Id.* In dissent, while arguing vigorously that the right of cross-examination should be limited only in exceptional cases, Mr. Justice Marshall made the suggestion that even in such cases the disciplinary board should call the witness before it *in camera* and itself probe his credibility. *Id.* at 590. This might be fruitful in other fields. *Cf.* DeJesus v. Penberthy, 344 F. Supp. 70, 75-76 (D. Conn. 1972) (cross-examination by the tribunal is possible substitute for cross-examination of adverse witnesses by the party).

[102] *Cf.* GEORGE SCHERMER ASSOCIATES, MORE THAN SHELTER: SOCIAL NEEDS IN LOW-AND MODERATE-INCOME HOUSING 40-42, 54-58 (1968). One suggested solution in this area has been to adopt the balance struck in Morrissey v. Brewer, 408 U.S. 471, 489 (1972), and to permit the concealment of the identity of complaining tenants whenever, in the judgment of the independent decisionmaker, revealing it would jeopardize tenant relationships or present a serious threat of reprisal. *See* Note, *supra* note 74, at 906-07.

[103] *See* BUSS, *supra* note 52, at 593-603.

Lower courts have reached different conclusions with respect to whether due process requires that a claimant have the right to confront and cross-examine adverse witnesses. For example, in McNeill v. Butz, 480 F.2d 314 (4th Cir. 1973), the court held that where untenured non-civil service employees are dismissed on the basis of secret charges which

Some aspects of the doctrine that the administrator must confine himself to the record are simply another form of what we have just been considering. But even on a broad view of a right to confrontation, the principle against use of extra-record evidence can be pushed too far. In England "a tribunal such as a rent tribunal is entitled to use its own knowledge and experience, for example, as to the level of rents or the scarcity of houses in its area."[104] Such matters fit into Professor Davis' category of "legislative facts,"[105] and notice of them should be permissible as long as the tribunal clearly indicates the basis for its decision so that erroneous fact-finding might later be challenged, either on appeal or in subsequent cases.

### 7.   Counsel

The *Goldberg* opinion quotes the oft-cited statement in *Powell v. Alabama*[106] that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."[107] Apparently no difference was perceived between a capital case and the suspension of a welfare allowance, except that in the latter the government was not required to provide counsel.

To be sure, counsel can often perform useful functions even in welfare cases or other instances of mass justice; they may bring out facts ignored by or unknown to the authorities, or help to work out satisfactory compromises. But this is only one side of

---

impugn their honesty and integrity, the Government must provide an opportunity for them to confront and cross-examine such adverse witnesses, absent a specific finding that the Government has "good cause" to protect its confidential informant with a cloak of absolute secrecy. *See* Esteban v. Central Mo. State College, 415 F.2d 1077, 1089 (8th Cir. 1969), *cert. denied*, 398 U.S. 965 (1970); Tibbs v. Board of Educ., 59 N.J. 506, 284 A.2d 179 (1971). By contrast, in Carpenter v. City of Greenfield School Dist. No. 6, 358 F. Supp. 220, 226-27 (E.D. Wis. 1973), the court concluded that, with respect to the dismissal of a teacher, hearsay reports based on interviews with students were permissible as long as reference was made to specific instances of proscribed conduct except where no meaningful response was possible. *See* United States *ex rel.* Miller v. Twomey, 479 F.2d 701, 715 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974); Behagen v. Intercollegiate Conference of Faculty Representatives, 346 F. Supp. 602, 608 (D. Minn. 1972). The school discipline cases are thoroughly reviewed in Buss, *supra* note 52, at 551-73. With respect to due process hearings for retarded children, see Kirp, Buss, & Kuriloff, *Legal Reform of Special Education: Empirical Studies and Procedural Reforms*, 62 CALIF. L. REV. 40, 79-81 (1974). *See also* Goss v. Lopez, 95 S. Ct. 729 (1975).

[104] SCHWARTZ & WADE, *supra* note 9, at 154 (citing Crofton Inv. Trust Ltd. v. Greater London Rent Comm'n, [1967] 2 Q.B. 955.

[105] DAVIS, *supra* note 1, § 7.06, at 430.

[106] 287 U.S. 45 (1932).

[107] *Id.* at 68-69.

the coin. Under our adversary system the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means.[108] Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty. The appearance of counsel for the citizen is likely to lead the government to provide one—or at least to cause the government's representative to act like one. The result may be to turn what might have been a short conference leading to an amicable result into a protracted controversy. Finally, it is usually mere words to talk of "retained" counsel in welfare cases. When counsel appears, he will almost inevitably have been provided by an organization supported in large part by public funds and the government is thus paying the cost as fully as if counsel were assigned.

It is thus fortunate that subsequent cases have not taken this portion of *Goldberg* as an absolute governing other types of hearings. The Supreme Court recognized in *Wolff* that in the prison context "[t]he insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals."[109] The Court thus declined to hold that inmates had a right either to appointed or even to "retained" counsel, instead indicating that where an illiterate inmate was involved, or where the issues were sufficiently complex to make the inmate unable "to collect and present the evidence necessary for an adequate comprehension of the case," he should be permitted to seek the aid of fellow prisoners, or if that is prohibited, to have "adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff."[110] This is a sensible compromise, which may be emulated, *mutatis mutandis*, in other contexts, such as student or employee discipline, where the disadvantages of the presence of counsel may outweigh the benefits. This portion of the *Wolff* decision, as well as the case-by-case approach of *Gagnon v. Scarpelli*[111] on revocation of probation,[112] are likely to have considerable anti-*Goldberg* rever-

---

[108] On this, and the whole subject of the adversary system, see Judge Frankel's remarkable Cardozo lecture, *The Search for Truth: An Umpireal View*, 123 U. Pa. L. Rev. 1031 (1975). Passages bearing particularly on the role of the advocate will be found at 1040-43, 1047-48, 1050-55.

[109] 418 U.S. at 570.

[110] *Id.*

[111] 411 U.S. 778 (1973).

[112] *Id.* at 787-91.

berations.[113]

These problems concerning counsel and confrontation inevitably bring up the question whether we would not do better to abandon the adversary system in certain areas of mass justice, notably in the many ramifications of the welfare system, in favor of one in which an examiner—or administrative law judge if you will—with no connection with the agency would have the responsibility for developing all the pertinent facts and making a just decision. Under such a model the "judge" would assume a much more active role with respect to the course of the hearing; for example, he would examine the parties, might call his own experts if needed, request that certain types of evidence be presented, and, if necessary, aid the parties in acquiring that evidence.[114]

Many parts of the mass justice area would be particularly suitable for such an experiment since the guidelines are sufficiently definite to avoid the danger that an outside reviewing panel might endeavor to remake agency policy.[115] Although questions of fact and policy may inevitably become inter-

---

[113] Prior to *Wolff* many lower courts had considered the right-to-counsel question in the context of student disciplinary proceedings. Although perhaps a majority of these courts concluded that due process does not incorporate the right to retain counsel, *see, e.g.*, Wasson v. Trowbridge, 382 F.2d 807, 812 (2d Cir. 1967) (as long as the government does not proceed through counsel); Barker v. Hardway, 283 F. Supp. 228, 237 (S.D.W. Va.), *aff'd*, 399 F.2d 638 (4th Cir. 1968) (per curiam), *cert. denied*, 394 U.S. 905 (1969); Due v. Florida A & M Univ., 233 F. Supp. 396, 403 (N.D. Fla. 1963), a substantial number, particularly since *Goldberg*, have reached the opposite result. *See, e.g.*, Givens v. Poe, 346 F. Supp. 202, 209 (W.D.N.C. 1972); Esteban v. Central Mo. State College, 277 F. Supp. 649, 651 (W.D. Mo. 1967), *aff'd*, 415 F.2d 1077 (8th Cir. 1969), *cert. denied*, 398 U.S. 965 (1970). Most commentators are of the view that there should be a right to retain counsel, at least in major disciplinary proceedings. *See, e.g.*, Buss, *supra* note 52, at 605-13; Wright, *The Constitution on the Campus*, 22 VAND. L. REV. 1027, 1075-76 (1969). One possible application of *Wolff* in the school situation might be allowing the school officials to appoint a staff member to assist the student in the preparation of his defense in lieu of retaining counsel. Similarly, courts may distinguish between the right to retain counsel at different levels of the educational process (*e.g.*, secondary school v. college) based on a difference in the perceived effect on the overall educational process of the presence of such counsel in disciplinary proceedings. *Goss v. Lopez* would not seem to proscribe such experimentation and differentiation since although intimating in dictum that "more formal procedures" might be required in cases of longer suspension or expulsion, the holding—in the context of a "short suspension"—left it to the informed discretion of the school administrator to determine whether counsel should be permitted in a particular case. 95 S. Ct. at 740.

[114] *Cf.* B. SCHWARTZ, FRENCH ADMINISTRATIVE LAW AND THE COMMON-LAW WORLD 124 (1954).

[115] This would seem to be a serious risk, for example, with regard to the panels for review of administrative decisions in schools with respect to the placement of retarded children suggested in Kirp, Buss & Kuriloff, *supra* note 103, at 123-25.

twined,[116] for the most part the tribunals would simply be determining the facts and then applying pertinent statutes and agency rules or regulations. The hearing boards presumably would have access to government officials and program administrators for pertinent information concerning agency policies. While such an experiment would be a sharp break with our tradition of adversary process, that tradition, which has come under serious general challenge from a thoughtful and distinguished judge,[117] was not formulated for a situation in which many thousands of hearings must be provided each month.[118] Whoever baptized the continental system as "inquisitorial" did a disservice to American legal thought.[119] Call it "investigatory" and the pejorative connotation fades away. Use of the investigatory system should not be viewed as a lessening of protection to the individual; if properly applied, it could well result in more. This investigatory model would also have the advantage of being more informal; the decisionmaker, in a conference-type setting, would hear the evidence and discuss the dispute with the parties and with their attorneys, assuming that they were permitted to have them.[120]

If we are to experiment with the investigatory model anywhere, this is the ideal place to do it. Strongly embedded traditions, specific constitutional limitations, and resistance of the bar will prevent its use not only in criminal but also, to a lesser extent, in ordinary civil litigation. There is no constitutional mandate requiring use of the adversary process in administrative

---

[116] *Cf.* Yee-Litt v. Richardson, 353 F. Supp. 996, 999-1000 (N.D. Cal.), *aff'd sub nom.* Carleson v. Yee-Litt, 412 U.S. 924 (1973) (rejecting policy/fact distinction as a basis whether to require a full evidentiary hearing); Mothers' & Children's Rights Org. v. Sterrett, 467 F.2d 797 (7th Cir. 1972) (same).

[117] Frankel, *supra* note 108.

[118] *See* Baum, *supra* note 51, at 49-50 ("police court" environment created by inadequate staff).

[119] Judge Frankel has noted our curious and unfortunate parochialism on this score, Frankel, *supra* note 108, at 1043.

[120] Critical to the successful implementation of this or indeed of any plan for improving the efficiency of mass justice is the assurance of an adequate supply of skilled hearing officials. Baum, *supra* note 51, at 45-47. Although the British example of drawing the membership of its tribunals in many areas from a pool of citizen volunteers or, in other areas, of drawing on individuals with special skills to work part time, *see* note 74 *supra*, should be emulated where feasible, given the number of hearings currently provided it is likely that most administrative agencies will be dependent upon "professional" decisionmakers for some time. There is thus a need to continue the upgrading of such positions, both through training and through compensation sufficient to attract capable individuals. *Cf.* B. SCHWARTZ, *supra* note 114, at 26-29, 56-57, 86-87 (French National School of Administration); M. WALINE, TRAITÉ ÉLÉMENDE DROIT ADMINISTRATIF 73 (6th ed. 1951).

hearings unless the Court chooses to construct one out of the vague contours of the due process clause. But that clause does not forbid reasonable experimentation. For a state to experiment with procedures for mass administrative justice wholly different from those required in a felony trial would be a splendid vindication of "one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory."[121] Alternatively, federal agencies administering various welfare programs might attempt to implement different forms of nonadversary procedure. Action of this sort would provide controlled experiments in areas where transplantation of even a diluted form of trial type proceedings is not likely to work well.

### 8 and 9.   The Making of a Record and a Statement of Reasons

I shall treat these two points together since they are closely associated with judicial review, although a statement of reasons serves other valuable functions as well.

Professors Schwartz and Wade tell us that "the aspect of American administrative law that impresses foreigners most unfavourably is the requirement of a formal record in every case where a hearing is held."[122] Americans are as addicted to transcripts as they have become to television; the sheer problem of warehousing these mountains of paper must rival that of storing atomic wastes. We risk the fate of the eminent professor Fulgence Sapir, in Anatole France's *Penguin Island*, who boasted that he had all of art classified on paper slips alphabetically and topically, only to find himself suffocated when his search for one slip caused all the others to cascade upon him. Except for administrative appeal or judicial review, there would seem to be no need for any "record" in the typical mass justice case;[123] the facts

---

[121] New State Ice Co. v. Liebman, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

[122] SCHWARTZ & WADE, *supra* note 9, at 132. They cite as an example of the judicial attitude toward the provision of transcripts a federal case in which at a prior hearing concerning the validity of the initial denial of a welfare application for a grant of household goods and winter clothing, the referee had refused to provide facilities for transcription of the proceedings. The district court granted an injunction requiring the welfare agency to provide a complete record of the proceedings, without feeling any need to justify its action in a written opinion. *Id.* 133 (citing Banner v. Smolenski, CCH Pov. LAW REP. ¶ 10,587 (D. Mass. 1969)).

[123] Many lawyers would doubtless argue that knowledge that a transcript is being made tends to restrain abuses by hearing officers. It is hard to see why unless the transcripts are read by some higher authority.

are simple enough that the hearing officer can render a decision on the basis of his recollection and notes, as is done in England.[124] Even administrative appeal or judicial review would not require a transcript; for centuries appeals were heard on the judge's notes.[125] Very likely, however, we have too little confidence in hearing examiners to allow this.[126] Although electronic recording has recently acquired a bad name in other contexts, in most cases it surely should be sufficient to use tapes and to transcribe them only if an appeal were taken.[127]

A written statement of reasons, almost essential if there is to be judicial review, is desirable on many other grounds.[128] The necessity for justification is a powerful preventive of wrong decisions.[129] The requirement also tends to effectuate intra-agency uniformity, and would be particularly important in this regard if the hearing board were composed of individuals drawn from outside the agency. A statement of reasons may even make a decision somewhat more acceptable to a losing claimant. Moreover, the requirement is not burdensome; sometimes it can even be met by checking a list on a card.[130] For all these reasons I would put this item close to the top rather than near the bottom of the scale.[131]

---

[124] In England since tribunals are often entitled to use their own general knowledge and experience, *see* note 104 *supra* & accompanying text, their decisions, therefore, to not have to be based "on the record" in the full American sense. If there is an appeal, or an application for review, on the ground that evidence was lacking concerning some finding of the tribunal, evidence of what transpired at the proceedings is normally provided by affidavit of the parties, although in some cases it may be given by direct oral testimony. *See, e.g.*, Regina v. Board of Control *ex parte* Rutty, [1956] 2 Q.B. 109.

[125] *See* Medina, *The Trial Judge's Notes: A Study in Judicial Administration*, 49 CORNELL L.Q. 1, 4 (1963).

[126] *But cf.* Wolff v. McDonnell, 418 U.S. 539, 564 (1974) (apparently limiting requirement of a "written record" in prison disciplinary cases to a statement by the factfinder as to the evidence relied on and the reasons for the disciplinary action; not a verbatim transcript or recording).

[127] *See* SCHWARTZ & WADE, *supra* note 9, at 133. New York has recently adopted the California practice of recording welfare hearings on tape.

[128] Less clear is the exact detail and scope which the written statement of reasons must take. *Compare* Caramico v. Secretary of the Dep't of Housing & Urban Dev., 509 F.2d 694 (2d Cir. 1974) (explicit decision of any disputed ground, including a statement of opposing considerations, that "adequately disposes of the issue"), *with* Burr v. New Rochelle Munic. Housing Auth., 479 F.2d 1165, 1170 (2d Cir. 1973) (statement "outlining" reasons for approving or rejecting rent increase). In these days when appellate courts themselves are being compelled to omit or abbreviate opinions, they should be careful about imposing unrealistically high requirements upon those who must administer mass justice.

[129] *See* Wolff v. McDonnell, 418 U.S. 539, 565 (1974).

[130] *See* K. DAVIS, DISCRETIONARY JUSTICE: A PRELIMINARY INQUIRY 104-05 (1969).

[131] Although the English courts have refused to include a statement of reasons in the

## 10. Public Attendance

Legal scholars have explained why this guarantee has been considered a fundamental element of a criminal trial.[132] However, this feature of court trials has received relatively slight emphasis with respect to administrative proceedings. Balancing the particular interests of the individual and the state concerning public attendance leads to the conclusion that it is manifestly inappropriate for certain administrative hearings and that, while it is arguably desirable in others, due process generally does not require it.[133]

To require an open hearing would be manifestly wrong in the case of a prison disciplinary proceeding. Beyond the burden that such a requirement would place on limited prison facilities, as the Court recognized in *Wolff*, "[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking."[134] Consequently, given the disruptive effect that a public hearing might have on legitimate institutional interests, prison officials must be accorded the discretion to keep hearings closed to the general public and press instead of being subjected "to unduly crippling constitutional impediments."[135] A more difficult question is whether the prisoner should at least be entitled to be accompanied by family or friends.

In the area of student disciplinary proceedings, several lower courts have concluded that procedural due process is not denied because the hearing was not open to other students, the

---

concept of natural justice, Regina v. Gaming Board for Great Britain *ex parte* Benaim & Khaida, [1970] 2 Q.B. 417, § 12(1) of the Tribunals and Inquiries Act 1958, 6 & 7 Eliz. 2, c. 66, imposes this duty on tribunals subject to the Act whenever reasons are requested "on or before the giving or notification of the decision . . . ." The courts take this mandate seriously. *See* SCHWARTZ & WADE, *supra* note 9, at 155-56. However, even among tribunals that are within the Act there are certain exceptions. For example, the Lord Chancellor may directly order that any class of decisions shall be exempt if he is of the opinion that the giving of such reasons is unnecessary or impracticable. 6 & 7 Eliz. 2, c. 66, § 12(4) (1958).

[132] Three principal reasons are typically cited for the right to an open trial as a part of due process. First, an open trial fosters confidence. *See* 6 J. WIGMORE, EVIDENCE § 1834, at 335 (3d ed. 1940). Second, a public trial will help to assure the accuracy of the evidence offered. 3 W. BLACKSTONE, COMMENTARIES *373. *But cf.* Radin, *The Right to a Public Trial*, 6 TEMP. L.Q. 381, 384 (1932). Third, the presiding officials will more likely conduct the proceedings fairly. J. WIGMORE, *supra*, § 1834, at 335. It has been urged that these reasons argue in favor of an open administrative hearing in many areas. *See* Comment, *The Right to an Open Administrative Hearing*, 53 B.U.L. REV. 899 (1973).

[133] *See* Wright, *supra* note 113, at 1079-80.

[134] Wolff v. McDonnell, 418 U.S. 539, 566 (1974).

[135] *Id.* at 566-67.

press, or the public in general.[136] The reasons for allowing closed hearings are somewhat similar to although here less forceful than those just canvassed.[137] In contrast, at least one court has concluded that due process requires a hearing on the termination of a government employee to be open.[138] Arguably the interest of the public in ensuring that the government functions fairly and the relatively greater ability of the government to provide for open hearings may support this distinction.[139]

In welfare cases the problem largely solves itself; there is no good reason to exclude the claimant's family and typically no one else has any interest in attending. In public and government-subsidized housing a much more difficult problem is presented. A private landlord may not have the facilities to conduct wholly public hearings or the readily available sanctions and enforcement mechanisms necessary to ensure that the "observers" do not disrupt the proceedings. Moreover, beyond disrupting the immediate proceeding, the presence of tenants with sharply differing views, vocally expressed, may fractionalize the tenant community, a result that likely would be inimical to the long term viability of the project.[140] Although tenants in a given housing project have an interest in ascertaining whether the procedures that test the correctness of evictions, fines, and other penalties assessed against them by the landlord are fair, the requirement of a statement of reasons should suffice.

## 11.  Judicial Review

Although I have not researched the state decisions, my impression is that, up to this time, judicial review in the area of mass justice has largely been limited to questions of fair procedure, and there has been little attempt to obtain review for lack

---

[136] Moore v. Student Affairs Comm., 284 F. Supp. 725, 731 (M.D. Ala. 1968); Zanders v. Louisiana State Bd. of Educ., 281 F. Supp. 747, 768 (W.D. La. 1968); *cf.* Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 159 (5th Cir.), *cert. denied*, 368 U.S. 930 (1961).

[137] Commentators, students and administrators are often divided on the question whether particular hearings should be open or closed, and who should have the power to make that decision. *Compare* CRISIS AT COLUMBIA: REPORT OF THE FACT-FINDING COMMISSION APPOINTED TO INVESTIGATE THE DISTURBANCES AT COLUMBIA UNIVERSITY IN APRIL AND MAY 1968, 97 (1968), *with* Linde, *Campus Law: Berkeley Viewed From Eugene*, 54 CALIF. L. REV. 40, 56-57 (1966).

[138] Fitzgerald v. Hampton, 467 F.2d 755 (D.C. Cir. 1972).

[139] *Cf.* Comment, *supra* note 132, at 915-18.

[140] *See* Note, *supra* note 74, at 906-07; GEORGE SCHERMER ASSOCIATES, *supra* note 102, at 40-42, 54-58.

of substantial evidence or even for arbitrariness or capriciousness. Would that it may remain so! The spectacle of a new source of litigation of this magnitude is frightening. Yet many state administrative procedure acts, not to speak of the supposed "common law" right of review, would seem to subject determinations of the sort here considered to substantive review. Surely this is an area where courts should exercise self-restraint; the agencies can promote this by fair procedures and adequate statements of reasons, remembering that one sufficiently outrageous example may burst the dike.[141]

### B.  *The Nature of the Governmental Action*

Now I shall endeavor to make up the other list, ranking the action proposed to be taken in terms of its seriousness to the individual. Obviously this survey cannot include every kind of governmental action; I shall have to limit myself to those that have surfaced most prominently.

For starters I would draw a distinction between cases in which government is seeking to take action against the citizen from those in which it is simply denying a citizen's request. This is not the discredited right-privilege distinction in another garb. The first category includes cases where government seeks to withdraw a "privilege" as well as a "right," if indeed these terms have any meaning in this context as distinguished from their proper Hohfeldian use.[142]

Still, one is entitled to ask whether the distinction has real validity. Even a beginner in mathematics knows that the distance between two points on the vertical axis is the same whether one measures down or up. Moreover, there are cases at the top of the second category whose seriousness is greater than those at the bottom of the first.[143] But the distinction has a notable lineage. The famous Article 39 of Magna Carta,[144] often seen as

---

[141] A classic instance is *In re* Gault, 387 U.S. 1 (1967).

[142] W. HOHFELD, FUNDAMENTAL LEGAL CONCEPTIONS AS APPLIED IN JUDICIAL REASONING 35-50 (W. Cook ed. 1919).

[143] Thus it was surely more serious for Mr. Willner to be denied admission to the bar on grounds of character, Willner v. Committee on Character & Fitness, 373 U.S. 96 (1963), or for Mrs. Knauff or Mr. Nezei to be denied reentry to the United States, Shaughnessy v. United States *ex rel.* Nezei, 345 U.S. 206 (1953); United States *ex rel.* Knauff v. Shaughnessy, 338 U.S. 537 (1950), than for a student at a state university to be suspended for a few weeks.

[144] "No freeman shall be taken or imprisoned or [and] disseised or exiled or in any way destroyed, nor will we go upon him nor send upon him, except by the lawful judg-

the origin of the concept of due process, speaks in terms of the king's going out or sending against a free man, not of his refusing a request. And whatever the mathematics, there is a human difference between losing what one has and not getting what one wants. This point is convincingly developed, in the context of revocation as distinguished from denial of parole, in Chief Justice Burger's opinion in *Morrissey v. Brewer*.[145] The distinction is valid in economic regulation as well. Revocation of a license is far more serious than denial of an application for one; in the former instance capital has been expended, investor expectations have been aroused, and people have been employed.

When we begin to rank cases within the first category, revocation of parole or probation must stand at or near the top. Deprivation of liberty, even conditional liberty, is the harshest action the state can take against the individual through the administrative process. The Supreme Court thus was right in demanding a very high level of procedural protection and in setting out the required procedures in detail.[146] Civil commitment warrants a similarly high place.[147]

Decisions involving the treatment of aliens reveal how the nature of the action affects the sort of "hearing" that is required. When an alien raises a factual issue regarding deportability, the Court applies the unusual requirement of "clear, unequivocal, and convincing evidence that the facts alleged as grounds for

---

ment of his peers or [and] by the law of the land." Magna Carta art. 39, in W. McKechnie, Magna Carta: A Commentary on the Great Charter of King John 375 (2d ed. 1914). *See* Statute of Westminster, 28 Edw. 3 (1354).

[145] 408 U.S. 471, 481-82 (1972). The Chief Justice quoted with approval the statement in United States *ex rel.* Bey v. Connecticut Bd. of Parole, 443 F.2d 1079, 1086 (2d Cir.), *vacated and remanded with direction to dismiss as moot*, 404 U.S. 879 (1971): "It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the condition of his release, than to his mere anticipation or hope of freedom." *See* Scarpa v. United States Bd. of Parole, 477 F.2d 278 (5th Cir.), *vacated on other grounds*, 414 U.S. 809 (1973); Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970), *cert. denied*, 400 U.S. 1023 (1971) (prisoner is not entitled, under the fourteenth amendment, to procedural due process rights upon his being interviewed and considered for parole prior to termination of his sentence). *But see* Bradford v. Weinstein, No. 73-1751 (4th Cir., Nov. 22, 1974).

[146] Arguably deprivation of good time credit ranks close to revocation of probation or parole. However, the distinctions made by Mr. Justice White in Wolff v. McDonnell, 418 U.S. 539, 560-63 (1974), have much validity. Moreover, the *Wolff* decision rests heavily on the special problems of according the full gamut of procedural rights within a prison. *See also* Jackson v. Wise, 43 U.S.L.W. 2272 (C.D. Cal., Dec. 10, 1974).

[147] Lynch v. Baxley, 386 F. Supp. 378 (M.D. Ala. 1974) (three-judge court). *See generally Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv. L. Rev. 1190 (1974).

deportation are true."[148] Since the statute[149] accords the full gamut of procedural safeguards except assignment of counsel,[150] the question of constitutional entitlement has not arisen. A much lower standard prevails when a concededly deportable alien seeks the discretionary remedy of suspension by the Attorney General.[151] While such an alien is entitled to a fair judgment by the decisionmaker,[152] the Supreme Court has held that the Attorney General is not "required to give a hearing with all the evidence spread upon an open record with respect to the considerations which may bear upon his grant or denial of an application . . . ."[153] And although today's Court might not echo the 1950 statement that for an alien seeking admission, "[w]hatever the procedure authorized by Congress is, it is due process . . . ,"[154] the procedural rights accorded such an alien would not be many.

Another category ranking high on the procedural scale is the revocation of a license to practice a profession. Here the government is threatening to deprive a person of a way of life to which he has devoted years of preparation and on which he and his family have come to rely.[155] Moreover, the types of issues often resemble those tried in actions for fraud or negligence, or even in criminal proceedings. Finally, the number of individuals involved in such disciplinary action in any given period is likely to be relatively small, and generally no other special circumstances justify a curtailment of procedural safeguards.[156]

---

[148] Woodby v. Immigration & Naturalization Serv., 385 U.S. 276, 286 (1966) (footnote omitted).

[149] Immigration & Nationality Act § 242(b), 8 U.S.C. § 1252(b) (1970).

[150] The statute does permit the alien to be represented by counsel at the hearing at his own expense. *Id.* § 242(b)(2), 8 U.S.C. § 1252(b)(2) (1970).

[151] *See, e.g.*, United States *ex rel.* Kaloudis v. Shaughnessy, 180 F.2d 489, 490-91 (2d Cir. 1950). The authority to grant or deny stays of deportation after an entry of a final order of deportation has been delegated to the district directors of the Immigration and Naturalization Service, pursuant to the Code of Federal Regulations, 8 C.F.R. § 243.4 (1973). *See, e.g.*, Fan Wan Keung v. Immigration & Naturalization Serv., 434 F.2d 301 (2d Cir. 1970); Kladis v. Immigration & Naturalization Serv., 343 F.2d 513 (7th Cir. 1965); Adame v. Immigration & Naturalization Serv., 349 F. Supp. 313 (N.D. Ill. 1972).

[152] United States *ex rel.* Accardi v. Shaughnessy, 347 U.S. 260 (1954).

[153] Jay v. Boyd, 351 U.S. 345, 353 (1956).

[154] United States *ex rel.* Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950); *accord,* Shaughnessy v. United States *ex rel.* Mezei, 345 U.S. 206, 212 (1953).

[155] *See, e.g., In re* Ruffalo, 390 U.S. 544 (1968) (disbarment); Mack v. Florida State Bd. of Dentistry, 430 F.2d 862 (5th Cir. 1970), *cert. denied,* 401 U.S. 954 (1971) (revocation of dentist license).

[156] *See* text accompanying notes 102-03 *supra.* Closely related to license revocation, though only an impediment and not a complete obstruction to continuing an established

We now enter the controversial area of mass justice, still in the context of government's acting against the individual. The fields are so diverse that it is impossible to apply any universal scale of seriousness. However, gradations appear within each field. Thus a welfare termination is more serious than a reduction;[157] suspension of a payment that is the claimant's only hope for income is more serious than a suspension that permits resort to other sources of income, even to the welfare system;[158] expulsion from public housing is more serious than transfer to a smaller apartment;[159] expulsion from a school is more serious than suspension or loss of credit;[160] severance from government service is graver than suspension pending a further hearing;[161] dismissal on a ground carrying a moral stigma is more serious than on one that does not; some types of prison discipline are more onerous than others.[162]

---

occupation, is debarment from participation in government contracts. Depending on a variety of factors, including amount of reliance on government work and ability to secure other customers, such "blacklisting" can cause severe economic consequences and, therefore, calls for procedural safeguards. *See* Gonzalez v. Freeman, 334 F.2d 570 (D.C. Cir. 1964) (Burger, J.).

[157] *See* Frost v. Weinberger, No. 74-2020 (2d Cir., Apr. 17, 1975).

[158] *See* Arnett v. Kennedy, 416 U.S. 134, 169 (1974) (Powell, J., concurring); *id.* at 201-02 (White, J., concurring & dissenting); Frost v. Weinberger, No. 74-2020 (2d Cir., Apr. 17, 1975); Crow v. California Dep't of Human Resources Dev., 490 F.2d 580 (9th Cir. 1973), *vacated and remanded for consideration of mootness*, 95 S. Ct. 1110 (1975) (majority, distinguishing *Goldberg* based on relative seriousness of loss, held that due process demands only an informal hearing prior to termination of unemployment benefits); *cf.* Torres v. New York State Dep't of Labor, 410 U.S. 971 (1973) (Marshall, J., dissenting); Steinberg v. Fusari, 364 F. Supp. 922 (D. Conn. 1973) (three-judge court), *vacated*, 95 S. Ct. 533 (1975).

[159] *Cf.* Brown v. Housing Auth., 340 F. Supp. 114 (E.D. Wis.) (opportunity to challenge reasons for termination of month-to-month tenancy must be given "at a meaningful time" to prevent hardship which will follow the tenant's being obligated to wait until he is summoned into court at the end of the 30-day period), *aff'd*, 471 F.2d 63 (7th Cir. 1972) (without reaching constitutional question).

[160] Finer gradations are possible within each subcategory. For example, most courts had developed distinctions based on the length of the given suspension from school to determine whether a hearing, and what type, must be provided when students are suspended. *See, e.g.,* Pervis v. LaMarque Indep. School Dist., 466 F.2d 1054 (5th Cir. 1972) (suspension for over three months requires a prior hearing); Linwood v. Board of Educ., 463 F.2d 763 (7th Cir.), *cert. denied*, 409 U.S. 1027 (1972) (seven-day suspension requires no hearing). *See also* Sullivan v. Houston Indep. School Dist., 475 F.2d 1071, 1077-78 (5th Cir.), *cert. denied*, 414 U.S. 1032 (1973). Although Goss v. Lopez, 95 S. Ct. 729 (1975), quite clearly overruled decisions such as *Linwood* with respect to what length of suspension triggers the need for some type of hearing as a matter of due process, the Court seems to accept the view that the *type* of hearing that must be provided is in part dependent upon the length of the suspension. For an extensive compilation of the often conflicting lower court decisions in this area, see *id.* at 737 n.8.

[161] *Cf.* Arnett v. Kennedy, 416 U.S. 134 (1974).

[162] *See* Wolff v. McDonnell, 418 U.S. 539, 571-72 n.19 (1974) ("We do not suggest,

*Goldberg v. Kelly*[163] is the lodestar in this area, but it sheds an uncertain light. After the usual litany that the required hearing "need not take the form of a judicial or quasi-judicial trial,"[164] Mr. Justice Brennan proceeded to demand almost all the elements of one.[165] This seemed all the more portentous in a setting where the statute accorded a terminated welfare recipient what was admittedly an adequate hearing within ten working days after a request and a decision within twelve working days thereafter.[166] The Court has not had subsequent occasion to consider what Chief Justice Burger called "intriguing possibilities concerning the right to a hearing at other stages in the welfare process which affect the total sum of assistance, even though the action taken might fall short of complete termination . . . [such as] welfare reductions or denial of increases . . . , or decisions concerning initial applications or requests for special assistance."[167] But the effect on the lower courts of *Goldberg*, in con-

---

however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges."); Newkirk v. Butler, 499 F.2d 1214 (2d Cir.), *cert. granted*, 95 S. Ct. 172 (1974) (prisoner who was transferred from a medium to maximum security prison on basis of rumor he was about to become involved in trouble concerning the formation of an inmate union is entitled to prior notice and a hearing); Sands v. Wainwright, 357 F. Supp. 1062 (M.D. Fla.), *vacated*, 491 F.2d 417 (5th Cir. 1973), *cert. denied*, 416 U.S. 992 (1974) (procedures required for revocation of "good time" credits, or solitary confinement, contrasted with those required for administrative segregation); Rinehart v. Brewer, 360 F. Supp. 105 (S.D. Iowa 1973), *aff'd*, 491 F.2d 705 (8th Cir. 1974); United States *ex rel.* Robinson v. Mancusi, 340 F. Supp. 662 (W.D.N.Y. 1972) (informal hearing required within 72 hours of revocation of certain privileges); Landman v. Royster, 333 F. Supp. 621 (E.D. Va. 1971).

[163] 397 U.S. 254 (1970).

[164] *Id.* at 266.

[165] *See* K. DAVIS, ADMINISTRATIVE LAW TEXT § 7.07, at 169-70 (3d ed. 1972). Professor Davis thinks the two omissions noted by him, a verbatim transcript and testimony under oath, probably have "no significance." This is scarcely true about the former; the Court in *Goldberg* deliberately omitted this as serving "primarily to facilitate judicial review," 397 U.S. at 267, which could hardly occur before the post-termination "fair hearing."

The statement in the text should also be qualified to the extent that the *Goldberg* opinion is rather vague about the claimant's right to call witnesses. This right may or may not be included within the phrase "by presenting his own arguments and evidence orally." 397 U.S. at 268. And clearly there is no mention of compulsory process.

[166] 397 U.S. at 259-60 n.5. However, "[I]t was conceded at oral argument that these time limits are not in fact observed." *Id.*

[167] Wheeler v. Montgomery, 397 U.S. 280, 284-85 (1970) (dissenting opinion). *But see* Arnett v. Kennedy, 416 U.S. 134, 169 (1974) (Powell, J., concurring); *id.* at 201-02 (White, J., concurring & dissenting). As indicated in note 51 *supra*, this has been due to the fact that federal and state statutes and regulations have generally provided procedural protections for claimants at almost all stages of the welfare process, exceeding those mandated by *Goldberg* with respect to the termination of assistance, even when the

*UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     Vol. 123:1267

junction with subsequent Supreme Court decisions, on the lower courts has been profound. The trend in one area after another has been to say, "If there, why not here?"[168] And "[t]he tendency of a principle to expand itself to the limit of its logic" has not been much counteracted, as Cardozo expected, "by the tendency

---

deprivations involved are less serious. *See, e.g.*, 45 C.F.R. § 205.10 (1974) (federal regulations governing state "fair hearings" with respect to AFDC grants, 42 U.S.C. §§ 601-10, 620-26, 630-44 (1970); *id.* §§ 1396a-1396i (Medicaid Programs); 20 C.F.R. § 416 (1974) (governing hearing requirements and procedures for all adult welfare assistance programs, 42 U.S.C. §§ 301-06 (1970) (Old Age Assistance); *id.* §§ 1201-06 (Aid to the Blind); *id.* §§ 1351-55 (Aid to the Permanently and Totally Disabled); *id.* §§ 1381-85 (Aid to the Aged, Blind, or Disabled)); 18 N.Y.C.R.R. § 358.16 (1974) (prescribing details of federally mandated "fair hearings" in New York); *id.* § 358.4(a)-(c) (1974) (hearing protection for recipients of food stamps, cash assistance benefits, and social services in New York); *Developments in Welfare Law—1973*, 59 CORNELL L. REV. 859, 927-40 (1974). However, this situation may not continue.

[168] *See, e.g.*, in addition to decisions already canvassed: (1) Termination of social security benefits: Williams v. Weinberger, 494 F.2d 1191 (5th Cir.), *petition for cert. filed*, 43 U.S.L.W. 3175 (U.S. Sept. 8, 1974) (No. 74-205); Eldridge v. Weinberger, 361 F. Supp. 520 (W.D. Va. 1973), *aff'd per curiam*, 493 F.2d 1230 (4th Cir. 1974), *cert. granted*, 95 S. Ct. 773 (1975). *See also* Meyerhoff & Mishkin, *Application of* Goldberg v. Kelly *Hearing Requirements to Termination of Social Security Benefits*, 26 STAN. L. REV. 549 (1974).

(2) Eviction of tenants from public housing: Brown v. Housing Auth., 471 F.2d 63 (7th Cir.), *aff'g* 340 F. Supp. 114 (E.D. Wis. 1972) (applying HUD regulations and thus not reaching constitutional holding of district court). Rejection of an applicant for public housing: Neddo v. Housing Auth., 355 F. Supp. 1397 (E.D. Wis. 1971); Davis v. Toledo Metro. Housing Auth., 311 F. Supp. 795 (N.D. Ohio 1970). *But see* Sumpter v. White Plains Housing Auth., 329 N.Y.2d 420, 278 N.E.2d 892, 328 N.Y.S.2d 649, *cert. denied*, 406 U.S. 928 (1972) (informal interview only requirement). *See also* Spady v. Mount Herman Housing Auth., 95 S. Ct. 243 (1974) (Douglas, J., dissenting from a denial of certiorari). Eviction of tenants from government-subsidized or -financed housing: Caramico v. Secretary of the Dep't of Housing & Urban Dev., 509 F.2d 694 (2d Cir. 1974) (notice of proposed action and grounds; tenant may submit and "support with evidence" any considerations he wishes the Secretary to take into account before reaching final determination; explicit decision of any ground which is disputed, including a statement of opposing considerations, "that adequately disposes of the issue"); Wilson v. Lincoln Redev. Corp., 488 F.2d 339, 342 n.7 (8th Cir. 1973) (informal hearing only requirement of due process); Bonner v. Park Lake Housing Dev. Fund Corp., 70 Misc. 2d 325, 330, 333 N.Y.S.2d 277, 282 (Sup. Ct. 1972) (informal conference). Rent increases in public housing: Burr v. New Rochelle Munic. Housing Auth., 479 F.2d 1165 (2d Cir. 1973) (flexible "hearing" requirement). *But see* Langevin v. Chenango Ct., Inc., 447 F.2d 296 (2d Cir. 1971); Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970). *See also* Thompson v. Washington, 497 F.2d 626 (D.C. Cir. 1973), *cert. denied*, 95 S. Ct. 235 (1974) (tenants in public housing constructed under National Housing Act, 12 U.S.C. §§ 1701-50 (1970), have statutory right "to be heard" prior to rent increases); Marshall v. Lynn, 497 F.2d 643 (D.C. Cir. 1973) (tenants in government-subsidized low-income housing have similar statutory right to participate in official consideration of rent increases by written submissions).

(3) Transfer of a civilly committed patient from a mental hospital to a prison because of alleged dangerous propensities. Romero v. Schaver, 386 F. Supp. 851 (D. Colo. 1974).

(4) Discontinuance of medicare benefits: Martinez v. Richardson, 472 F.2d 1121 (10th Cir. 1973).

to confine itself within the limits of its history."[169] However, the mechanical application of *Goldberg*, indeed some portions of that decision itself, will now have to be reconsidered in light of *Wolff* and of *Arnett v. Kennedy*.[170]

The spread of *Goldberg* has posed another problem. The complaining party in an action under the Civil Rights Act,[171] be he welfare recipient, dismissed teacher, displaced tenant, or aggrieved prisoner, normally will complain of denial not of a single procedural safeguard but of several. The complainant in the next case will raise still other points. A federal district judge, being thus placed in a situation where he is gradually evolving a code of administrative procedure for the particular subject, is sorely tempted to make an end to it and to promulgate procedural rules covering all the problems that he can foresee in a particular area.[172]

Although something is to be said for doing this, I regard the tendency as unfortunate in most areas of mass justice, particularly for inferior courts. The Chief Justice was right when he asked whether it would not be wiser "to hold the heavy hand of constitutional adjudication and allow evolutionary procedures at various administrative levels to develop, given their flexibility to

---

[169] B. Cardozo, The Nature of the Judicial Process 51 (1921).

[170] 416 U.S. 134 (1974).

[171] 42 U.S.C. § 1983 (1970).

[172] The notable early opinion in Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (5th Cir.) (Rives, J.), *cert. denied*, 368 U.S. 930 (1961), did substantially this in its analysis of the constitutional constraints limiting the discretion of administrators to expel students from public colleges; however, the opinion was as much concerned with pointing out what was not required as in developing what was. Another interesting pre-*Goldberg* example, which, in endeavoring to eliminate the possibility of conflicting decisions by judges in the same district, illustrates the essentially legislative character of such judgments, can be found in the rules promulgated by the judges for the Western District of Missouri with respect to student discipline in tax-supported institutions, General Order on Judicial Standards of Procedure & Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (1969). For a recent decision developing elaborate standards of procedural protection for varying types of prison discipline, see Sands v. Wainwright, 357 F. Supp. 1062 (M.D. Fla.), *vacated*, 491 F.2d 417 (5th Cir. 1973), *cert. denied*, 416 U.S. 992 (1974). An extremely detailed piece of legislation with respect to civil commitment was developed in Lynch v. Baxley, 386 F. Supp. 378 (M.D. Ala. 1974) (three-judge court, with one judge dissenting). A contrary attitude, favoring case-by-case adjudication by federal courts and leaving it to the states to develop their own procedures, is illustrated by United States *ex rel.* Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974). The Seventh Circuit, speaking through Judge Stevens, over the partial dissent of Chief Judge Swygert, cited with approval Sostre v. McGinnis, 442 F.2d 178, 197 (2d Cir. 1971) (en banc), *cert. denied*, 404 U.S. 1049, 405 U.S. 978 (1972), in which Judge Kaufman had said:

We would not presume to fashion a constitutional harness of nothing more than our guesses. It would be mere speculation for us to decree that the effect of

make adjustments in procedure without long delays."[173] As Judge Learned Hand wisely said,

> Constitutions are deliberately made difficult of amendment; mistaken readings of them cannot be readily corrected. Moreover, if they could be, constitutions must not degenerate into vade mecums or codes; when they begin to do so, it is a sign of a community unsure of itself and seeking protection against its own misgivings.[174]

Courts are good at deciding cases, bad at drafting legislation; typically they see the case at hand and a few others but not the entire spectrum. If federal judges impose a code upon a state, every claim of breach is the basis for a suit under the Civil Rights Act. Furthermore, there is no single correct solution for most of the problems here considered; as previously suggested, more of one procedural safeguard may justify less of another.[175] Experience has shown the wisdom of Mr. Justice Harlan's observation, "I seriously doubt the wisdom of these 'guideline' decisions. They suffer the danger of pitfalls that usually go with judging in a vacuum. However carefully written, they are apt in their application to carry unintended consequences which once accomplished are not always easy to repair."[176]

Beyond this there is an institutional difficulty. One can readily imagine how different administrative codes would be as written by each of the twenty-seven judges of the Southern District of New York; much would depend on the luck of the draw. Appellate resolution of the grant or denial of a right claimed in a particular case is appropriate enough, but reviewing courts should not have to rework codes developed by district judges relating to points not directly at issue. This process would be painfully lengthy and indirect, and future code amendments

---

equipping prisoners with more elaborate constitutional weapons against the administration of discipline by prison authorities would be more soothing to the prison atmosphere and rehabilitative of the prisoner or, on the other hand, more disquieting and destructive of remedial ends. This is a judgment entrusted to state officials, not federal judges.

479 F.2d at 717 (footnote omitted).

[173] Wheeler v. Montgomery, 397 U.S. 280, 283 (1970) (Burger, C.J., dissenting).

[174] L. HAND, *The Contribution of an Independent Judiciary to Civilization*, in THE SPIRIT OF LIBERTY 162 (I. Dilliard 3d ed. 1960).

[175] *See* text accompanying note 70 *supra*.

[176] Sanders v. United States, 373 U.S. 1, 32 (1963) (Harlan, J., dissenting).

from new perceptions or reevaluations would be most difficult to make. Legislation should generally be left to the states or, when appropriate, to Congress and federal agencies.

It is unfortunate that, five years after *Goldberg,* we have so little empirical knowledge how it has worked in its own field, let alone in others where its principles have been applied. For one thing, one would wish to know whether the procedural safeguards that *Goldberg* required have really been applied, and, if not, whether the failure has been due to bureaucratic obduracy or to basic impracticability.[177] One would wish also to know the costs, both of administrative expenses that would not otherwise have been incurred and of continuation of unjustified payments,[178] in relation to the benefits of injustices prevented. This is not to suggest that benefits can be precisely quantified in dollar terms or that *some* excess of the costs would call for reconsideration of the required procedures. As Mr. Justice Brennan has rightly said, administrative fairness usually does entail "some additional administrative burdens and expense."[179] But if the excess of costs over estimated benefits were, say, four-fold, with the concomitant likelihood that, in the Chief Justice's words, "new layers of procedural protection may become an intolerable drain on the very funds earmarked for food, clothing, and other living essentials,"[180] one would at least wish to examine whether

---

[177] A 1972 study of fair hearing procedures as practiced by the New York City Public Welfare Agencies, Mashaw, *The Management Side of Due Process: Some Theoretical and Litigation Notes on the Assurance of Accuracy, Fairness, and Timeliness in the Adjudication of Social Welfare Claims,* 59 CORNELL L. REV. 772, 813-14 (1974), found that a procedurally regular hearing had not been provided in a significant number of cases: (1) 5% of the appellants received no notice of proposed adverse action; (2) 25% did not receive timely notice; (3) two-thirds failed to receive an adequate statement of what was proposed and the factual and policy reasons therefor; (4) in 15% of the cases aid had not been continued pending appeal; (5) only 25% of the applicants requesting access to agency files were granted such access; (6) in only 7% of the cases was an opportunity for cross-examination provided by having witnesses present. The results of a study by D. Kirchheimer, Community Evaluation of Fair Hearing Procedures Available to Public Assistance Recipients 5, 6 (1973) (on file at New York City Human Resources Administration), seem to comport with a 1969 research project which, using survey questionnaire methodology, examined the attitudes of social workers toward administrative hearings and found that a substantial portion of these individuals had negative feelings concerning the relative utility of providing hearings. *See* Scott, *The Reality of Procedural Due Process—A Study of the Implementation of Fair Hearing Requirements by the Welfare Caseworker,* 13 WM. & MARY L. REV. 725 (1972).

[178] *See* note 54 *supra.*

[179] Richardson v. Wright, 405 U.S. 205, 227 (1972) (Brennan, J., dissenting).

[180] Wheeler v. Montgomery, 397 U.S. 280, 284 (1970) (Burger, C.J., dissenting).

it would not be possible to devise some less cumbersome but nevertheless fair procedures.[181]

When we move to the category in which government is merely refusing an application for a benefit, the atmosphere is quite different. To be sure, due process prevents an agency from using impermissible standards[182] or from abdicating its function.[183] Similarly, due process may require a trial-type hearing on a claim of eligibility when the consequences of a refusal are serious.[184] But to my knowledge no court has held that an unsuccessful applicant for admission to the bar is entitled to a trial-type hearing on the grading of his examination paper;[185] that an unsuccessful applicant for admission to a state university with a limited number of places is entitled to an evidentiary hearing with respect to his turn-down;[186] or that a person on the waiting list for public housing is entitled to such a hearing on a claim that a later applicant has been preferred.

---

[181] While cost-benefit analyses are not so readily made in other fields, the need for empirical studies is great. *See* Sostre v. McGinnis, 442 F.2d 178, 197 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 405 U.S. 978 (1972) ("We are particularly unwilling to interfere with state administrative processes when reliable, detailed information or empirical studies are as scanty as they are on the subject of prison disciplinary procedures").

[182] *See, e.g.*, Vulcan Soc'y v. Civil Serv. Comm'n, 490 F.2d 387 (2d Cir. 1973). *See also* Bridgeport Guardians, Inc. v. Members of Bridgeport Civ. Serv. Comm'n, 482 F.2d 1333 (2d Cir. 1973).

[183] This was the situation in the well-known case of Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964). The Mayor and Aldermen of Atlanta had granted liquor licenses under a system of "ward courtesy" whereby licenses were issued only after approval by one or both of the aldermen of the ward in which the establishment was to be located. The opinion instructed the district court to enjoin the denial of licenses under that system if it found that no ascertainable standards had in fact been developed by the board by which an applicant "can intelligently seek to qualify for a license . . . until a legal standard is established and procedural due process provided in the liquor store licensing field," *id.* at 612. However, the opinion did not clarify the content of this standard. It is hard to believe that the court thought eligible applicants competing for a single license were constitutionally entitled to "comparative hearings" such as those provided by statute in FCC proceedings.

[184] *See, e.g.*, Willner v. Committee on Character & Fitness, 373 U.S. 96 (1963) (holding that petitioner was clearly entitled to notice and a hearing—including confrontation and cross-examination—on the grounds for the denial of admission to the bar). *See also* Homer v. Richmond, 292 F.2d 719, 722 (D.C. Cir. 1961). The same reasoning should apply to an application for welfare benefits in which, typically, the only issue is eligibility. Compare the principle that an alien seeking suspension of a valid deportation order is entitled to a hearing on eligibility but not on the exercise of discretion to suspend deportation. Jay v. Boyd, 351 U.S. 345 (1956).

[185] *See* Whitfield v. Illinois Bd. of Law Examiners, 504 F.2d 474 (7th Cir. 1974).

[186] Except, of course, when the charge is invidious discrimination on the grounds of race, religion, or sex. *See generally* Avins v. Rutgers, The State Univ., 385 F.2d 151 (3d Cir. 1967), *cert. denied*, 390 U.S. 920 (1968) (author of law review article not entitled to a hearing to show that editors' refusal to publish was due to dislike of author's views).

## V.   Hearing Requirements for Rulemaking

In the area of rulemaking the *Florida East Coast*[187] decision stands in sharp contrast to the broadened rights to a hearing we have been reviewing. Since the case is not exactly a household term, indeed remains largely unknown except to the cognoscenti, a short statement of the facts is in order.

In 1917 Congress amended the Interstate Commerce Act to endow the ICC with power "after hearing" to establish reasonable "rules, regulations and practices" with respect to freight car service, including the compensation to be paid by one railroad for using the cars of another.[188] In fixing such compensation the Commission generally accorded a full trial-type hearing.[189] In an effort to deal with shortages of freight cars, Congress enacted a further amendment in 1966[190] empowering the Commission to add a penalty, euphemistically described as "an incentive element," to fair compensation for the use of freight cars found to be in inadequate supply.

The legislative history of the amendment indicated congressional belief that "full hearings" would be accorded,[191] and so the Commission seems to have thought.[192] Ultimately, responding to congressional pressure for action, the Commission took a shortcut, according the right to file written statements of fact and position concerning a proposed schedule of charges but denying an oral hearing in the absence of a request showing "with specificity the need therefor and the evidence to be adduced."[193] The Commission denied all such requests.[194] When two southern carriers attacked the order on the ground that the Administrative Procedure Act[195] and the "hearing" provision of the Inter-

---

[187] United States v. Florida E.C. Ry., 410 U.S. 224 (1973). *See* text accompanying note 31 *supra.*

[188] Act of May 29, 1917, ch. 23, 40 Stat. 101, *as amended,* 49 U.S.C. § 1 (1970).

[189] *See, e.g.,* the order invalidated because of lack of thorough investigation and detailed findings in Boston & M.R.R. v. United States, 162 F. Supp. 289 (D. Mass.) (three-judge court), *appeal dismissed,* 358 U.S. 68 (1958).

[190] Act of May 26, 1966, Pub. L. No. 89-430, § 1, 80 Stat. 168 (codified at 49 U.S.C. § 1(14)(a) (1970)).

[191] *See* 112 Cong. Rec. 10443 (1966) (remarks of Representative Staggers).

[192] *See* United States v. Florida E.C. Ry., 410 U.S. 224, 254-55 (1973) (Douglas, J., dissenting); Incentive Per Diem Charges—1968, 337 I.C.C. 217, 219 (1970) (parties accorded "a hearing under section 556" of the APA in connection with ICC consideration of incentive charges).

[193] Incentive Per Diem Charges—1968, 337 I.C.C. 183, 213 (1969).

[194] United States v. Florida E.C. Ry., 410 U.S. 224, 234 (1973).

[195] 5 U.S.C. § 556 (1970).

state Commerce Act[196] required opportunity for greater participation by parties, the Supreme Court, reversing a lower court decision in their favor,[197] upheld the order on the ground that the Commission had simply engaged in rulemaking. For rulemaking, governed by 5 U.S.C. section 553(c) rather than section 556 unless the rules were "required by statute to be made on the record after opportunity for an agency hearing," the opportunity to submit written comments was sufficient participation.

If the case stood only for the proposition that the provision of the APA requiring trial-type procedures when rules, in the ordinary sense of that term, "are required by statute to be made on the record after opportunity for an agency hearing" should be limited to the few statutes that used these words or something very much like them, the decision would be of relatively little moment.[198] Indeed, as the judge who had the misfortune of having to write a lengthy and difficult opinion in a case where the statute did require this,[199] I would look with special favor on a development that prevented a spread of the infection of full

---

[196] 49 U.S.C. § 1(14)(a) (1970).

[197] Florida E.C. Ry. v. United States, 322 F. Supp. 725 (M.D. Fla. 1971) (three-judge court).

In Long Island R.R. v. United States, 318 F. Supp. 490 (E.D.N.Y. 1970) (three-judge court), the court, in an opinion by the writer, had also held that the statute contemplated a trial-type hearing but dismissed the complaint on the ground that the Long Island had not shown that it would be prejudiced by denial of an oral hearing, 5 U.S.C. § 556(d) (1970). The decision was not appealed.

[198] In the wake of *Florida East Coast* lower courts have been naturally hesitant to find a requirement of the more formal procedures of 5 U.S.C. § 556 (1970), which are imposed when rules are required by statute to be made "on the record." In Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1250 (D.C. Cir. 1973), the court deemed the words "on the record" to be the "touchstone test" for imposing all of the trial-type requirements of that section. *See also* Bell Tel. Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974); Duquesne Light Co. v. EPA, 481 F.2d 1, 6 n.26 (3d Cir. 1973); International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 630 n.48 (D.C. Cir. 1973); Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking*, 87 HARV. L. REV. 782, 795 (1974).

[199] National Nutritional Foods Ass'n v. FDA, 504 F.2d 761 (2d Cir. 1974), *cert. denied*, 95 S. Ct. 135 (1975). That case included 15 petitions for review of two final regulations of the FDA prescribing label requirements and standards of identity for vitamins and minerals, promulgated under authority of 21 U.S.C. §§ 341, 343(j) (1970). The agency hearing transcript comprised more than 32,000 pages and the material sent us, consisting of selected portions of the record, filled three feet of shelf space. The use of trial-type procedures had been of little avail; cross-examination of government witnesses, which filled some 60% of the pages devoted to the Government's presentation, yielded precious few admissions or other statements of any significance. Ironically, the hearing examiner had denied cross-examination in the one instance where it might have been most useful. 504 F.2d at 792-99.

trial-type hearings to the sort of rulemaking that is predominantly a determination of policy.

However, the sweep of the *Florida East Coast* decision goes far beyond that. The opinion seems to say that "hearing" provisions in regulatory statutes, which had long been regarded as requiring trial-type hearings, have been modified by the Administrative Procedure Act so that nothing more than notice and written comment is required if the action falls within the APA's expansive definition of rulemaking,[200] and implicitly, of course, that this comports with due process.[201] The definition of rulemaking is exceedingly broad, about the only limitation being that a rule can have only future effect.[202] Although the *Florida East Coast* opinion noted that the incentive payments "were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act,"[203] the APA definition of "rule" refers to a "statement of general *or particular* applicability,"[204] and one can hardly believe Mr. Justice Rehnquist's decision would have been different if the Commission had used its power to exempt certain railroads from payment of incentive per diem charges.

---

[200] To be sure, Justice Rehnquist makes a point of the fact that the action under review in the *Florida East Coast* case was taken pursuant to a post-APA amendment of the Interstate Commerce Act. 410 U.S. at 240-41 & n.8. But the 1966 amendment to § 1(14) was substantive, not procedural, and history showed that both Congress and the Commission intended previous procedures to continue. *See* notes 191-92 *supra*. The "after hearing" language has been a part of the statute since the Esch Car Service Act was enacted in 1917. Act of May 29, 1917, ch. 23, 40 Stat. 101, *as amended*, 49 U.S.C. § 1 (1970).

[201] Mr. Justice Douglas found this modification more than just implicit, *see* 410 U.S. at 246-47.

[202] 5 U.S.C. §§ 551(4)-(5). Section 551(4) reads:
"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing . . . .
Justice Rehnquist noted that the order in *Florida East Coast* was "basically [a] legislative-type judgment, for prospective application only." 410 U.S. at 246.

[203] 410 U.S. at 246.

[204] 5 U.S.C. § 551(4) (1970) (emphasis added). Drawing on the legislative history, Professor Davis says, "The words 'or particular' were not intended to change into rule making what before the Act was regarded as adjudication. Those words mean no more than that what is otherwise rule making does not become adjudication merely because it applies only to particular parties or to a particular situation." 1 DAVIS, *supra* note 5, § 5.02, at 296 (1958) (footnote omitted). One could as well say "no less." *See, e.g.*, Anaconda Co. v. Ruckelshaus, 482 F.2d 1301 (10th Cir. 1973) (promulgation of standard limiting sulfur dioxide which affected only one polluter properly handled as rulemaking).

The *Florida East Coast* decision thus signals a large expansion of what can be done by notice and comment rulemaking and a corresponding retraction of the area where a trial-type hearing is required in the regulatory field. A clear example would be the division of joint rates, a subject closely akin to charges for car hire. In *The New England Divisions Case*[205] Justice Brandeis took great pains to justify the Commission's action, pursuant to section 15(6) of the Interstate Commerce Act,[206] in fixing divisions on a regional basis to assist the New England lines in the face of an argument by other roads that the Commission was obliged to consider divisions among carriers on an individual basis. Characterizing the proceeding as "adjudication,"[207] he described the lengthy hearings and extensive evidence received by the Commission in satisfaction of the "full hearing" requirement of the statute.[208] If the Commission today were to think it desirable to increase divisions for the beleaguered roads in the Northeast, *Florida East Coast* seems to say that notice and comment rulemaking might suffice.

Still more important is ratemaking, the approval or prescription of which is specifically incorporated in the APA definition of a rule. Why would not the order of the Secretary of Agriculture fixing future rates for fifty stockyard agencies in Kansas City, which was before the Court in *Morgan II*,[209] now constitute rulemaking subject only to notice and comment procedures unless it matters that the pertinent statute spoke of a "full hearing" rather than simply a hearing?[210] The *Florida East Coast* majority, although unwilling to commit itself, evidently thinks it might be.[211] Indeed why would not a future rate order

---

[205] 261 U.S. 184 (1923).

[206] 49 U.S.C. § 15(6) (1970).

[207] 261 U.S. at 197.

[208] *Id.* at 200. Although Mr. Justice Brandeis concluded "[t]hat there is no constitutional obstacle to the adoption of the method pursued . . . ," *id.* at 199, *i.e.*, the use of evidence of typical conditions, subject to later adjustment, rather than evidence respecting each combination of railroads for which divisions were necessary, one does not get the impression that he would have thought a mere notice and comment procedure constituted due process.

[209] Morgan v. United States, 304 U.S. 1 (1938).

[210] The Packers and Stockyards Act, 7 U.S.C. § 211(a) (1970), permitted the Secretary to prescribe "just and reasonable . . . rates" for stockyard services after "full hearing."

[211] Mr. Justice Rehnquist was not prepared in *Florida East Coast* to contend that a "hearing" under 49 U.S.C. § 1(14)(a) (1970) and a "full hearing" under the Packers and Stockyards Act would necessarily involve the same procedural requirements. 410 U.S. at

like that in *ICC v. Louisville & Nashville R.R.*,[212] which was held to have required a trial-type hearing, now constitute rulemaking which can be effectuated by mere notice and comment, since a rule is nonetheless a rule despite its "particular applicability"? Although the *Florida East Coast* majority sought to distinguish the *Louisville & Nashville* situation by calling it adjudication rather than rulemaking,[213] the distinction did not carry much conviction to the dissenters,[214] nor does it to me.[215]

Hard-pressed agencies will not be slow to draw such lessons from the *Florida East Coast* decision.[216] I am not saying that, from a policy standpoint, this development is bad; I am saying that it is quite as revolutionary in the sense of retracting what had been thought to be procedural rights as *Goldberg* was in advancing them. Mr. Justice Douglas, joined by Mr. Justice Stewart, was accurate when he began his dissent by saying, "The present decision marks a sharp break with traditional concepts of procedural due process."[217]

The Court is going to have to engage in more hard thinking about the location of what Justice Rehnquist conceded to be the not very bright line "between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particu-

---

243. This difference may be of considerable practical significance. *See, e.g.*, 49 U.S.C. § 15(1) (1970) (according to parties a right to a "full hearing" before rail freight rates may be set aside as unjust, unreasonable, or discriminatory and new rates prescribed by the ICC); 47 U.S.C. § 309(e) (1970) (providing for a "full hearing" in connection with FCC consideration of applications for a broadcast license). But query whether the members of Congress over the years have had any idea that the adjective was more than hortatory or that they were producing a different result when they required only a "hearing," as, for example, in §§ 4(e) and 5(a) of the Natural Gas Act, 15 U.S.C. §§ 717c & d (1970), rather than a "full hearing." *See also* note 233 *infra*.

[212] 227 U.S. 88 (1913). *See* text accompanying notes 22-24 *supra*.

[213] 410 U.S. at 244. It would clearly seem to follow from *Florida East Coast* that to such extent as there is a due process right to a hearing with respect to rent increases in public or publicly assisted housing, notice and opportunity for comment would suffice. *Cf.* note 168 *supra*.

[214] 410 U.S. at 253-54.

[215] *See* Long Island R.R. v. United States, 318 F. Supp. 490, 497 (E.D.N.Y. 1970).

[216] Taking its cue from the reasoning of United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972), the Tenth Circuit approved an area rate-making order of the Federal Power Commission promulgated after implementation of new procedures which "drastically changed the procedure from the traditional method involving trial-type adjudicatory proceedings" to informal conferences and staff investigation and analysis. Phillips Petroleum Co. v. FPC, 475 F.2d 842, 844 (10th Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974). *See also* Bell Tel. Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974).

[217] 410 U.S. at 246.

lar cases on the other."[218] The line becomes especially difficult to draw in ratemaking. The process in fixing a future rate for a single power company or for a particular rail movement is much more like the process in determining the reasonableness of past rates[219] than the process in setting nationwide safety standards or in prescribing rules for solicitation of proxies. Much more than that, since even in rulemaking that is predominantly of the policy type, there may be subsidiary issues on which notice-and-comment procedures will not always assure fair agency decisionmaking and permit meaningful judicial review, it may be doubted that they will inevitably fill the statutory or constitutional bill.

This point has already become a subject of much controversy among the judges of the District of Columbia Circuit. This is a court of special importance for administrative law because, in addition to its exclusive jurisdiction over FCC licensing decisions and actions of the Environmental Protection Agency as to emission standards under the Clean Air Act,[220] it is an optional venue under a flock of regulatory statutes and has attracted—doubtless to the delight of the other circuits—the largest share of environmental litigation and review of orders of

---

[218] 410 U.S. at 245.

Presumably the *Florida East Coast* majority did not mean to call in question the holdings in Wong Yang Sung v. McGrath, 339 U.S. 33 (1950), followed in summary per curiam reversals in Cates v. Haderlein, 342 U.S. 804 (1951), and Riss & Co. v. United States, 341 U.S. 907 (1951), that although the adjudication section of the APA, 5 U.S.C. § 554(a) (1970), also uses the phrase "required by statute to be determined on the record after opportunity for an agency hearing," APA adjudication procedures must be applied whenever the action was adjudication within 5 U.S.C. §§ 551(6)-(7) (1970) and it is the Constitution rather than a statute which compels a "hearing." However, the failure of the *Florida East Coast* opinion to deal with this problem could well produce litigation over the continued vitality and applicability of *Wong Yang Sung.* If the "required by statute to be determined on the record" language reads only on the few statutes using the words recognized as magical in *Florida East Coast,* why would not the Constitution rather than the APA supply the sole guide as to proper adjudicative procedure? And this scarcely would include all the APA safeguards. The lack of discussion of the "to be determined on the record" language in *Wong Yang Sung* has always been puzzling. Perhaps Mr. Justice Jackson was relying on the conclusion in U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 42 (1947) that adjudication is always "on the record."

[219] In Baer Bros. Mercantile Co. v. Denver & R.G.R.R., 233 U.S. 479, 486 (1914), after insisting on the importance of the past-future distinction, the Court sensibly observed that "testimony showing the unreasonableness of a past rate may also furnish information on which to fix a reasonable future rate and both subjects can be, and often are, disposed of by the same order." *See* FRIENDLY, THE FEDERAL ADMINISTRATIVE AGENCIES 8-11 (1962).

[220] 42 U.S.C. § 1857h-5 (1970).

the Federal Power Commission fixing natural gas rates. The court had savored its role, explaining that "[w]e stand on the threshold of a new era in the history of the long and fruitful collaboration of administrative agencies and reviewing courts."[221] But now the judges are not so sure what this brave new world is to be. In an opinion handed down only three weeks after the *Florida East Coast* decision but obviously well on the way to completion before then, Judge Leventhal said in dictum that even in an environmental rulemaking proceeding "a right of cross-examination, consistent with time limitations, might well extend to particular cases of need, on critical points where the general procedure proved inadequate to probe 'soft' and sensitive subjects and witnesses."[222] Chief Judge Bazelon, although disagreeing in some particulars, also believed that his insistence that "the agency [provide] 'a framework for principled decision-making' "[223] might mean that, in some environmental cases, the "critical character" of the decision "requires at the least a carefully limited right of cross-examination at the hearing . . . . "[224] Shortly thereafter Judge Wilkey joined by Judge Leventhal and District Judge Jameson of Montana set aside a gas rate order of the FPC on the ground that the statutory requirement of substantial evidence to support the minimum rate order demanded more than notice and comment procedures. Judge Wilkey's opinion put the court squarely on record in favor of a "flexible interpretation of the APA" and against "forcing the problem into the artificial cubbyholes of 'informal' versus 'formal.' "[225]

---

[221] Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 597 (D.C. Cir. 1971) (Bazelon, C.J.). *See* Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 394 (D.C. Cir. 1973), *cert. denied*, 417 U.S. 921 (1974) ("the court and agency are in a kind of partnership relationship . . .") (Leventhal, J.); Environmental Defense Fund, Inc. v. EPA, 465 F.2d 528, 541 (D.C. Cir. 1972) (courts "as . . . partner[s] in the overall administrative process") (Leventhal, J.). There is little doubt who is considered to be the senior partner.

[222] International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 631 (D.C. Cir. 1973).

[223] *Id.* at 651 (concurring opinion). This phrase comes from the concluding paragraph of his opinion in Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 598 (D.C. Cir. 1971).

[224] International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 651-52 (concurring opinion). The difference of opinion between the two judges again surfaced in a rate case, Public Serv. Comm'n v. FPC, 487 F.2d 1043 (D.C. Cir. 1973), *vacated*, 417 U.S. 964 (1974), where Judge Bazelon, with the concurrence of a district judge, went further in requiring a sufficient justification than Judge Leventhal believed proper.

[225] Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1252 (D.C. Cir. 1973). The court said, *id.* at 1260:

   Informal comments simply cannot create a record that satisfies the substantial evidence test. Even if controverting *information* is submitted in the form of

Judge J. Skelly Wright, who had the bad luck not to have been on the panels that rendered these and other important decisions on the subject, has taken to the law reviews to upbraid his colleagues for what he terms their "'ad hoc' approach to procedural review" of rulemaking, contrary in his view to the clear command of the APA and in no way justified under the due process clause.[226]

As always, Judge Wright's argument is forceful. One would not gather from a reading of section 553[227] alone that courts were free to impose procedures for rulemaking more stringent than those prescribed by Congress. Beyond that, an agency ought to know in advance how to proceed when promulgating a "rule" and not have to risk reversal and remand because a reviewing court decides that something more was needed in the particular case—with attendant expense and delay.[228] What Judge Wright thinks would be the "completely predictable" ad-

---

comments by adverse parties, the procedure employed cannot be relied upon as adequate. A "whole record," as that phrase is used in this context, does not consist merely of the raw data introduced by the parties. It includes the process of testing and illumination ordinarily associated with adversary, adjudicative procedures. Without this critical element, informal comments, even by adverse parties, are two halves that do not make a whole. Thus, it is adversary procedural devices which permit testing and elucidation that raise information from the level of mere inconsistent data to evidence "substantial" enough to support rates.

The opinion sought to distinguish *Florida East Coast* on the ground that the Interstate Commerce Act does not contain the substantial evidence language included in later statutes like the Natural Gas Act. 15 U.S.C. § 717r(b) (1970). 483 F.2d at 1260-61 nn.83 & 84. This is scarcely a persuasive point in light of the long history of substantial evidence review of ICC orders. The court disagreed with Phillips Petroleum Co. v. FPC, 475 F.2d 842 (10th Cir. 1973), believing that Judge Seth's dissenting opinion in that case was more persuasive. 483 F.2d at 1262. *See* note 216 *supra*.

[226] Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review*, 59 CORNELL L. REV. 375, 384 (1974). For other decisions condemned, see *id.* at 384 nn.39-42.

At long last Ethyl Corp. v. EPA, 43 U.S.L.W. 2334 (D.C. Cir., Jan. 28, 1975), gave Judge Wright an opportunity for judicial expression of his views; predictably, in light of his article, he disagreed with Judge Wilkey's reversal of an order of the Environmental Protection Agency.

[227] 5 U.S.C. § 553 (1970).

[228] The costs of delay are enormous. A paper, Future Energy Requirements: Capital Productivity and Capital Costs, submitted by Jerome S. Katzin and George J. Konomos of Kuhn, Loeb & Co. at the New York City hearings of the Federal Energy Administration on Project Independence, August 19-22, 1974, demonstrated that the cost of a $600 million 1200 megawatt nuclear generating plant, assuming a 12% cost of money and an 8% inflation factor, would be $1,336,000,000 if the plant took 10 years to construct as against $981 million if the plant could be finished in six. Schedule I. For all electric generating projects planned for the single year 1980, a 20% reduction in the period of construction would save $3.1 billion on the same assumptions. Schedule IV.

ministrative response to the ad hoc approach, namely, for the agency to clothe its action "in the full wardrobe of adjudicatory procedure" in every case in order to avoid the risk of reversal in some,[229] would be equally bad.

A judge not in the arena must wonder whether the war Judge Wright is waging with his colleagues is not in some degree semantic. He emphasizes that agency action is subject to substantive review, whether because of the particular statute or the APA,[230] on a standard either of substantial evidence or at least of arbitrariness or capriciousness.[231] Although the substantial evidence requirement of the APA applies only in a case subject to sections 556 and 557 "or otherwise reviewed on the record of an agency hearing provided by statute,"[232] it is arguable that, even as regards rulemaking, the latter phrase is not limited to the few cases where the statute expressly requires a determination "on the record" after opportunity for an agency hearing.[233] Apart from this, many recent statutes apply the substantial evidence test to judicial review of rulemaking.[234] Furthermore, the degree of difference between the substantial evidence test and the arbitrary and capricious test can readily be exaggerated.[235] One can hardly quarrel with the conclusion that if a reviewing court finds that the procedures followed by the agency in adopting a rule have not produced a body of evidence enabling it to pronounce

---

[229] Wright, *supra* note 226, at 395.

[230] 5 U.S.C. §§ 701, 702, 706 (1970).

[231] Wright, *supra* note 226, at 390.

[232] 5 U.S.C. § 706(2)(E) (1970).

[233] *See* Judge Wilkey's argument in Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1258-59 (D.C. Cir. 1973), based on the statutory requirement for agency transmission of a transcript of the record, 15 U.S.C. § 717r(b) (1970), and the concession in U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 33-34 (1947), that rate orders under the Interstate Commerce Act and the Packers and Stockyards Act must be regarded as "required by statute to be made on the record after opportunity for an agency hearing."

[234] *See, e.g.,* Consumer Product Safety Act, 15 U.S.C. § 2060 (Supp. III, 1973), and the Occupational Safety and Health Act, 29 U.S.C. § 655(f) (1970).

[235] *See* Associated Indus., Inc. v. United States Dep't of Labor, 487 F.2d 342, 349-50 (2d Cir. 1973), and authorities there cited. For a contrary view on the significance of the difference with respect to licensing see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 95 S. Ct. 438, 441-42 (1974), and Judge Wright's opinion in Ethyl Corp. v. EPA, 43 U.S.L.W. 2334, 2335 (D.C. Cir., Jan. 28, 1975) ("arbitrary and capricious" is an "undemanding" standard). *But see* National Nutritional Foods Ass'n v. Weinberger, No. 74-1738 (2d Cir., Feb. 3, 1975), in which the court remanded for a further evaluation of the adequacy of the record to support the agency's action. Judge Lumbard, concurring, expressed his view that when an agency engages in substantive rulemaking, the arbitrary and capricious and substantial evidence standards are identical. *Id.* at 1623-24.

the required benediction, the court must remand.[236] In other words, while Judge Wilkey's general condemnation of notice and comment procedure as applied to ratemaking[237] may have been too broad, he very likely reached the proper result in the case before him.[238]

It is thus not too consequential whether a court invalidates a rule on the ground that the procedures have not developed substantial evidence to support it or even evidence adequate to rebut a claim that it is arbitrary and capricious, or, instead, takes the route of prescribing ad hoc procedural requirements in addition to those of section 553. Although the former course seems more in keeping with the statutory language and less likely to promote undue judicial activism, the practical result is much the same. Both roads lead to the conclusion that an administrator engaged in rulemaking governed by the APA cannot always be sure that rudimentary notice and comment procedures, even if they measure up to Judge Wright's salutary specifications,[239] will always suffice. There will continue to be cases of rulemaking in which, in order to show that its action is supported by substantial evidence or even to avoid characterization of its action as "arbitrary and capricious," the agency must provide *"some mechanism for interested parties to introduce adverse evidence and criticize evidence introduced by others."*[240] Just what mechanism must be provided will depend on the interests at stake, the complexity of the issue, and the usefulness of the particular mechanism as weighed against its adverse effects.[241] In most cases the rulemaking pro-

---

[236] *See, e.g.,* International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 649 (D.C. Cir. 1973): "The procedures followed in this case . . . have resulted in a record that leaves this court uncertain, at a minimum, whether the essentials of the intention of Congress were achieved. This requires a remand whereby the record as made will be supplemented by further proceedings."

[237] *See* note 225 *supra*.

[238] This seems to be Chief Judge Bazelon's approach in Public Serv. Comm'n v. FPC, 487 F.2d 1043, 1087 (D.C. Cir. 1973), *vacated*, 417 U.S. 964 (1974).

[239] Wright, *supra* note 226, at 395.

[240] Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1258 (D.C. Cir. 1973) (emphasis in original). *See* Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 392-401 (D.C. Cir. 1973), *cert. denied*, 417 U.S. 921 (1974), the reasoning of which Judge Wright seems to find compatible with his formulation of the proper role of judicial review in this area, Wright, *supra* note 226, at 380 n.17, 381 n.22. *See also* South Terminal Corp. v. EPA, 504 F.2d 646, 662 (1st Cir. 1974), holding that notice and comment rulemaking was proper but remanding a particular issue for receipt and consideration of further arguments.

[241] The Administrative Conference of the United States has been considering whether § 553 requires amendment. *See* 2 RECOMMENDATIONS AND REPORTS OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES 66-67 (1972) (Recommendation

cedures suggested by Judge Wright should suffice; in a few, with respect to the same issue, they may not.

In rulemaking also we thus end with a requirement not much more precise than "some kind of hearing." While *Florida East Coast* liberates the agencies from the constraints of full adjudicatory procedures in many cases where these had been thought required, it is not a license for sloppiness. If reviewing courts insist that an agency engaged in rulemaking properly advise the parties of the intended action and the grounds and data thought to support it, afford opportunity for opposing the action or proposing alternatives, and render reasoned decisions, then the broadened role for "informal" rulemaking adumbrated by the decision, whether "right" or "wrong" as a matter of precedent, will be a constructive development, avoiding the delays incident to formal adjudicative procedures in many instances where these are not needed, yet safeguarding the essentials.[242]

## VI. Conclusion

With that I bring this long survey to a close. If I have raised more problems than I have settled, that is the prerogative of a judge giving a lecture, as distinguished from the certainty seemingly felt by students writing law review notes. We have traveled over wide areas—from termination of welfare payments to the establishment of incentive per diem for freight cars, from student and prison discipline to rates for natural gas.[243] Yet the problem is always the same—to devise procedures that are both fair and feasible.

---

72-5; Procedures for Adoption of Rules of General Applicability); Hamilton, *Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rulemaking*, 60 CALIF. L. REV. 1276 (1972). The problem is that the infinite varieties of rulemaking make it difficult and probably unwise to go beyond a minimal amount of legislative prescription. For an interesting recent example of the latter, see Federal Trade Commission Improvement Act, 83 Stat. 2183, tit. II, §§ 201, 202 (1975).

[242] For illuminating pre-*Florida East Coast* discussion, see Boyer, *Alternatives to Administrative Trial-Type Hearings for Resolving Complex Scientific, Economic, and Social Issues*, 71 MICH. L. REV. 111 (1972); Clagett, *Informal Action—Adjudication—Rule Making: Some Recent Developments in Federal Administrative Law*, 1971 DUKE L.J. 51; Hamilton, *supra* note 241; Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform*, 118 U. PA. L. REV. 485 (1970).

[243] The exercise in breadth has necessarily involved a sacrifice in depth with respect to particular areas. Happily, one such gap, relating to the *Florida East Coast* case, is about to be filled in an article by Professor Nathaniel L. Nathanson in a forthcoming issue of the *Columbia Law Review*, a draft of which I was privileged to read after I had nearly completed my own writing.

In this task we still have far to go. In the mass justice area the Supreme Court has yielded too readily to the notions that the adversary system is the only appropriate model and that there is only one acceptable solution to any problem, and consequently has been too prone to indulge in constitutional codification. There is need for experimentation, particularly for the use of the investigative model, for empirical studies, and for avoiding absolutes. While the Court has been too rigid in some ways, it has been too vague in others. Apart from the field of creditors' preliminary remedies,[244] the lower courts have been furnished little in the way of principle that will enable them to decide with fair assurance as new situations develop. One source of the difficulty has stemmed from the Court's pulling practically all the procedural stops in *Goldberg* which, although styled as a welfare termination, was in fact a suspension under peculiarly necessitous circumstances. All that was really wrong with the New York procedure was the failure to afford any opportunity for an oral presentation in situations where claimants often were unable to state their case in writing and to provide some opportunity for testing the credibility of tipsters.[245] Now *Goss v. Lopez* has advanced the frontiers of due process without giving any indication where, if anywhere, the stopping place may be. Meanwhile *Florida East Coast* was floated, greatly expanding the area for notice-and-comment rulemaking without precise explanation of the decision's effect on prior rulings of the Court, on situations where the statutory language differed slightly,[246] and on long-held assumptions of regulated industries and their counsel, or sufficient consideration of the occasional inadequacies of infor-

---

[244] This area, not discussed in detail in this Article, is considered to be in a state of serious disarray by several Justices. *See* North Ga. Finishing, Inc. v. Di-Chem, Inc., 95 S. Ct. 719, 726 (1975) (Blackmun, J., joined by Rehnquist, J., dissenting).

[245] The opinion of the three-judge court, Kelly v. Wyman, 294 F. Supp. 893 (S.D.N.Y. 1968), which was affirmed in *Goldberg* was much more moderate than the Supreme Court's. After outlining the rather modest requirements, Judge Feinberg characterized them as an "informal conference." *Id.* at 905.

[246] For example, does it matter whether a "hearing" statute was pre-APA or post-APA; whether it requires a "hearing" or a "full hearing"; whether it includes a direction for transmission of the record; whether it contains a substantial evidence clause; whether a substantial evidence clause is the conventional one making determinations conclusive if supported by substantial evidence or one directing a court to set the order aside if not supported by substantial evidence? The Court, or Congress, should move speedily to clear up these uncertainties. To my mind such distinctions are trivial; the best course is to give *Florida East Coast* a broad application but to recognize that in some cases even the best notice-and-comment rulemaking may not suffice with respect to some issue.

mal procedure which had already surfaced. While I applaud the Court's basic initiatives with respect to administrative hearings, the time for some new thinking and also for some tidying up has arrived.