

# Medicare: Insolvency Projections

Updated May 29, 2020

Congressional Research Service

https://crsreports.congress.gov

RS20946

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Medicare is the nation's health insurance program for persons aged 65 and older and certain disabled persons. Medicare consists of four distinct parts: Part A (Hospital Insurance, or HI); Part B (Supplementary Medical Insurance, or SMI); Part C (Medicare Advantage, or MA); and Part D (the outpatient prescription drug benefit).

The Part A program is financed primarily through payroll taxes levied on current workers and their employers; these taxes are credited to the HI trust fund. The Part B program is financed through a combination of monthly premiums paid by current enrollees and general revenues. Income from these sources is credited to the SMI trust fund. As an alternative, beneficiaries can choose to receive all their Medicare services through private health plans under the MA program; payment is made on beneficiaries' behalf in appropriate parts from the HI and SMI trust funds. The Part D drug benefit is funded through a separate account in the SMI trust fund and is financed through general revenues, state contributions, and beneficiary premiums. The HI and SMI trust funds are overseen by the Medicare Board of Trustees, which makes an annual report to Congress concerning the financial status of the funds.

Since the inception of Medicare in 1966, the HI trust fund has always faced a projected shortfall. The insolvency date has been postponed a number of times, primarily due to legislative changes that have had the effect of restraining growth in program spending. The 2020 Medicare Trustees Report projects that, under intermediate assumptions, the HI trust fund will become insolvent in 2026, the same year as estimated in the prior two years' reports. (The trustees' estimate does not reflect potential effects of the COVID-19 pandemic on Medicare spending and financing. A discussion of potential COVID-19-related factors that could affect HI solvency may be found at the end of this CRS report.)

# Contents

Introduction ................................................................................................................................... 1
Medicare Hospital Insurance Financing ....................................................................................... 1
What Is the HI Trust Fund? ........................................................................................................... 2
History of HI Solvency Projections .............................................................................................. 3
Current Insolvency Projections ..................................................................................................... 7
What Would Happen If the Fund Became Insolvent? .................................................................. 8
Potential Impact of the COVID-19 Pandemic on HI Trust Fund Solvency ................................. 8
    Potential Impact on HI Revenues ........................................................................................... 9
    Potential Impact on HI Expenditures ..................................................................................... 9
Medicare Financing Issues ......................................................................................................... 10

# Figures

Figure 1. Projected Number of Years Until Medicare HI Trust Fund Insolvency .......................... 4
Figure 2. HI Trust Fund Assets at Beginning of Year as a
    Percentage of Annual Expenditures ............................................................................................ 7

# Tables

Table 1. Year of Projected Insolvency of the Hospital Insurance (HI) Trust Fund in Past
    and Current Trustees Reports .................................................................................................... 4

Table A-1. Operation of the Hospital Insurance Trust Fund, Calendar Years 1970-2029 ............. 12
Table B-1. Tax Rates and Maximum Tax Bases ........................................................................... 14

# Appendixes

Appendix A. Operation of the Hospital Insurance Trust Fund ...................................................... 12
Appendix B. Historical Payroll Tax Rates ..................................................................................... 14

# Contacts

Author Information ....................................................................................................................... 15

# Introduction

Medicare is a federal insurance program that pays for covered health care services of qualified beneficiaries. It was established in 1965 under Title XVIII of the Social Security Act as a federal entitlement program to provide health insurance to individuals aged 65 and older, and it has been expanded over the years to include permanently disabled individuals under the age of 65.

Medicare consists of four distinct parts, A through D. Part A covers hospital services, skilled nursing facility (SNF) services, home health visits, and hospice services. Most persons aged 65 and older are automatically entitled to premium-free Part A because they or their spouse paid Medicare payroll taxes for at least 40 quarters (10 years) on earnings covered by either the Social Security or the Railroad Retirement systems. Part B covers a broad range of medical services, including physician services, laboratory services, durable medical equipment, and outpatient hospital services. Enrollment in Part B is voluntary; however, most beneficiaries with Part A also enroll in Part B. Part C, Medicare Advantage (MA), provides private plan options, such as managed care, for beneficiaries who are enrolled in both Part A and Part B. Part D provides optional outpatient prescription drug coverage.[1]

Medicare expenditures are driven by a variety of factors, including the level of enrollment, the complexity of medical services provided, health care inflation, and life expectancy. In 2019, Medicare provided benefits to about 61 million persons at an estimated total cost of $796 billion.[2]

The Medicare program has two separate trust funds—the Hospital Insurance (HI) trust fund and the Supplementary Medical Insurance (SMI) trust fund. The Part A program, which is financed mainly through payroll taxes levied on current workers, is accounted for through the HI trust fund. The Part B and Part D programs, which are funded primarily through general revenue and beneficiary premiums, are accounted for through the SMI trust fund.[3] Both funds are maintained by the Department of the Treasury and overseen by the Medicare Board of Trustees, which reports annually to Congress concerning the funds' financial status.[4] Financial projections are made using economic assumptions based on current law, including estimates of consumer price index, workforce size, wage increases, and life expectancy.

From its inception, the HI trust fund has faced a projected shortfall and eventual insolvency. Because of the way it is financed, the SMI trust fund cannot become insolvent; however, the Medicare trustees continue to express concerns about the rapid growth in SMI costs.[5]

# Medicare Hospital Insurance Financing

Similar to the Social Security system, the HI portion of Medicare was designed to be self-supporting and is financed through dedicated sources of income, rather than relying on general

---

[1] For additional information on the Medicare program, see CRS Report R40425, *Medicare Primer*.

[2] Boards of Trustees, Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, *2020 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds*, April 22, 2020, Table II.B1, at https://www.cms.gov/files/document/2020-medicare-trustees-report.pdf, hereinafter, the 2020 Report of the Medicare Trustees.

[3] Payments are made for beneficiaries enrolled in Part C from the Hospital Insurance (HI) and Supplementary Medical Insurance (SMI) trust funds based on estimates of HI and SMI spending under Part C.

[4] Medicare Trustees Reports may be found at http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/index.html.

[5] For further information on Medicare financing, see CRS Report R43122, *Medicare Financial Status: In Brief*.

tax revenues. The primary source of income credited to the HI trust fund is *payroll taxes* paid by employees and employers; each pays a tax of 1.45% on earnings. The self-employed pay 2.9%. Unlike Social Security, there is no upper limit on earnings subject to the tax.[6] The Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended) imposes an additional tax of 0.9% on high-income workers with wages over $200,000 for single filers and $250,000 for joint filers, effective for taxable years beginning in 2013.[7]

Additional income to the HI trust fund consists of premiums paid by voluntary enrollees who are not entitled to premium-free Medicare Part A through their (or their spouse's) work in covered employment, a portion of the federal income taxes paid on Social Security benefits,[8] and interest on federal securities held by the HI trust fund.

## What Is the HI Trust Fund?

The HI trust fund is a financial account in the U.S. Treasury into which all income to the Part A portion of the Medicare program is credited and from which all benefits and associated administrative costs of the Part A program are paid. The trust fund is solely an accounting mechanism—no actual money is transferred into or out of the fund.[9]

HI operates on a "pay-as-you-go" basis, meaning the annual revenues to the HI trust fund, primarily the taxes paid by current workers and their employers, are used to pay Part A benefits for today's Medicare beneficiaries. When the government receives Medicare revenues (e.g., payroll taxes), income is credited by the Treasury to the appropriate trust fund in the form of special issue interest-bearing government securities.[10] (Interest on these securities is also credited to the trust fund.) The tax income exchanged for these securities then goes into the General Fund of the Treasury and is indistinguishable from other cash in the General Fund; this cash may be used for any government spending purpose. When payments for Medicare Part A services are made, the payments are paid out of the General Fund of the Treasury and a corresponding amount of securities is deleted from (written off) the HI trust fund.

In years in which the HI trust fund spends less than it receives in income, the fund has a *cash-flow surplus*. When this occurs, the HI trust fund securities exchanged for any income in excess of spending show up as assets on the trust fund's financial accounting balance sheets and are available to the system to meet future obligations. The trust fund surpluses are not reserved for future Medicare benefits but are simply bookkeeping entries that indicate how much Medicare has lent to the Treasury (or, alternatively, what is owed to Medicare by the Treasury). From a

---

[6] Prior to 1991, the upper limit on taxable earnings was the same as for Social Security. The Omnibus Budget Reconciliation Act of 1990 (OBRA 90; P.L. 101-508) raised the limit in 1991 to $125,000. Under automatic indexing provisions, the maximum was increased to $130,200 in 1992 and $135,000 in 1993. The Omnibus Budget Reconciliation Act of 1993 (OBRA 93; P.L. 103-66) eliminated the upper limit entirely beginning in 1994.

[7] For additional detail, see archived CRS Report R41128, *Health-Related Revenue Provisions in the Patient Protection and Affordable Care Act (ACA)*.

[8] Since 1994, the HI trust fund has had an additional funding source; OBRA 93 increased the maximum amount of Social Security benefits subject to income tax from 50% to 85% and provided that the additional revenues would be credited to the HI trust fund.

[9] There are about 200 federal trust funds. For additional information on how federal trust funds operate within the context of the federal budget, see CRS Report R41328, *Federal Trust Funds and the Budget*.

[10] Unlike marketable securities, special issues can be redeemed at any time at face value. Investment in special issues gives the trust funds the same flexibility as holding cash.

unified budget perspective, these assets represent future budget obligations and are treated as liabilities.[11]

If, in a given year, the HI trust fund spends more than it receives in income, the fund has a *cash-flow deficit*. In deficit years, Medicare can redeem any securities accumulated in previous years (including interest). When the securities are redeemed, the government needs to raise the resources necessary to pay for the securities and the monies are transferred from the Treasury's General Fund to the HI trust fund. When the assets credited to the trust fund reach zero, the fund is deemed *insolvent*.

(See **Appendix A** for a discussion of recent and projected HI cash flows and for data on historical and projected HI operations through 2029.)

# History of HI Solvency Projections

The HI trust fund has never become insolvent. The Medicare Board of Trustees projected insolvency for the HI trust fund beginning with the 1970 report,[12] at which time the trust fund was expected to become insolvent in only two years. (See **Table 1** and **Figure 1**.) The insolvency date has been postponed a number of times since the beginning of Medicare through various methods. For example, the payroll tax rate has been adjusted periodically by Congress as one of the mechanisms to maintain the financial adequacy of the HI trust fund. (See **Appendix B** for historical payroll tax rates.)

Other legislative changes have been made at various times to slow the growth in HI program spending; generally, these measures have been part of larger budget reconciliation laws that attempt to restrain overall federal spending. To illustrate, in the mid-1990s, efforts to curtail Medicare spending intensified as Congress considered legislation to bring the entire federal budget into balance and culminated in the passage of the Balanced Budget Act of 1997 (BBA 97; P.L. 105-33). In early 1997, the Medicare trustees had projected that the HI trust fund would become insolvent within four years, in 2001. Following the enactment of BBA 97, significant improvements were made in the short-term projections over the next few years. The new projections reflected a number of factors, including lower expected expenditures as a result of changes made by BBA 97 (primarily resulting from modifications in Medicare Part C payments and the establishment of prospective payment systems for certain Part A providers);[13] continued efforts to combat fraud and abuse; and strong economic growth, which was expected to generate more revenues to the trust fund from payroll taxes.

---

[11] For additional information, see the 2020 Report of the Medicare Trustees, Appendix F.

[12] Medicare Trustees Reports from 1966 through 1994 may be found on the Social Security History webpage at https://www.ssa.gov/history/reports/trust/trustyears.html. More recent reports may be found on the CMS webpage, "Trustees Report & Trust Funds," at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/index.html.

[13] The Balanced Budget Act of 1997 (BBA 97; P.L. 105-33) established the Medicare + Choice program under Part C. Medicare Part C was changed to Medicare Advantage by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA; P.L. 108-173).

**Table 1. Year of Projected Insolvency of the Hospital Insurance (HI) Trust Fund in Past and Current Trustees Reports**

| Year of Trustees Report | Year of Projected Insolvency | Year of Trustees Report | Year of Projected Insolvency | Year of Trustees Report | Year of Projected Insolvency |
|---|---|---|---|---|---|
| **1970** | 1972 | **1987** | 2002 | **2005** | 2020 |
| **1971** | 1973 | **1988** | 2005 | **2006** | 2018 |
| **1972** | 1976 | **1989** | None Indicated | **2007** | 2019 |
| **1973** | None Indicated | **1990** | 2003 | **2008** | 2019 |
| **1974** | None Indicated | **1991** | 2005 | **2009** | 2017 |
| **1975** | Late 1990s | **1992** | 2002 | **2010** | 2029 |
| **1976** | Early 1990s | **1993** | 1999 | **2011** | 2024 |
| **1977** | Late 1980s | **1994** | 2001 | **2012** | 2024 |
| **1978** | 1990 | **1995** | 2002 | **2013** | 2026 |
| **1979** | 1992 | **1996** | 2001 | **2014** | 2030 |
| **1980** | 1994 | **1997** | 2001 | **2015** | 2030 |
| **1981** | 1991 | **1998** | 2008 | **2016** | 2028 |
| **1982** | 1987 | **1999** | 2015 | **2017** | 2029 |
| **1983** | 1990 | **2000** | 2025 | **2018** | 2026 |
| **1984** | 1991 | **2001** | 2029 | **2019** | 2026 |
| **1985** | 1998 | **2002** | 2030 | **2020** | 2026 |
| **1986** | 1996 | **2003** | 2026 | | |
| **1986 (amended)** | 1998 | **2004** | 2019 | | |

**Sources:** Intermediate projections of various Medicare Trustees Reports, 1970-2020.

**Figure 1. Projected Number of Years Until Medicare HI Trust Fund Insolvency**



**Sources:** Intermediate projections of various Medicare Trustees Reports, 1970-2020.
**Notes:** No specific estimates were provided by the Medicare trustees for years 1973-1977 and 1989.

There were concerns that the savings achieved through the enactment of BBA 97 were greater than intended at the time of enactment and had unintended consequences for health care providers. As a result of these concerns, Congress enacted two measures: the Balanced Budget Refinement Act of 1999 (BBRA 99; P.L. 106-113) and the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA 2000; P.L. 106-554). These measures were designed to reverse some of the BBA 97 spending reductions.

Despite enactment of BBRA 99 and BIPA 2000, which increased program spending, the 2001 and 2002 Medicare Trustees Reports continued to delay the projected insolvency date. These improvements in solvency projections reflected both stronger-than-expected economic growth and lower-than-expected program costs due to lower projected enrollment in Medicare Part C, heightened antifraud and abuse initiatives, and lower-than-expected increases in health care costs.

The 2003 report projections, however, shifted direction. The projected insolvency date was 2026, four years earlier than the 2030 date projected in the 2002 report. The revision was due to lower-than-expected HI-taxable payroll[14] and higher-than-expected hospital expenditures. In the next year, the 2004 report projected that the HI trust fund would become insolvent in 2019, seven years earlier than projected in 2003. A number of factors contributed to the revision of the projected insolvency date, including slow wage growth (on which payroll taxes are based) and faster growth in inpatient hospital benefits. In addition, the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA; P.L. 108-173) added significantly to HI costs, primarily through higher payments to rural hospitals and to private plans under the MA program.[15]

The 2005 Medicare Trustees Report projected that the HI trust fund would become insolvent one year later than projected in 2004, in 2020. The revision reflected slightly higher income and slightly lower costs in 2004 than previously estimated. The 2006 report moved the insolvency date forward again, to 2018. The revision reflected expectations of slightly higher costs and increased utilization of HI services. Both the 2007 and 2008 reports projected a 2019 insolvency date, although the 2008 report indicated that insolvency would occur earlier in the year. The 2009 report moved the insolvency date forward to 2017, due primarily to lower payroll tax income resulting from the December 2007 to June 2009 economic recession (the "Great Recession").

The 2010 Medicare Trustees Report, issued subsequent to the enactment of the ACA, estimated that the combination of lower Part A costs and higher payroll-tax revenues expected to result from the ACA would postpone depletion of the HI trust fund's assets until 2029, 12 years later than the date projected in the 2009 report.[16] However, the 2011 report projected that the HI trust fund would become insolvent in 2024, five years earlier than projected in the 2010 report. The worsening financial outlook was primarily due to lower-than-expected payroll taxes stemming from higher-than-expected unemployment, and slow wage growth in 2010 caused by the continuing effects of the 2007-2009 economic recession. The 2012 Medicare Trustees Report projected the same 2024 insolvency date. Although income from payroll taxes was expected to increase at a faster rate than expenditures through 2018 due to the projected economic recovery,

---

[14] The lower projection of payroll taxes was primarily due to a revision by the Bureau of Economic Analysis in national wages and salaries for 2001 and 2002.

[15] The Part D outpatient prescription drug program, which was created by the MMA, is funded under SMI; the increased expenditures associated with this new benefit therefore had little impact on projections of Medicare (HI) solvency.

[16] The expected reductions were primarily due to productivity adjustments to Part A provider payment updates and reduced payments to Medicare Advantage plans.

the application of an additional 0.9% HI payroll tax for high-income workers beginning in 2013,[17] and the 2% reduction in spending required by the Budget Control Act of 2011 (BCA; P.L. 112-25) from 2013 through 2021,[18] income was still expected to be insufficient to fully cover projected HI expenses during that period.

In their 2013 report, the Medicare trustees projected a somewhat better short-term outlook for the HI trust fund. They moved the insolvency date two years later than their 2012 estimate, to 2026. The improved projections were primarily due to lower-than-expected expenditures in 2012, the base year used to project future expenditures, and a larger-than-estimated impact of ACA payment methodology changes on MA costs.[19] In their 2014 report, the Medicare trustees reported some improvement in Medicare's financial outlook and therefore moved the insolvency date four years later than their 2013 estimate, to 2030. This improvement was mainly due to lower expected utilization of and/or spending for certain Part A services, including inpatient hospital, skilled nursing, and home health care. The 2015 Trustees Report projected a similar short-term financial outlook and maintained the 2030 insolvency date estimate.

The 2016 Medicare Trustees Report projected a slightly worsened short-term outlook for the HI trust fund and therefore moved the insolvency date two years earlier than their 2015 estimate, to 2028. This change was primarily due to lower-than-expected payroll-tax income in 2015 and to assumptions of a slowing in real wage growth. In their 2017 report, the Medicare trustees projected a slightly improved short-term outlook for the HI trust fund and therefore moved the insolvency date one year later than their 2016 estimate, to 2029. This change was primarily due to lower-than-expected HI expenditures in 2016 (which reduced the projection base) and lower projected future utilization of inpatient hospital services.

The 2018 Medicare Trustees Report projected a worsened short-term outlook for the HI trust fund, and therefore moved the insolvency date three years earlier than their 2017 estimate, to 2026 (from 2029 in the 2017 report). This shift was primarily due to changes in estimates affecting HI revenues, including a reduction in projected income from payroll taxes due to lower-than-expected wages in 2017 and projections of slower gross domestic product growth, as well as expectations of reduced income from taxes on Social Security benefits as a result of 2017 legislation that lowered individual income taxes through 2025.

In their 2019 report, the Medicare trustees projected the same date of insolvency (2026) as in their 2018 report. However, HI income was projected to be lower than estimated in the 2018 report due to lower-than-expected payroll tax revenue and reduced income from the taxation of Social Security benefits. Additionally, although expenditures were expected to be slightly higher than the prior year's estimates because of higher-than-projected 2018 HI expenditures and higher projected updates to provider payments, these updated spending estimates were mostly offset by an expectation of lower future utilization of skilled nursing facility services.

---

[17] The high-income payroll tax was added by the ACA. See "Medicare Hospital Insurance Financing."

[18] Subsequent legislation extended the reductions for an additional nine years, through FY2030. For additional information on the Budget Control Act of 2011 (BCA; P.L. 112-25) and required Medicare spending reductions, see archived CRS Report R41965, *The Budget Control Act of 2011*, CRS Report R40425, *Medicare Primer*, and CRS Report R45106, *Medicare and Budget Sequestration*.

[19] See archived CRS Report R41196, *Medicare Provisions in the Patient Protection and Affordable Care Act (PPACA): Summary and Timeline*.

# Current Insolvency Projections

In their 2020 report,[20] the Medicare trustees project the same date of insolvency (2026) as in both their 2018 and 2019 reports. Although HI income is projected to be lower than estimated in the 2019 report due to expected lower payroll tax revenue, expenditures also are expected to be lower than last year's estimates, because of lower-than-expected 2019 HI expenditures, lower-than-expected provider payment updates, and a change in the trustees' projection methodology. Higher projected spending growth for Medicare Advantage is expected to partially offset the projected decrease in HI expenditures.

Starting in 2008, expenditures in the HI trust fund exceeded income each year through 2015. Although the Medicare trustees reported small surpluses in 2016 and 2017, the HI trust fund again experienced deficits in 2018 and 2019. (See **Table A-1**.) The trustees project that, in all future years, expenditure growth will continue to outpace growth in income and trust fund assets will be used to make up the difference between income and expenditures until the assets are depleted in 2026. (See **Figure 2**.)

**Figure 2. HI Trust Fund Assets at Beginning of Year as a Percentage of Annual Expenditures**

(estimates from selected 2009-2020 Medicare Trustees Reports)



**Sources:** Data from the Boards of Trustees, Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, *2009 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds*, Table II.E1, and Summaries of the applicable 2011 through 2020 Annual Reports of the Social Security and Medicare Boards of Trustees, Chart D (2011) and Chart E (2013, 2015-2020).

**Notes:** The 2010 estimated insolvency date was 2029. The 2012 insolvency date estimate was the same as the date projected in the 2011 report (2024), 2014 insolvency date estimate was the same as that in the 2015 report (2030), and the 2018 insolvency date was the same as projected in the 2019 and 2020 reports (2026). The 2020 projections do not reflect potential effects of the COVID-19 pandemic on the Medicare program.

---

[20] 2020 Report of the Medicare Trustees, April 22, 2020. The trustees' estimate does not reflect potential economic and healthcare impacts of the COVID-19 pandemic on the Medicare program.

Each year, beginning in 2010, the Centers for Medicare & Medicaid Services (CMS) actuaries have issued an illustrative alternative scenario that has assumed that certain ACA changes that reduce Part A provider reimbursements would be gradually phased out.[21] As the 2020 alternative scenario assumes that this phaseout would begin in 2028, after the projected 2026 HI insolvency date, this alternative analysis assumes the same 2026 date of insolvency.

## What Would Happen If the Fund Became Insolvent?

The practical function of the HI trust fund is to permit the continued payment of bills in the event of a temporary financial strain (e.g., lower income or higher costs than expected) without requiring legislative action. As long as the HI trust fund has a balance (i.e., securities are credited to the fund), the Treasury Department is authorized to make payments for Medicare Part A services. If the HI trust fund is not able to pay all current expenses out of current income and accumulated trust fund assets, the HI trust fund is considered to be *insolvent*.[22]

To date, the HI trust fund has never become insolvent. There are no provisions in the Social Security Act that govern what would happen if insolvency were to occur. For example, the program has no statutory authority to use general revenues to fund Part A services in the event of such a shortfall.

In their 2020 report, the Medicare trustees project that the HI trust fund will be exhausted in 2026. At that time, HI would continue to receive payroll tax income from which some benefits could be paid; however, funds would be sufficient to pay for only 90% of Part A expenses. Unless action is taken prior to that date to increase revenues or to decrease expenditures (or some combination of the two), Congress may face a legislative decision regarding whether, and how, to provide for another source of funding (e.g., general revenues) to make up for these deficits.

## Potential Impact of the COVID-19 Pandemic on HI Trust Fund Solvency

As noted, the 2020 Medicare Trustees Report analysis and projections did not reflect potential effects of the COVID-19 pandemic on the Medicare program, including on estimates of HI insolvency. The report noted that, "given the uncertainty associated with these impacts, the Trustees believe that it is not possible to adjust the estimates accurately at this time."[23] According to the report, in the near term, the pandemic is likely to materially affect the economic, demographic, and health care-specific assumptions on which the report's projections are based.

The impact of the COVID-19 pandemic and its economic repercussions on the solvency of the HI trust fund will depend on a variety of factors potentially affecting both revenues (primarily payroll taxes) and Medicare Part A expenditures over the next several years. As described in more detail below, the impact of the COVID-19 pandemic on HI revenues will depend largely on

---

[21] Memo from John D. Shatto and M. Kent Clemens, "Projected Medicare Expenditures under an Illustrative Scenario with Alternative Payment Updates to Medicare Providers," April 22, 2020, at https://www.cms.gov/files/document/illustrative-alternative-scenario-2020.pdf.

[22] From time to time, it is reported that Medicare is on the verge of "bankruptcy"; however, in the context of federal trust funds, this term is not meaningful. It is true that a trust fund's outgo can be greater than its income and that trust funds can have a zero balance, but, unlike private businesses, the federal government is not in danger of "going out of business" or having its assets seized by creditors. As noted, Congress has often taken actions to increase the trust fund's revenues or reduce its outgo when the Medicare HI trust fund has faced imminent insolvency.

[23] 2020 Report of the Medicare Trustees, p. 1.

changes in the level of current workers' taxable wages during this period compared with the current Medicare trustees' projections. By contrast, the effect on HI expenditures will depend on the type and quantity of Part A-covered services used by Medicare beneficiaries who become infected with COVID-19, as well as the extent to which the type and quantity of non-COVID-19-related Part A services provided during this time differ from estimates in the 2020 Trustees Report. Should revenues decrease or expenditures increase sufficiently compared to pre-COVID-19 projections, HI insolvency could occur sooner than the currently projected date of 2026. (Alternatively, lower-than-projected expenditures could delay the insolvency date.)

## Potential Impact on HI Revenues

As the HI trust fund is funded primarily through payroll taxes on current workers (calculated as a percentage of employment wages), a substantial decrease in the number of workers and/or in the wages of current workers can significantly affect HI funding levels. For example, during the 18-month recession that started in December 2007, the HI trust fund saw a sharp decline in payroll tax revenue as a result of higher unemployment and slow growth in wages. In 2008, payroll tax collections totaled $199 billion, but they fell to $191 billion in 2009 and decreased further to $182 billion in 2010; payroll tax collections did not fully recover until 2012.[24] (See **Appendix A**.)

The potential impact of the COVID-19 pandemic on HI revenues ultimately will depend on the number of workers losing employment and the level of wages in that employment, any reduction or slowing in the growth in wages of those who remain employed, and the timing and nature of an economic recovery.

## Potential Impact on HI Expenditures

Due to age and/or disability, Medicare enrollees are deemed to be at especially high risk of serious illness if they contract COVID-19; as such, any associated medical treatment of these individuals could be costly. However, a number of different factors could affect how the COVID-19 pandemic ultimately impacts total HI spending. Such factors include the number of Medicare beneficiaries who become infected with the COVID-19 virus, the number of those infected who need hospitalization and post-acute care services, the intensity of the treatment in those settings (including intensive-care-unit services), the geographic distribution of cases (which affects Medicare payment amounts),[25] the number of outlier payments for long stays,[26] and the duration and frequency of COVID-19 outbreaks.

Additional expenditures stemming from recent, and possible future, legislation also may impact HI solvency. For example, the Coronavirus Aid, Relief, and Economic Security (CARES) Act (P.L. 116-136) increased Medicare inpatient hospital payments for COVID-19 patients,[27] changed

---

[24] 2020 Report of the Medicare Trustees, p. 50.

[25] See CRS Report R40425, *Medicare Primer* for an overview of Medicare payment methods for Part A services.

[26] Section 1886(d)(5)(A) of the Social Security Act provides for payments to Medicare-participating hospitals in addition to their basic prospective payments for cases incurring extraordinarily high costs. See CMS, "Outlier Payments," at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/outlier.

[27] See CRS Report R46334, *Selected Health Provisions in Title III of the CARES Act (P.L. 116-136)*. CARES Act §3711. CBO estimates that about 2 million Medicare beneficiaries will be admitted to a hospital with a diagnosis of COVID-19 during the emergency, and about 1 million of them will be beneficiaries in traditional Medicare who are treated at hospitals paid under Medicare's inpatient prospective payment system. CBO estimates that this provision will increase Medicare spending by about $3 billion during FY2020 and FY2021. CBO Cost Estimate: *H.R. 748, CARES Act,* P.L. 116-136, April 16, 2020, p.17.

the criteria for payments to certain post-acute care providers during the public health emergency period,[28] and suspended Medicare sequestration from May through December 2020.[29] CBO estimates the changes related to inpatient and post-acute care will increase Medicare outlays by about $7 billion over five years (from FY2020 through FY2025),[30] and that the sequestration suspension will increase outlays by about $8 billion over the same period.[31] Similarly, COVID-19-related CMS regulations and Section 1135 waivers affecting coverage of Part A health care services and/or Part A provider payments also could affect HI spending.[32]

Growth in the number of Medicare-eligible individuals who lose their employment and health coverage provided through that employment and move to Medicare as their primary coverage also could increase HI costs. Medicare generally pays secondary to health coverage provided through current employment. However, if a Medicare-eligible individual leaves his or her employment (e.g., due to job loss) and enrolls in Medicare if not previously enrolled, Medicare would then pay primary for that individual.[33] Medicare would therefore incur a larger portion of the costs for such individuals' future health care services, COVID-19-related or otherwise. (By contrast, some Medicare-eligible individuals may decide to postpone retirement and thus offset some or all of the potential aforementioned increases.)

Increased COVID-19-related HI costs, however, could be offset somewhat, or entirely, by reduced non-COVID-19-related hospitalizations and post-acute care services that would have been provided in the absence of the pandemic (such as non-time sensitive procedures), as well as by premature deaths due to COVID-19. The net impact on HI spending of any reduction in non-COVID-19-related services would depend on when and whether such services were provided at a later time and the extent to which any related delays resulted in patient health complications.

# Medicare Financing Issues

Much of the concern about the financial status of Medicare tends to focus on the HI trust fund date of insolvency, when Medicare no longer has the authority to pay for Part A health care services in full. This focus can, however, detract from the larger issues confronting the Medicare program as a whole and from the program's current and future impact on the federal budget and on taxpayers. When viewed from the perspective of the entire federal budget, as the number of beneficiaries and per capita health care costs continue to grow, total Medicare spending obligations (HI and SMI spending combined) are expected to place increasing demands on federal budgetary resources.

---

[28] CARES Act §3711. The Secretary of Health and Human Services declared a public health emergency on January 31, 2020, under Section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19. The declaration was retroactively dated to January 27, 2020, and renewed on April 21. See CRS Insight IN11253, *Domestic Public Health Response to COVID-19: Current Status*.

[29] CARES Act §3709.

[30] CBO Cost Estimate*: H.R. 748, CARES Act,* P.L. 116-136*,* April 16, 2020, Table 2, at https://www.cbo.gov/publication/56334.

[31] The inpatient and post-acute care payment changes primarily affect Part A spending and therefore affect HI solvency. However, the sequestration suspension affects *all* Medicare benefit spending, not only Part A; therefore, only a portion of the estimated $8 billion cost increase would affect HI solvency.

[32] See CRS Legal Sidebar LSB10430, *Section 1135 Waivers and COVID-19: An Overview*. See also CMS, "Current Emergencies" webpage at https://www.cms.gov/About-CMS/Agency-Information/Emergency/EPRO/Current-Emergencies/Current-Emergencies-page.

[33] See CRS Report R40082, *Medicare Part B: Enrollment and Premiums*.

As noted earlier, because of the way it is financed, the SMI (Parts B and D) portion of Medicare cannot become insolvent. However, a continuing shift from providing care in inpatient (Part A) settings to outpatient (Parts B and D) settings has resulted in a greater portion of Medicare spending being covered by beneficiary premiums and general revenues than by dedicated payroll taxes.[34] In the future, the Medicare trustees estimate that the portion of personal and corporate income taxes needed to fund SMI will increase from about 15.8% in 2020 to about 22.1% in 2030 and 30.1% in 2094.[35]

---

[34] See Medicare Payment Advisory Commission, *Report to Congress: Medicare Payment Policy*, March 2020, Figure 1-11, "The HI Trust Fund Covers a Declining Share of Total Medicare Spending," p. 23, at http://medpac.gov/docs/default-source/reports/mar20_entirereport_sec.pdf.

[35] This amount is separate from and in addition to the payroll taxes used to fund the Part A (HI) portion of the program. These estimates do not take into account potential financial and healthcare utilization impacts of the COVID-19 pandemic. For an overview of the federal tax system, see CRS Report R45145, *Overview of the Federal Tax System in 2019*.

# Appendix A. Operation of the Hospital Insurance Trust Fund

Beginning in 2004, expenditures began exceeding *tax* income (from payroll taxes and from the taxation of Social Security benefits). Expenditures began to exceed *total* income (tax income plus all other sources of revenue) in 2008, and Hospital Insurance (HI) assets (the balance of the HI trust fund at the beginning of the year) were used to meet the portion of expenditures that exceeded income. Expenditures exceeded income every year from 2008 through 2015. In 2016 and 2017, the HI trust fund ran a small surplus, but in 2018 and 2019, the fund again experienced deficits. Expenditures are expected to continue to exceed income each year thereafter, with trust fund assets making up the difference, until the asset balance is depleted in 2026. At that time, the HI trust fund would no longer have sufficient funds to allow for the full payment of Part A expenditures (see **Table A-1**, below, for historical and projected Medicare financial data through 2029).

**Table A-1. Operation of the Hospital Insurance Trust Fund, Calendar Years 1970-2029**

(in billions of dollars)

| | Income | | | Expenditures | | | Trust Fund | |
|---|---|---|---|---|---|---|---|---|
| Year | Payroll Taxes | Interest, Transfers, Other[a] | Total | Benefit Payments | Admin. Expenses | Total | Net Change from Prior Year | Balance at End of Year |
| *Historical Data* | | | | | | | | |
| 1970 | $4.9 | $1.2 | $6.0 | $5.1 | $0.2 | $5.3 | $0.7 | $3.2 |
| 1975 | 11.5 | 1.4 | 13.0 | 11.3 | 0.3 | 11.6 | 1.4 | 10.5 |
| 1980 | 23.8 | 2.1 | 26.1 | 25.1 | 0.5 | 25.6 | 0.5 | 13.7 |
| 1985 | 47.6 | 3.9 | 51.4 | 47.6 | 0.8 | 48.4 | 4.8 | 20.5 |
| 1990 | 72.0 | 8.4 | 80.4 | 66.2 | 0.8 | 67.0 | 13.4 | 98.9 |
| 1995 | 98.4 | 16.7 | 115.0 | 116.4 | 1.2 | 117.6 | -2.6 | 130.3 |
| 2000 | 144.4 | 22.9 | 167.2 | 128.5 | 2.6 | 131.1 | 36.1 | 177.5 |
| 2005 | 171.4 | 28.0 | 199.4 | 180.0 | 2.9 | 182.9 | 16.4 | 285.8 |
| 2006 | 181.3 | 30.2 | 211.5 | 189.0 | 2.9 | 191.9 | 19.6 | 305.4 |
| 2007 | 191.9 | 31.9 | 223.7 | 200.2 | 2.9 | 203.1 | 20.7 | 326.0 |
| 2008 | 198.7 | 32.0 | 230.8 | 232.3 | 3.3 | 235.6 | -4.7 | 321.3 |
| 2009 | 190.9 | 34.5 | 225.4 | 239.3 | 3.2 | 242.5 | -17.1 | 304.2 |
| 2010 | 182.0 | 33.6 | 215.6 | 244.5 | 3.5 | 247.9 | -32.3 | 271.9 |
| 2011 | 195.6 | 33.4 | 228.9 | 252.9 | 3.8 | 256.7 | -27.7 | 244.2 |
| 2012 | 205.7 | 37.3 | 243.0 | 262.9 | 3.9 | 266.8 | -23.8 | 220.4 |
| 2013 | 220.8 | 30.3 | 251.1 | 261.9 | 4.3 | 266.2 | -15.0 | 205.4 |
| 2014 | 227.4 | 33.9 | 261.2 | 264.9 | 4.5 | 269.3 | -8.1 | 197.3 |
| 2015 | 241.1 | 34.3 | 275.4 | 273.4 | 5.5 | 278.9 | -3.5 | 193.8 |

| Year | Income | | | Expenditures | | | Trust Fund | |
|---|---|---|---|---|---|---|---|---|
| | Payroll Taxes | Interest, Transfers, Other[a] | Total | Benefit Payments | Admin. Expenses | Total | Net Change from Prior Year | Balance at End of Year |
| 2016 | 253.5 | 37.3 | 290.8 | 280.5 | 4.9 | 285.4 | 5.4 | 199.1 |
| 2017 | 261.5 | 37.8 | 299.4 | 293.3 | 3.2 | 296.5 | 2.8 | 202.0 |
| 2018 | 268.3 | 38.3 | 306.6 | 303.0 | 5.2 | 308.2 | −1.6 | 200.4 |
| 2019 | 285.1 | 37.4 | 322.5 | 322.8 | 5.4 | 328.3 | −5.8 | 194.6 |
| *Intermediate Estimates* | | | | | | | | |
| 2020 | 301.5 | 40.5 | 342.0 | 345.7 | 5.6 | 351.2 | −9.2 | 185.4 |
| 2021 | 313.6 | 42.3 | 356.0 | 365.8 | 5.9 | 371.7 | −15.7 | 169.7 |
| 2022 | 328.2 | 44.7 | 372.8 | 389.9 | 6.2 | 396.1 | −23.3 | 146.4 |
| 2023 | 343.1 | 47.1 | 390.0 | 415.9 | 6.6 | 422.4 | −32.4 | 114.0 |
| 2024 | 358.6 | 49.7 | 408.3 | 442.0 | 6.9 | 449.0 | −40.7 | 73.3 |
| 2025 | 374.2 | 52.8 | 427.0 | 469.6 | 7.3 | 476.9 | −49.9 | 23.4 |
| 2026 | 390.9 | 60.1 | 450.9 | 497.8 | 7.7 | 505.5 | −54.6 | −31.2 |
| 2027 | 408.2 | 67.4 | 475.6 | 527.8 | 8.2 | 536.0 | −60.3 | −91.5 |
| 2028 | 426.9 | 70.5 | 497.4 | 558.8 | 8.6 | 567.4 | −70.0 | −161.5 |
| 2029 | 445.4 | 73.3 | 518.7 | 587.3 | 9.2 | 596.5 | −77.8 | −239.3 |

**Source:** Boards of Trustees, Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, *2020 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds*, April 22, 2020, Table III.B4.

**Notes:** Sums may not equal totals due to rounding.

a. Includes income from the taxation of Social Security benefits, Railroad Retirement account transfers, premiums paid by voluntary enrollees, and interest.

# Appendix B. Historical Payroll Tax Rates

**Table B-1. Tax Rates and Maximum Tax Bases**

| | | Tax Rate (percentage of taxable earnings) | |
|---|---|---|---|
| **Calendar Year** | **Maximum Tax Base** | **Employees and Employers, Each** | **Self-Employed** |
| 1966 | $6,600 | 0.35% | 0.35% |
| 1967 | 6,600 | 0.50 | 0.50 |
| 1968-1971 | 7,800 | 0.60 | 0.60 |
| 1972 | 9,000 | 0.60 | 0.60 |
| 1973 | 10,800 | 1.00 | 1.00 |
| 1974 | 13,200 | 0.90 | 0.90 |
| 1975 | 14,100 | 0.90 | 0.90 |
| 1976 | 15,300 | 0.90 | 0.90 |
| 1977 | 16,500 | 0.90 | 0.90 |
| 1978 | 17,700 | 1.00 | 1.00 |
| 1979 | 22,900 | 1.05 | 1.05 |
| 1980 | 25,900 | 1.05 | 1.05 |
| 1981 | 29,700 | 1.30 | 1.30 |
| 1982 | 32,400 | 1.30 | 1.30 |
| 1983 | 35,700 | 1.30 | 1.30 |
| 1984 | 37,800 | 1.30 | 2.60 |
| 1985 | 39,600 | 1.35 | 2.70 |
| 1986 | 42,000 | 1.45 | 2.90 |
| 1987 | 43,800 | 1.45 | 2.90 |
| 1988 | 45,000 | 1.45 | 2.90 |
| 1989 | 48,000 | 1.45 | 2.90 |
| 1990 | 51,300 | 1.45 | 2.90 |
| 1991 | 125,000 | 1.45 | 2.90 |
| 1992 | 130,200 | 1.45 | 2.90 |
| 1993 | 135,000 | 1.45 | 2.90 |
| 1994-2012 | no limit | 1.45 | 2.90 |
| 2013 and later[a] | no limit | 1.45 | 2.90 |

**Source:** 2020 Medicare Trustees Report, Table III.B2.

a. Beginning in 2013, workers pay an additional 0.9% of their earnings above $200,000 (those who file individual tax returns) or $250,000 (those who file joint tax returns).

## Author Information

Patricia A. Davis
Specialist in Health Care Financing

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.